# McGOWAN ET AL. *v.* MARYLAND.

No. 8. Argued December 8, 1960.—Decided May 29, 1961.

*Harry Silbert* argued the cause for appellants. With him on the brief were *A. Jerome Diener* and *Sidney Schlachman.*

*John Martin Jones, Jr.,* Special Assistant Attorney General of Maryland, argued the cause for appellee. With him on the brief was *C. Ferdinand Sybert,* Attorney General.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The issues in this case concern the constitutional validity of Maryland criminal statutes,[1] commonly known as Sunday Closing Laws or Sunday Blue Laws. These statutes, with exceptions to be noted hereafter, generally proscribe all labor, business and other commercial activities on Sunday. The questions presented are whether the classifications within the statutes bring about a denial of equal protection of the law, whether the laws are so vague as to fail to give reasonable notice of the forbidden conduct and therefore violate due process, and whether the statutes are laws respecting an establishment of religion or prohibiting the free exercise thereof.

Appellants are seven employees of a large discount department store located on a highway in Anne Arundel County, Maryland. They were indicted for the Sunday sale of a three-ring loose-leaf binder, a can of floor wax, a stapler and staples, and a toy submarine in violation of Md. Ann. Code, Art. 27, § 521. Generally, this section prohibited, throughout the State, the Sunday sale of all merchandise except the retail sale of tobacco products, confectioneries, milk, bread, fruits, gasoline, oils, greases,

---

[1] These statutes, in their entirety, are found in Md. Ann. Code, 1957, Art. 27, §§ 492–534C; Art. 2B, §§ 28 (a), 90–106; Art. 66C, §§ 132 (d), 698 (d). Those sections specifically referred to hereafter may be found in an Appendix to this opinion, *post,* p. 453.

drugs and medicines, and newspapers and periodicals. Recently amended, this section also now excepts from the general prohibition the retail sale in Anne Arundel County of all foodstuffs, automobile and boating accessories, flowers, toilet goods, hospital supplies and souvenirs. It now further provides that any retail establishment in Anne Arundel County which does not employ more than one person other than the owner may operate on Sunday.

Although appellants were indicted only under § 521, in order properly to consider several of the broad constitutional contentions, we must examine the whole body of Maryland Sunday laws. Several sections of the Maryland statutes are particularly relevant to evaluation of the issues presented. Section 492 of Md. Ann. Code, Art. 27, forbids all persons from doing any work or bodily labor on Sunday and forbids permitting children or servants to work on that day or to engage in fishing, hunting and unlawful pastimes or recreations. The section excepts all works of necessity and charity. Section 522 of Md. Ann. Code, Art. 27, disallows the opening or use of any dancing saloon, opera house, bowling alley or barber shop on Sunday. However, in addition to the exceptions noted above, Md. Ann. Code, Art. 27, § 509, exempts, for Anne Arundel County, the Sunday operation of any bathing beach, bathhouse, dancing saloon and amusement park, and activities incident thereto and retail sales of merchandise customarily sold at, or incidental to, the operation of the aforesaid occupations and businesses. Section 90 of Md. Ann. Code, Art. 2B, makes generally unlawful the sale of alcoholic beverages on Sunday. However, this section, and immediately succeeding ones, provide various immunities for the Sunday sale of different kinds of alcoholic beverages, at different hours during the day, by vendors holding different types of licenses, in different political divisions of the State—particularly

in Anne Arundel County. See Md. Ann. Code, Art. 2B, § 28 (a).

The remaining statutory sections concern a myriad of exceptions for various counties, districts of counties, cities and towns throughout the State. Among the activities allowed in certain areas on Sunday are such sports as football, baseball, golf, tennis, bowling, croquet, basketball, lacrosse, soccer, hockey, swimming, softball, boating, fishing, skating, horseback riding, stock car racing and pool or billiards. Other immunized activities permitted in some regions of the State include group singing or playing of musical instruments; the exhibition of motion pictures; dancing; the operation of recreation centers, picnic grounds, swimming pools, skating rinks and miniature golf courses. The taking of oysters and the hunting or killing of game is generally forbidden, but shooting conducted by organized rod and gun clubs is permitted in one county. In some of the subdivisions within the State, the exempted Sunday activities are sanctioned throughout the day; in others, they may not commence until early afternoon or evening; in many, the activities may only be conducted during the afternoon and late in the evening. Certain localities do not permit the allowed Sunday activity to be carried on within one hundred yards of any church where religious services are being held. Local ordinances and regulations concerning certain limited activities supplement the State's statutory scheme. In Anne Arundel County, for example, slot machines, pinball machines and bingo may be played on Sunday.

Among other things, appellants contended at the trial that the Maryland statutes under which they were charged were contrary to the Fourteenth Amendment for the reasons stated at the outset of this opinion. Appellants were convicted and each was fined five dollars and costs. The Maryland Court of Appeals affirmed, 220

Md. 117, 151 A. 2d 156; on appeal brought under 28 U. S. C. § 1257 (2), we noted probable jurisdiction. 362 U. S. 959.

## I.

Appellants argue that the Maryland statutes violate the "Equal Protection" Clause of the Fourteenth Amendment on several counts. First, they contend that the classifications contained in the statutes concerning which commodities may or may not be sold on Sunday are without rational and substantial relation to the object of the legislation.[2] Specifically, appellants allege that the statutory exemptions for the Sunday sale of the merchandise mentioned above render arbitrary the statute under which they were convicted. Appellants further allege that § 521 is capricious because of the exemptions for the operation of the various amusements that have been listed and because slot machines, pin-ball machines, and bingo are legalized and are freely played on Sunday.

The standards under which this proposition is to be evaluated have been set forth many times by this Court. Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws

---

[2] Companion arguments made by appellants are that the exceptions to the Sunday sale's prohibition so undermine the alleged purpose of Sunday as a day of rest as to bear no rational relationship to it and thereby render the statutes violative of due process; that the distinctions drawn by the statutes are so unreasonable as to violate due process.

result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. See *Kotch* v. *Board of River Port Pilot Comm'rs,* 330 U. S. 552; *Metropolitan Casualty Ins. Co.* v. *Brownell,* 294 U. S. 580; *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61; *Atchison, T. & S. F. R. Co.* v. *Matthews,* 174 U. S. 96.[3]

It would seem that a legislature could reasonably find that the Sunday sale of the exempted commodities was necessary either for the health of the populace or for the enhancement of the recreational atmosphere of the day—that a family which takes a Sunday ride into the country will need gasoline for the automobile and may find pleasant a soft drink or fresh fruit; that those who go to the beach may wish ice cream or some other item normally sold there; that some people will prefer alcoholic beverages or games of chance to add to their relaxation; that newspapers and drug products should always be available to the public.

The record is barren of any indication that this apparently reasonable basis does not exist, that the statutory distinctions are invidious, that local tradition and custom might not rationally call for this legislative treatment. See *Salsburg* v. *Maryland,* 346 U. S. 545, 552–553; *Kotch*

---

[3] More recently we declared:

"The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. *Tigner* v. *Texas,* 310 U. S. 141. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. *Semler* v. *Dental Examiners,* 294 U. S. 608. The legislature may select one phase of one field and apply a remedy there, neglecting the others. *A. F. of L.* v. *American Sash Co.,* 335 U. S. 538. The prohibition of the Equal Protection Clause goes no further than the *invidious discrimination." Williamson* v. *Lee Optical,* 348 U. S. 483, 489. (Emphasis added.)

v. *Board of River Port Pilot Comm'rs, supra.* Likewise, the fact that these exemptions exist and deny some vendors and operators the day of rest and recreation contemplated by the legislature does not render the statutes violative of equal protection since there would appear to be many valid reasons for these exemptions, as stated above, and no evidence to dispel them.

Secondly, appellants contend that the statutory arrangement which permits only certain Anne Arundel County retailers to sell merchandise essential to, or customarily sold at, or incidental to, the operation of bathing beaches, amusement parks et cetera is contrary to the "Equal Protection" Clause because it discriminates unreasonably against retailers in other Maryland counties. But we have held that the Equal Protection Clause relates to equality between persons as such, rather than between areas and that territorial uniformity is not a constitutional prerequisite. With particular reference to the State of Maryland, we have noted that the prescription of different substantive offenses in different counties is generally a matter for legislative discretion. We find no invidious discrimination here. See *Salsburg* v. *Maryland, supra.*

Thirdly, appellants contend that this same statutory provision, Art. 27, § 509, violates the "Equal Protection" Clause because it permits only certain merchants within Anne Arundel County (operators of bathing beaches and amusement parks et cetera) to sell merchandise customarily sold at these places while forbidding its sale by other vendors of this merchandise, such as appellants' employer.[4] Here again, it would seem that a legislature

---

[4] Whether § 509 is to be read this way or is to be read to permit the sale of such merchandise by all vendors in Anne Arundel County is unclear. The Maryland Court of Appeals found it unnecessary to reach this question of state law. For purposes of this argument, we accept the construction of § 509 set forth by appellants.

could reasonably find that these commodities, necessary for the health and recreation of its citizens, should only be sold on Sunday by those vendors at the locations where the commodities are most likely to be immediately put to use. Such a determination would seem to serve the consuming public and at the same time secure Sunday rest for those employees, like appellants, of all other retail establishments. In addition, the enforcement problems which would accrue if large retail establishments, like appellants' employer, were permitted to remain open on Sunday but were restricted to the sale of the merchandise in question would be far greater than the problems accruing if only beach and amusement park vendors were exempted. Here again, there has been no indication of the unreasonableness of this differentiation. On the record before us, we cannot say that these statutes do not provide equal protection of the laws.

## II.

Another question presented by appellants is whether Art. 27, § 509, which exempts the Sunday retail sale of "merchandise essential to, or customarily sold at, or incidental to, the operation of" bathing beaches, amusement parks et cetera in Anne Arundel County, is unconstitutionally vague. We believe that business people of ordinary intelligence in the position of appellants' employer would be able to know what exceptions are encompassed by the statute either as a matter of ordinary commercial knowledge or by simply making a reasonable investigation at a nearby bathing beach or amusement park within the county. See *United States* v. *Harriss*, 347 U. S. 612, 617–618. Under these circumstances, there is no necessity to guess at the statute's meaning in order to determine what conduct it makes criminal. *Connally* v. *General Construction Co.*, 269 U. S. 385, 391. Questions concerning proof that the items appellants sold were customarily

sold at, or incidental to the operation of, a bathing beach or amusement park were not raised in the Maryland Court of Appeals, nor are they raised here. Thus, we cannot consider the matter. *Whitney* v. *California,* 274 U. S. 357, 362–363.

## III.

The final questions for decision are whether the Maryland Sunday Closing Laws conflict with the Federal Constitution's provisions for religious liberty. First, appellants contend here that the statutes applicable to Anne Arundel County violate the constitutional guarantee of freedom of religion in that the statutes' effect is to prohibit the free exercise of religion in contravention of the First Amendment, made applicable to the States by the Fourteenth Amendment.[5] But appellants allege only economic injury to themselves; they do not allege any infringement of their own religious freedoms due to Sunday closing. In fact, the record is silent as to what appellants' religious beliefs are. Since the general rule is that "a litigant may only assert his own constitutional rights or immunities," *United States* v. *Raines,* 362 U. S. 17, 22, we hold that appellants have no standing to raise this contention.[6] *Tileston* v. *Ullman,* 318 U. S. 44, 46. Furthermore, since appellants do not specifically allege that the statutes infringe upon the religious beliefs of the department store's present or prospective patrons, we

---

[5] *Cantwell* v. *Connecticut,* 310 U. S. 296, 303; *Murdock* v. *Pennsylvania,* 319 U. S. 105, 108; *West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624, 639; *Everson* v. *Board of Education,* 330 U. S. 1, 5; *McCollum* v. *Board of Education,* 333 U. S. 203, 210.

[6] MR. JUSTICE BLACK is of the opinion that appellants do have standing to raise this contention. He believes that their claim is without merit for the reasons expressed in *Braunfeld* v. *Brown, post,* p. 599, at pp. 602–610, and *Gallagher* v. *Crown Kosher Super Market, post,* p. 617, at pp. 630–631.

have no occasion here to consider the standing question of *Pierce* v. *Society of Sisters*, 268 U. S. 510, 535–536. Those persons whose religious rights are allegedly impaired by the statutes are not without effective ways to assert these rights. Cf. *N. A. A. C. P.* v. *Alabama*, 357 U. S. 449, 459–460; *Barrows* v. *Jackson*, 346 U. S. 249, 257. Appellants present no weighty countervailing policies here to cause an exception to our general principles. See *United States* v. *Raines, supra.*

Secondly, appellants contend that the statutes violate the guarantee of separation of church and state in that the statutes are laws respecting an establishment of religion contrary to the First Amendment, made applicable to the States by the Fourteenth Amendment. If the purpose of the "establishment" clause was only to insure protection for the "free exercise" of religion, then what we have said above concerning appellants' standing to raise the "free exercise" contention would appear to be true here. However, the writings of Madison, who was the First Amendment's architect, demonstrate that the establishment of a religion was equally feared because of its tendencies to political tyranny and subversion of civil authority.[7] Thus, in *Everson* v. *Board of Education, supra,* the Court permitted a district taxpayer to challenge, on "establishment" grounds, a state statute which authorized district boards of education to reimburse parents for fares paid for the transportation of their children to both public and Catholic schools. Appellants here concededly have suffered direct economic injury, allegedly due to the imposition on them of the tenets of the Christian religion.[8] We find that, in these circum-

---

[7] Madison's Memorial and Remonstrance Against Religious Assessments, Par. 8, reprinted in the Appendix to Mr. Justice Rutledge's dissenting opinion in *Everson* v. *Board of Education, supra,* at p. 68.

[8] Cf. *Doremus* v. *Board of Education*, 342 U. S. 429, where complainants failed to show direct and particular economic detriment.

stances, these appellants have standing to complain that the statutes are laws respecting an establishment of religion.

The essence of appellants' "establishment" argument is that Sunday is the Sabbath day of the predominant Christian sects; that the purpose of the enforced stoppage of labor on that day is to facilitate and encourage church attendance; that the purpose of setting Sunday as a day of universal rest is to induce people with no religion or people with marginal religious beliefs to join the predominant Christian sects; that the purpose of the atmosphere of tranquility created by Sunday closing is to aid the conduct of church services and religious observance of the sacred day. In substantiating their "establishment" argument, appellants rely on the wording of the present Maryland statutes, on earlier versions of the current Sunday laws and on prior judicial characterizations of these laws by the Maryland Court of Appeals. Although only the constitutionality of § 521, the section under which appellants have been convicted, is immediately before us in this litigation, inquiry into the history of Sunday Closing Laws in our country, in addition to an examination of the Maryland Sunday closing statutes in their entirety and of their history, is relevant to the decision of whether the Maryland Sunday law in question is one respecting an establishment of religion. There is no dispute that the original laws which dealt with Sunday labor were motivated by religious forces. But what we must decide is whether present Sunday legislation, having undergone extensive changes from the earliest forms, still retains its religious character.

Sunday Closing Laws go far back into American history, having been brought to the colonies with a background of English legislation dating to the thirteenth century. In 1237, Henry III forbade the frequenting of markets on

Sunday; the Sunday showing of wools at the staple was banned by Edward III in 1354; in 1409, Henry IV prohibited the playing of unlawful games on Sunday; Henry VI proscribed Sunday fairs in churchyards in 1444 and, four years later, made unlawful all fairs and markets and all showings of any goods or merchandise; Edward VI disallowed Sunday bodily labor by several injunctions in the mid-sixteenth century; various Sunday sports and amusements were restricted in 1625 by Charles I. Lewis, A Critical History of Sunday Legislation, 82–108; Johnson and Yost, Separation of Church and State, 221. The law of the colonies to the time of the Revolution and the basis of the Sunday laws in the States was 29 Charles II, c. 7 (1677). It provided, in part:

> "For the better observation and keeping holy the Lord's day, commonly called Sunday: be it enacted . . . that all the laws enacted and in force concerning the observation of the day, *and repairing to the church thereon,* be carefully put in execution; and that all and every person and persons whatsoever shall upon every Lord's day apply themselves to the observation of the same, by exercising themselves thereon in the duties of piety and true religion, publicly and privately; and that no tradesman, artificer, workman, laborer, or other person whatsoever, *shall do or exercise any worldly labor or business or work* of their ordinary callings upon the Lord's day, or any part thereof (works of necessity and charity only excepted); . . . and that no person or persons whatsoever shall publicly cry, show forth, or expose for sale any wares, merchandise, fruit, herbs, goods, or chattels, whatsoever, upon the Lord's day, or any part thereof. . . ." (Emphasis added.) [9]

---

[9] English statutes subsequent to this are cited and discussed in Lewis, *op. cit., supra,* pp. 111–142.

Observation of the above language, and of that of the prior mandates, reveals clearly that the English Sunday legislation was in aid of the established church.

The American colonial Sunday restrictions arose soon after settlement. Starting in 1650, the Plymouth Colony proscribed servile work, unnecessary travelling, sports, and the sale of alcoholic beverages on the Lord's day and enacted laws concerning church attendance. The Massachusetts Bay Colony and the Connecticut and New Haven Colonies enacted similar prohibitions, some even earlier in the seventeenth century. The religious orientation of the colonial statutes was equally apparent. For example, a 1629 Massachusetts Bay instruction began, "And to the end the Sabbath may be celebrated in a religious manner. . . ." A 1653 enactment spoke of Sunday activities "which things tend much to the dishonor of God, the reproach of religion, and the profanation of his holy Sabbath, the sanctification whereof is sometimes put for all duties immediately respecting the service of God. . . ." Lewis, *op. cit., supra,* at pp. 160–195, particularly at 167, 169.[10] These laws persevered after the Revolution and, at about the time of the First Amendment's adoption, each of the colonies had laws of some sort restricting Sunday labor. See note, 73 Harv. L. Rev. 729–730, 739–740; Johnson and Yost, *op. cit., supra,* at pp. 222–223.

But, despite the strongly religious origin of these laws, beginning before the eighteenth century, nonreligious

---

[10] A 1695 New York Sunday law provided:

"Whereas, the true and sincere worship of God according to his holy will and commandments, is often profaned and neglected by many of the inhabitants and sojourners in this province, who do not keep holy the Lord's day, but in a disorderly manner accustom themselves to travel, laboring, working, shooting, fishing, sporting, playing, horse-racing, frequenting of tippling houses and the using many other unlawful exercises and pastimes, upon the Lord's day, to the great scandal of the holy Christian faith, be it enacted, etc." *Id.,* at 200–201.

arguments for Sunday closing began to be heard more distinctly and the statutes began to lose some of their totally religious flavor. In the middle 1700's, Blackstone wrote, "[T]he keeping one day in the seven holy, as a time of relaxation and refreshment as well as for public worship, is of admirable service to a state considered merely as a civil institution. It humanizes, by the help of conversation and society, the manners of the lower classes; which would otherwise degenerate into a sordid ferocity and savage selfishness of spirit; it enables the industrious workman to pursue his occupation in the ensuing week with health and cheerfulness." 4 Bl. Comm. 63. A 1788 English statute dealing with chimney sweeps, 28 Geo. III, c. 48, in addition to providing for their Sunday religious affairs, also regulated their hours of work. The preamble to a 1679 Rhode Island enactment stated that the reason for the ban on Sunday employment was that "persons being evill minded, have presumed to employ in servile labor, more than necessity requireth, their servants. . . ." 3 Records of the Colony of Rhode Island and Providence Plantations 31. The New York law of 1788 omitted the term "Lord's day" and substituted "the first day of the week commonly called Sunday." 2 Laws of N. Y. 1785–1788, 680. Similar changes marked the Maryland statutes, discussed below. With the advent of the First Amendment, the colonial provisions requiring church attendance were soon repealed. Note, 73 Harv. L. Rev., *supra*, at pp. 729–730.

More recently, further secular justifications have been advanced for making Sunday a day of rest, a day when people may recover from the labors of the week just passed and may physically and mentally prepare for the week's work to come. In England, during the First World War, a committee investigating the health conditions of munitions workers reported that "if the maximum output is to be secured and maintained for any length of

time, a weekly period of rest must be allowed. . . . On economic and social grounds alike this weekly period of rest is best provided on Sunday." [11]

The proponents of Sunday closing legislation are no longer exclusively representatives of religious interests. Recent New Jersey Sunday legislation was supported by labor groups and trade associations, Note, 73 Harv. L. Rev. 730–731; modern English Sunday legislation was promoted by the National Federation of Grocers and supported by the National Chamber of Trade, the Drapers' Chamber of Trade, and the National Union of Shop Assistants. 308 Parliamentary Debates, Commons 2158–2159.

Throughout the years, state legislatures have modified, deleted from and added to their Sunday statutes. As evidenced by the New Jersey laws mentioned above, current changes are commonplace. Almost every State in our country presently has some type of Sunday regulation and over forty possess a relatively comprehensive system. Note, 73 Harv. L. Rev. 732–733; Note, 12 Rutgers L. Rev. 506. Some of our States now enforce their Sunday legislation through Departments of Labor, e. g., 6 S. C. Code Ann. (1952), § 64–5. Thus have Sunday laws evolved from the wholly religious sanctions that originally were enacted.

Moreover, litigation over Sunday closing laws is not novel. Scores of cases may be found in the state appellate courts relating to sundry phases of Sunday enactments.[12] Religious objections have been raised there on numerous occasions but sustained only once, in *Ex parte Newman*, 9 Cal. 502 (1858); and that decision was overruled three years later, in *Ex parte Andrews*, 18 Cal. 678. A substantial number of cases in varying postures bearing

---

[11] Ministry of Munitions, Health of Munition Workers Committee, Report on Sunday Labour, Memorandum No. 1 (1915), 5.

[12] See cases collected at 50 Am. Jur. 802 *et seq.;* 24 A. L. R. 2d 813 *et seq.;* 57 A. L. R. 2d 975 *et seq.*

on state Sunday legislation have reached this Court.[13] Although none raising the issues now presented have gained plenary hearing, language used in some of these cases further evidences the evolution of Sunday laws as temporal statutes. Mr. Justice Field wrote in *Soon Hing* v. *Crowley,* 113 U. S. 703, at p. 710:

> "Laws setting aside Sunday as a day of rest are upheld, not from any right of the government to legislate for the promotion of religious observances, but from its right to protect all persons from the physical and moral debasement which comes from uninterrupted labor. Such laws have always been deemed beneficent and merciful laws, especially to the poor and dependent, to the laborers in our factories and workshops and in the heated rooms of our cities; and their validity has been sustained by the highest courts of the States."

While a member of the California Supreme Court, Mr. Justice Field dissented in *Ex parte Newman, supra,* at pp. 519–520, 528, saying:

> "Its requirement is a cessation from labor. In its enactment, the Legislature has given the sanction of law to a rule of conduct, which the entire civilized world recognizes as essential to the physical and moral well-being of society. Upon no subject is there such a concurrence of opinion, among philosophers, moralists and statesmen of all nations, as on the necessity of periodical cessations from labor. One

---

[13] See *Soon Hing* v. *Crowley,* 113 U. S. 703; *Hennington* v. *Georgia,* 163 U. S. 299; *Petit* v. *Minnesota,* 177 U. S. 164; *Friedman* v. *New York,* 341 U. S. 907; *McGee* v. *North Carolina,* 346 U. S. 802; *Gundaker Central Motors, Inc.,* v. *Gassert,* 354 U. S. 933; *Grochowiak* v. *Pennsylvania,* 358 U. S. 47; *Ullner* v. *Ohio,* 358 U. S. 131; *Kidd* v. *Ohio,* 358 U. S. 132.

day in seven is the rule, founded in experience, and sustained by science. . . . The prohibition of secular business on Sunday is advocated on the ground that by it the general welfare is advanced, labor protected, and the moral and physical well-being of society promoted."

This was quoted with approval by Mr. Justice Harlan in *Hennington* v. *Georgia, supra,* who also stated:

"It is none the less a civil regulation because the day on which the running of freight trains is prohibited is kept by many under a sense of religious duty. The legislature having, as will not be disputed, power to enact laws to promote the order and to secure the comfort, happiness and health of the people, it was within its discretion to fix the day when all labor, within the limits of the State, works of necessity and charity excepted, should cease." *Id.,* at 304.

And Mr. Chief Justice Fuller cited both of these passages in *Petit* v. *Minnesota, supra.*

Before turning to the Maryland legislation now here under attack, an investigation of what historical position Sunday Closing Laws have occupied with reference to the First Amendment should be undertaken, *Everson* v. *Board of Education, supra,* at p. 14.

This Court has considered the happenings surrounding the Virginia General Assembly's enactment of "An act for establishing religious freedom," 12 Hening's Statutes of Virginia 84, written by Thomas Jefferson and sponsored by James Madison, as best reflecting the long and intensive struggle for religious freedom in America, as particularly relevant in the search for the First Amendment's meaning. See the opinions in *Everson* v. *Board of Education, supra.* In 1776, nine years before the bill's

438

passage, Madison co-authored Virginia's Declaration of Rights which provided, *inter alia,* that "all men are equally entitled to the free exercise of religion, according to the dictates of conscience. . . ." 9 Hening's Statutes of Virginia 109, 111–112. Virginia had had Sunday legislation since early in the seventeenth century; in 1776, the laws penalizing "maintaining any opinions in matters of religion, *forbearing to repair to church,* or the exercising any mode of worship whatsoever" (emphasis added), were repealed, and all dissenters were freed from the taxes levied for the support of the established church. *Id.,* at 164. The Sunday labor prohibitions remained; apparently, they were not believed to be inconsistent with the newly enacted Declaration of Rights. Madison had sought also to have the Declaration expressly condemn the existing Virginia establishment.[14] This hope was finally realized when "A Bill for Establishing Religious Freedom" was passed in 1785. In this same year, Madison presented to Virginia legislators "A Bill for Punishing . . . Sabbath Breakers" which provided, in part:

> "If any person on Sunday shall himself be found labouring at his own or any other trade or calling, or shall employ his apprentices, servants or slaves in labour, or other business, except it be in the ordinary houshold offices of daily necessity, or other work of necessity or charity, he shall forfeit the sum of ten shillings for every such offence, deeming every apprentice, servant, or slave so employed, and every day he shall be so employed as constituting a distinct offence." [15]

This became law the following year and remained during the time that Madison fought for the First Amendment in the Congress. It was the law of Virginia, and similar

---

[14] Brant, James Madison, The Virginia Revolutionist, 245–246.

[15] 2 The Papers of Thomas Jefferson 555.

laws were in force in other States, when Madison stated at the Virginia ratification convention:

> "Happily for the states, they enjoy the utmost freedom of religion. . . . Fortunately for this commonwealth, a majority of the people are decidedly against any exclusive establishment. I believe it to be so in the other states. . . . I can appeal to my uniform conduct on this subject, that I have warmly supported religious freedom." [16]

In 1799, Virginia pronounced "An act for establishing religious freedom" as "a true exposition of the principles of the bill of rights and constitution," and repealed all subsequently enacted legislation deemed inconsistent with it. 2 Shepherd, Statutes at Large of Virginia, 149. Virginia's statute banning Sunday labor stood.[17]

In *Reynolds* v. *United States,* 98 U. S. 145, the Court relied heavily on the history of the Virginia bill. That case concerned a Mormon's attack on a statute making bigamy a crime. The Court said:

> "In connection with the case we are now considering, it is a significant fact that on the 8th of December, 1788, after the passage of the act establishing religious freedom, and after the convention of Virginia had recommended as an amendment to the Constitution of the United States the declaration in a bill of rights that 'all men have an equal, natural, and unalienable right to the free exercise of religion, according to the dictates of conscience,' the legislature

---

[16] 3 Elliot's Debates (2d ed. 1836) 330.

[17] In *Judefind* v. *State,* 78 Md. 510, 515, 28 A. 405, 407 (1894), the Maryland Court of Appeals stated, "Article thirty-six of our Declaration of Rights guarantees religious liberty; but the members of the distinguished body that adopted that Constitution never supposed they were giving a death blow to Sunday laws by inserting that Article."

of that State substantially enacted the statute of James I., death penalty included, because, as recited in the preamble, 'it hath been doubted whether bigamy or poligamy be punishable by the laws of this Commonwealth.' 12 Hening's Stat. 691. From that day to this we think it may safely be said there never has been a time in any State of the Union when polygamy has not been an offence against society, cognizable by the civil courts and punishable with more or less severity. In the face of all of this evidence, it is impossible to believe that the constitutional guaranty of religious freedom was intended to prohibit legislation in respect to this most important feature of social life." *Id.*, at 165.

In the case at bar, we find the place of Sunday Closing Laws in the First Amendment's history both enlightening and persuasive.

But in order to dispose of the case before us, we must consider the standards by which the Maryland statutes are to be measured. Here, a brief review of the First Amendment's background proves helpful. The First Amendment states that "Congress shall make no law respecting an establishment of religion. . . ." U. S. Const., Amend. I. The Amendment was proposed by James Madison on June 8, 1789, in the House of Representatives. It then read, in part:

"The civil rights of none shall be abridged on account of religious belief or worship, *nor shall any national religion be established,* nor shall the full and equal rights of conscience be in any manner, or on any pretext, infringed." (Emphasis added.) I Annals of Congress 434.

We are told that Madison added the word "national" to meet the scruples of States which then had an established church. 1 Stokes, Church and State in the United

States, 541. After being referred to committee, it was considered by the House, on August 15, 1789, acting as a Committee of the Whole. Some assistance in determining the scope of the Amendment's proscription of establishment may be found in that debate.

In its report to the House, the committee, to which the subject of amendments to the Constitution had been submitted, recommended the insertion of the language, "no religion shall be established by law." I Annals of Congress 729. Mr. Gerry "said it would read better if it was, that no religious doctrine shall be established by law." *Id.*, at 730. Mr. Madison "said, he apprehended the meaning of the words to be, that Congress should not establish a religion, and enforce the legal observation of it by law, nor compel men to worship God in any manner contrary to their conscience. . . . He believed that the people feared one sect might obtain a pre-eminence, or two combine together, and establish a religion to which they would compel others to conform." *Id.*, at 730–731.

The Amendment, as it passed the House of Representatives nine days later, read, in part:

> "Congress shall make no law establishing religion. . . ." Records of the United States Senate, 1A–C2 (U. S. Nat. Archives).

It passed the Senate on September 9, 1789, reading, in part:

> "Congress shall make no law establishing articles of faith, or a mode of worship. . . ." *Ibid.*

An early commentator opined that the "real object of the amendment was . . . to prevent any national ecclesiastical establishment, which should give to an hierarchy the exclusive patronage of the national government." 3 Story, Commentaries on the Constitution of the United States, 728. But, the First Amendment, in its final form,

did not simply bar a congressional enactment *establishing a church;* it forbade all laws *respecting an establishment of religion.* Thus, this Court has given the Amendment a "broad interpretation . . . in the light of its history and the evils it was designed forever to suppress. . . ." *Everson* v. *Board of Education, supra,* at pp. 14–15. It has found that the First and Fourteenth Amendments afford protection against religious establishment far more extensive than merely to forbid a national or state church. Thus, in *McCollum* v. *Board of Education,* 333 U. S. 203, the Court held that the action of a board of education, permitting religious instruction during school hours in public school buildings and requiring those children who chose not to attend to remain in their classrooms, to be contrary to the "Establishment" Clause.

However, it is equally true that the "Establishment" Clause does not ban federal or state regulation of conduct whose reason or effect merely happens to coincide or harmonize with the tenets of some or all religions. In many instances, the Congress or state legislatures conclude that the general welfare of society, wholly apart from any religious considerations, demands such regulation. Thus, for temporal purposes, murder is illegal. And the fact that this agrees with the dictates of the Judaeo–Christian religions while it may disagree with others does not invalidate the regulation. So too with the questions of adultery and polygamy. *Davis* v. *Beason,* 133 U. S. 333; *Reynolds* v. *United States, supra.* The same could be said of theft, fraud, etc., because those offenses were also proscribed in the Decalogue.

Thus, these broad principles have been set forth by this Court. Those cases dealing with the specific problems arising under the "Establishment" Clause which have reached this Court are few in number. The most extensive discussion of the "Establishment" Clause's latitude

is to be found in *Everson* v. *Board of Education, supra,* at pp. 15–16:

> "The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa.* In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between church and State.' "

Under challenge was a statute authorizing repayment to parents of their children's transportation expenses to public and Catholic schools. The Court, speaking through MR. JUSTICE BLACK, recognized that "it is undoubtedly true that children are helped to get to church schools," and "[t]here is even a possibility that some of the children might not be sent to the church schools if the parents were compelled to pay their children's bus fares out of their own pockets when transportation to a public school would have been paid for by the State." *Id.,* at 17. But the Court found that the purpose and effect of the statute in question was general "public welfare leg-

islation," *id.*, at 16; that it was to protect all school children from the "very real hazards of traffic," *id.*, at 17; that the expenditure of public funds for school transportation, to religious schools or to any others, was like the expenditure of public funds to provide policemen to safeguard these same children or to provide "such general government services as ordinary police and fire protection, connections for sewage disposal, public highways and sidewalks," *id.*, at 17–18.[18]

In light of the evolution of our Sunday Closing Laws through the centuries, and of their more or less recent emphasis upon secular considerations, it is not difficult to discern that as presently written and administered, most of them, at least, are of a secular rather than of a religious character, and that presently they bear no relationship to establishment of religion as those words are used in the Constitution of the United States.

Throughout this century and longer, both the federal and state governments have oriented their activities very largely toward improvement of the health, safety, recreation and general well-being of our citizens. Nu-

---

[18] Mr. Justice Rutledge, joined by MR. JUSTICE FRANKFURTER, Mr. Justice Jackson and Mr. Justice Burton, filed a lengthy dissenting opinion in which the First Amendment's history was studied in detail. He defined the "establishment" problem as follows:

"Compulsory attendance upon religious exercises went out early in the process of separating church and state, together with forced observance of religious forms and ceremonies. Test oaths and religious qualification for office followed later. These things none devoted to our great tradition of religious liberty would think of bringing back. *Hence today, apart from efforts to inject religious training or exercises and sectarian issues into the public schools, the only serious surviving threat to maintaining that complete and permanent separation of religion and civil power which the First Amendment commands is through use of the taxing power to support religion, religious establishments, or establishments having a religious foundation whatever their form or special religious function.*" *Id.*, at 44. (Emphasis added.)

merous laws affecting public health, safety factors in industry, laws affecting hours and conditions of labor of women and children, week-end diversion at parks and beaches, and cultural activities of various kinds, now point the way toward the good life for all. Sunday Closing Laws, like those before us, have become part and parcel of this great governmental concern wholly apart from their original purposes or connotations. The present purpose and effect of most of them is to provide a uniform day of rest for all citizens; the fact that this day is Sunday, a day of particular significance for the dominant Christian sects, does not bar the State from achieving its secular goals. To say that the States cannot prescribe Sunday as a day of rest for these purposes solely because centuries ago such laws had their genesis in religion would give a constitutional interpretation of hostility to the public welfare rather than one of mere separation of church and State.

We now reach the Maryland statutes under review. The title of the major series of sections of the Maryland Code dealing with Sunday closing—Art. 27, §§ 492–534C— is "Sabbath Breaking"; § 492 proscribes work or bodily labor on the "Lord's day," and forbids persons to "profane the Lord's day" by gaming, fishing et cetera; § 522 refers to Sunday as the "Sabbath day." As has been mentioned above, many of the exempted Sunday activities in the various localities of the State may only be conducted during the afternoon and late evening; most Christian church services, of course, are held on Sunday morning and early Sunday evening. Finally, as previously noted, certain localities do not permit the allowed Sunday activities to be carried on within one hundred yards of any church where religious services are being held. This is the totality of the evidence of religious purpose which may be gleaned from the face of the present statute and from its operative effect.

The predecessors of the existing Maryland Sunday laws are undeniably religious in origin. The first Maryland statute dealing with Sunday activities, enacted in 1649, was entitled "An Act concerning Religion." 1 Archives of Maryland 244–247. It made it criminal to "profane the Sabbath or Lords day called Sunday by frequent swearing, drunkennes or by any uncivill or disorderly recreation, or by working on that day when absolute necessity doth not require it." *Id.*, at 245. A 1692 statute entitled "An Act for the Service of Almighty God and the Establishment of the Protestant Religion within this Province," 13 Archives of Maryland 425–430, after first stating the importance of keeping the Lord's Day holy and sanctified and expressing concern with the breach of its observance throughout the State, then enacted a Sunday labor prohibition which was the obvious precursor of the present § 492.[19] There was a re-enactment in 1696 entitled "An Act for Sanctifying & keeping holy the Lord's Day Commonly called Sunday." 19 Archives of Maryland 418–420. By 1723, the Sabbath-breaking section of the statute assumed the present form of § 492, omitting the specific prohibition against Sunday swearing and the patently religiously motivated title. Bacon, Laws of Maryland (1723), c. XVI.

There are judicial statements in early Maryland decisions which tend to support appellants' position. In an 1834 case involving a contract calling for delivery on Sun-

---

[19] "[N]o Person or Persons within this Province shall work or do any bodily Labour or Occupation upon any Lords Day commonly called Sunday, nor shall command or wilfully suffer or permitt any of his or their children Servants or Slaves to work or labour as aforesaid (the absolute works of necessity and mercy allways Excepted) Nor shall suffer or permitt any of his her or their Children Servants or Slaves or any other under their Authority to abuse or Prophane the Lords Day by drunkenness, Swearing Gaming, fowling fishing, hunting or any other Sports Pastimes or Recreations whatsoever." *Id.*, at 426.

day, the Maryland Court of Appeals remarked that "Ours is a christian community, and a day set apart as the day of rest, is the day consecrated by the resurrection of our Saviour, and embraces the twenty-four hours next ensuing the midnight of Saturday." *Kilgour* v. *Miles*, 6 Gill and Johnson 268, 274. This language was cited with approval in *Judefind* v. *State*, 78 Md. 510, 514, 28 A. 405, 406 (1894). It was also stated there:

> "It is undoubtedly true that rest from secular employment on Sunday does have a tendency to foster and encourage the Christian religion—of all sects and denominations that observe that day—as rest from work and ordinary occupation enables many to engage in public worship who probably would not otherwise do so. But it would scarcely be asked of a Court, in what professes to be a Christian land, to declare a law unconstitutional because it requires rest from bodily labor on Sunday, (except works of necessity and charity,) and *thereby* promotes the cause of Christianity. If the Christian religion is, incidentially or otherwise, benefited or fostered by having this day of rest, as it undoubtedly is, there is all the more reason for the enforcement of laws that help to preserve it. Whilst Courts have generally sustained Sunday laws as 'civil regulations,' their decisions will have no less weight if they are shown to be in accordance with divine law as well as human." *Id.*, at 515–516, 28 A., at 407.

But it should be noted that, throughout the *Judefind* decision, the Maryland court specifically rejected the contention that the laws interfered with religious liberty and stated that the laws' purpose was to provide the "advantages of having a weekly day of rest, 'from a mere physical and political standpoint.' " *Id.*, at 513, 28 A., at 406.

Considering the language and operative effect of the current statutes, we no longer find the blanket prohibition

against Sunday work or bodily labor. To the contrary, we find that § 521 of Art. 27, the section which appellants violated, permits the Sunday sale of tobaccos and sweets and a long list of sundry articles which we have enumerated above; we find that § 509 of Art. 27 permits the Sunday operation of bathing beaches, amusement parks and similar facilities; we find that Art. 2B, § 28, permits the Sunday sale of alcoholic beverages, products strictly forbidden by predecessor statutes; we are told that Anne Arundel County allows Sunday bingo and the Sunday playing of pinball machines and slot machines, activities generally condemned by prior Maryland Sunday legislation.[20] Certainly, these are not works of charity or necessity. Section 521's current stipulation that shops with only one employee may remain open on Sunday does not coincide with a religious purpose. These provisions, along with those which permit various sports and entertainments on Sunday, seem clearly to be fashioned for the purpose of providing a Sunday atmosphere of recreation, cheerfulness, repose and enjoyment. Coupled with the general proscription against other types of work, we believe that the air of the day is one of relaxation rather than one of religion.

The existing Maryland Sunday laws are not simply verbatim re-enactments of their religiously oriented antecedents. Only § 492 retains the appellation of "Lord's day" and even that section no longer makes recitation of religious purpose. It does talk in terms of "profan[ing] the Lord's day," but other sections permit the activities

---

[20] A 1674 Maryland statute provided, in part:

"[T]hat noe ordinary Keeper shall from and after the publicacon hereof directly nor indirectly upon the Sabbath or Lords Day draw or sell any strong Liquors nor permit or suffer in or about their house or houses any tipling or gaming att Cards, Dice, ninepinn playing or other such unlawfull exercises whatsoever. . . ." 2 Archives of Maryland 414.

previously thought to be profane. Prior denunciation of Sunday drunkenness is now gone. Contemporary concern with these statutes is evidenced by the dozen changes made in 1959 and by the recent enactment of a majority of the exceptions.

Finally, the relevant pronouncements of the Maryland Court of Appeals dispel any argument that the statutes' announced purpose is religious. In *Hiller* v. *Maryland,* 124 Md. 385, 92 A. 842 (1914), the court had before it a Baltimore ordinance prohibiting Sunday baseball. The court said:

> "What the eminent chief judge said with respect to police enactments which deal with the protection of the public health, morals and safety apply with equal force to those which are concerned with the peace, order and quiet of the community on Sunday, for these social conditions are well recognized heads of the police power. Can the Court say that this ordinance has no real and substantial relation to the peace and order and quiet of Sunday, as a day of rest, in the City of Baltimore?" *Id.,* at 393, 92 A., at 844. See also *Levering* v. *Williams,* 134 Md. 48, 54–59, 106 A. 176, 178–179 (1919).

And the Maryland court declared in its decision in the instant case: "The legislative plan is plain. It is to compel a day of rest from work, permitting only activities which are necessary or recreational." *McGowan* v. *State, supra,* at p. 123, 151 A. 2d, at 159. After engaging in the close scrutiny demanded of us when First Amendment liberties are at issue, we accept the State Supreme Court's determination that the statutes' present purpose and effect is not to aid religion but to set aside a day of rest and recreation.

But this does not answer all of appellants' contentions. We are told that the State has other means at its disposal

to accomplish its secular purpose, other courses that would not even remotely or incidentally give state aid to religion. On this basis, we are asked to hold these statutes invalid on the ground that the State's power to regulate conduct in the public interest may only be executed in a way that does not unduly or unnecessarily infringe upon the religious provisions of the· First Amendment. See *Cantwell* v. *Connecticut, supra,* at pp. 304–305. However relevant this argument may be, we believe that the factual basis on which it rests is not supportable. It is true that if the State's interest were simply to provide for its citizens a periodic respite from work, a regulation demanding that everyone rest one day in seven, leaving the choice of the day to the individual, would suffice.

However, the State's purpose is not merely to provide a one-day-in-seven work stoppage. In addition to this, the State seeks to set one day apart from all others as a day of rest, repose, recreation and tranquility—a day which all members of the family and community have the opportunity to spend and enjoy together, a day on which there exists relative quiet and disassociation from the everyday intensity of commercial activities, a day on which people may visit friends and relatives who are not available during working days.[21]

---

[21] This purpose has been articulated in various ways at different times. The parliamentary debates on the British Shops (Sunday Trading Restriction) Bill in 1936 are particularly instructive. The sponsor of the Bill stated:

"I realise also that the State to-day is interfering more and more with family life and more and more controlling the family liberty, and were this a Bill to restrict liberty, and above all to restrict the liberty of the family, I would not be responsible for introducing it. But I hope to show to the House that it is a Bill which is necessary to secure the family life and liberty of hundreds of thousands of our people. . . . They have the right to a holiday on Sunday, to be able to rest from work·on that day and to go out into the parks or into the country on a summer day. That is the liberty for which

Obviously, a State is empowered to determine that a rest-one-day-in-seven statute would not accomplish this purpose; that it would not provide for a general cessation of activity, a special atmosphere of tranquility, a day which all members of the family or friends and relatives might spend together. Furthermore, it seems plain that the problems involved in enforcing such a provision would be exceedingly more difficult than those in enforcing a common-day-of-rest provision.

Moreover, it is common knowledge that the first day of the week has come to have special significance as a rest day in this country. People of all religions and

they are asking, and that is the liberty which this Bill would give to them." 308 Parliamentary Debates, Commons 2157–2158.
Another member stated:
"As a family man let me say that my family life would be unduly disturbed if any member had his Sunday on a Tuesday. The value of a Sunday is that everybody in the family is at home on the same day. What is the use of talking about a six-day working week in which six members of a family would each have his day of rest on a different day of the week?" Id., at 2198.
Reports of the International Labour Conferences are also revealing:
"Social custom requires that the same rest-day should as far as possible be accorded to the members of the same working family and to the working class community as a whole. It is a fact that originally religious motives determined the rest-day and that the tradition thus established has subsequently been maintained by law. It appears to be a universal rule that workers in the same area or in the same country have the same rest-day, and that the rest-day coincides with the day established by tradition or custom; and the International Labour Office proposes that this rule should be maintained." Rep. VII, International Labour Conference, 3d Sess. 1921, 127–128.
"A study of national standards shows that the most usual practice is to grant the weekly rest collectively on specified days of the week. This tendency to ensure that the weekly rest is taken at the same time by all workers on the day established by tradition or custom has an obvious social purpose, namely to enable the workers to take part in the life of the community and in the special forms of recreation which are available on certain days." Rep. VII (1), International Labour Conference, 39th Sess. 1956, 24.

people with no religion regard Sunday as a time for family activity, for visiting friends and relatives, for late sleeping, for passive and active entertainments, for dining out, and the like. "Vast masses of our people, in fact, literally millions, go out into the countryside on fine Sunday afternoons in the Summer. . . ." 308 Parliamentary Debates, Commons 2159. Sunday is a day apart from all others.[22] The cause is irrelevant; the fact exists. It would seem unrealistic for enforcement purposes and perhaps detrimental to the general welfare to require a State to choose a common day of rest other than that which most persons would select of their own accord. For these reasons, we hold that the Maryland statutes are not laws respecting an establishment of religion.

The distinctions between the statutes in the case before us and the state action in *McCollum* v. *Board of Education, supra,* the only case in this Court finding a violation of the "Establishment" Clause, lend further substantiation to our conclusion. In *McCollum,* state action permitted religious instruction in public school buildings during school hours and required students not attending the religious instruction to remain in their classrooms during that time. The Court found that this system had the effect of coercing the children to attend religious classes; no such coercion to attend church services is present in the situation at bar. In *McCollum,* the only alternative available to the nonattending students was to remain in their classrooms; the alternatives open to nonlaboring persons in the instant case are far more diverse. In *McCollum,* there was direct cooperation between state officials and religious ministers; no such direct participation exists under the Maryland laws. In *McCollum,* tax-supported buildings were used to aid religion; in the

---

[22] The Constitution itself provides for a Sunday exception in the calculation of the ten days for presidential veto. U. S. Const., Art. I, § 7.

instant case, no tax monies are being used in aid of religion.

Finally, we should make clear that this case deals only with the constitutionality of § 521 of the Maryland statute before us. We do not hold that Sunday legislation may not be a violation of the "Establishment" Clause if it can be demonstrated that its purpose—evidenced either on the face of the legislation, in conjunction with its legislative history, or in its operative effect—is to use the State's coercive power to aid religion.

Accordingly, the decision is

*Affirmed.*

[For opinion of MR. JUSTICE FRANKFURTER, joined by MR. JUSTICE HARLAN, see post, p. 459.]

[For dissenting opinion of MR. JUSTICE DOUGLAS, see post, p. 561.]

## APPENDIX TO OPINION OF THE COURT.

### Md. Ann. Code, Art. 27.

#### "Sabbath Breaking.

"*§ 492.—Working on Sunday; Permitting children or servants to game, fish, hunt, etc.*—No person whatsoever shall work or do any bodily labor on the Lord's day, commonly called Sunday; and no person having children or servants shall command, or wittingly or willingly suffer any of them to do any manner of work or labor on the Lord's day (works of necessity and charity always excepted), nor shall suffer or permit any children or servants to profane the Lord's day by gaming, fishing, fowling, hunting or unlawful pastime or recreation; and every person transgressing this section and being hereof convicted before a justice of the peace shall forfeit five dollars, to be applied to the use of the county."

"§ *509.—Beaches, amusement parks, picnic groves, etc., in Anne Arundel County.*—It shall be lawful to operate, work at, or be employed in the occupations of operating any bathing beach, bathhouse, amusement park, dancing saloon, the sale or selling of any novelties, souvenirs, accessories, or other merchandise essential to, or customarily sold at, or incidental to, the operation of the aforesaid occupations and businesses, at retail, picnic groves, amusements, games, amusement rides, amusement devices, entertainments, shows and the hiring or renting of boats, tables, chairs, beach umbrellas, on the first day of the week, commonly called Sunday, within Anne Arundel County, and §§ 492, 521 and 522 of this article are repealed, in so far and to the extent that they prohibit the operating of and/or the working of or employment of persons in the operation of any bathing beach, bathhouse, amusement park, dancing saloon, the sale or selling at retail of any merchandise, essential to or customarily sold or incidental to the operation of the aforesaid occupations or businesses, picnic groves, amusements, games, amusement rides, amusement devices, entertainments, shows, and the hiring and renting of boats, tables, chairs, beach umbrellas, on the first day of the week, commonly called Sunday, in Anne Arundel County."

"§ *521.—Sale, etc., of merchandise on Sunday; exceptions.*

"(a) *Sunday sales of merchandise prohibited; excepted articles.*—No person in this State shall sell, dispose of, barter, or deal in, or give away any articles of merchandise on Sunday, except retailers, who may sell and deliver on said day tobacco, cigars, cigarettes, candy, sodas and soft drinks, ice, ice cream, ices and other confectionery, milk, bread, fruits, gasoline, oils and greases.

"(b) *Additional excepted articles in Anne Arundel County; certain establishments excepted.*—In Anne Arundel County, in addition to the articles of merchandise

hereinbefore mentioned, retailers may sell, barter, deal in, and deliver on Sunday the following articles of merchandise: butter, eggs, cream, soap and other detergents, disinfectants, vegetables, meats, and all other food or food stuffs prepared or intended for human consumption, automobile accessories and parts, boating and fishing accessories, artificial and natural flowers and shrubs, toilet goods, hospital supplies, thermometers, camera films, souvenirs, surgical instruments, rubber goods, paper goods, drugs, medicines, patent medicines, and all other articles used for the relief of pain or prescribed by a physician; provided, however, that nothing in this subtitle shall be construed to prevent the operation of any retail establishment on Sunday, the operation of which does not entail the employment of more than one person, not including the owner or proprietor.

"(c) *Penalty for violation; second and subsequent offenses; revocation of license.*—Any person violating any one of the provisions of this section shall be liable to indictment in any court in this State having criminal jurisdiction, and upon conviction thereof shall be fined a sum of not less than twenty nor more than fifty dollars, in the discretion of the court, for the first offense, and if convicted a second time for a violation of this section, the person or persons so offending shall be fined a sum not less than $50 nor more than $500, and be imprisoned for not less than 10 nor more than 30 days, in the discretion of the court, and his, her or their license, if any was issued, shall be declared null and void by the judge of said court; and it shall not be lawful for such person or persons to obtain another license for the period of twelve months from the time of such conviction, nor shall a license be obtained by any other person or persons to carry on said business on the premises or elsewhere, if the person, so as aforesaid convicted, has any interest whatever therein, or shall derive any profit whatever therefrom; and in case

of being convicted more than twice for a violation of this section, such person or persons on each occasion shall be imprisoned for not less than thirty nor more than sixty days, and fined a sum not less than double that imposed on such person or persons on the last preceding conviction; and his, her or their license, if any was issued, shall be declared null and void by the court, and no new license shall be issued to such person or persons for a period of two years from the time of such conviction, nor to anyone else to carry on said business wherein he or she is in anywise interested, as before provided for the second violation of the provisions of this section; all the fines to be imposed under this section shall be paid to the State.

"(d) *Apothecaries: sale of newspapers and periodicals.*—This section is not to apply to apothecaries and such apothecaries may sell on Sunday drugs, medicines, and patent medicines as on week days; and this section shall not apply to the sale of newspapers and periodicals.

"§ *522.—Keeping open or using dancing saloon, opera house, tenpin alley, barber saloon or ball alley on Sunday.*—It shall not be lawful to keep open or use any dancing saloon, opera house, tenpin alley, barber saloon or ball alley within this State on the Sabbath day, commonly called Sunday; and any person or persons, or body politic or corporate, who shall violate any provision of this section, or cause or knowingly permit the same to be violated by a person or persons in his, her or its employ shall be liable to indictment in any court of this State having criminal jurisdiction, and upon conviction thereof shall be fined a sum not less than fifty dollars nor more than one hundred dollars, in the discretion of the court, for the first offense; and if convicted a second time for a violation of this section, the person or persons, or body politic or corporate shall be fined a sum not less than one hundred nor more than five hundred dollars; and if a natural person shall be imprisoned, not less than ten nor

more than thirty days in the discretion of the court; and in the case of any conviction or convictions under this section subsequent to the second, such person or persons, body politic or corporate shall be fined on each occasion a sum at least double that imposed upon him, her, them or it on the last preceding conviction; and if a natural person, shall be imprisoned not less than thirty nor more than sixty days in the discretion of the court; all fines to be imposed under this section shall be paid to the State."

## Md. Ann. Code, Art. 2B.

"§ *28.—Anne Arundel County.*

"(a) *Special Sunday licenses.*—(1) Notwithstanding any other provision of this article, no license for sale of alcoholic beverages issued by the board of license commissioners for Anne Arundel County (except 'special licenses' provided for in § 22 of this article) shall be deemed to nor shall it permit or authorize the holder thereof to sell any alcoholic beverages in Anne Arundel County after 2 A. M. on Sundays, except as hereinafter provided.

"(2) Any person holding a license for the sale of alcoholic beverages in Anne Arundel County (except persons holding any Class BP, WP, LP, or LT license, 'Package Goods—off sale license,' 'six day tavern license,' or 'special licenses') issued by the board of license commissioners for Anne Arundel County, shall, upon application made as for new licenses and approval thereof by the board of license commissioners for Anne Arundel County, as provided for by §§ 60 and 67 (c) of this article, be issued a license to be known as a 'special Sunday license,' upon payment of the fee therefor as provided herein.

"(3) Such 'special Sunday license' shall authorize the holder thereof to sell alcoholic beverages of the same kind, and subject to the same limitations as to hours, alcoholic content of the beverages to be sold thereunder, restric-

tions and provisions, as govern such other license for the sale of alcoholic beverages, issued to and held by the holder of such 'special Sunday license,' on each Sunday. No 'special Sunday license' shall be issued to any person who does not hold an alcoholic beverage license of some other class issued by the board of license commissioners for Anne Arundel County."

"§ *90—Sundays.*—(a) *Bar and counter sales.*—(1) No retail dealer holding a Class B or C license shall be permitted to sell any alcoholic beverage at a bar or counter on Sunday.

"(2) Provided, that in Anne Arundel County it shall be lawful to sell, vend, serve, deliver and/or consume any alcoholic beverages permitted by law to be sold in the first, second, third, fourth, fifth, seventh and eighth districts of Anne Arundel County at any bar or counter on any day on which the sale of alcoholic beverages is permitted by law.

"(b) *General restrictions.*—(1) In the jurisdictions in which this subsection is applicable, it shall be unlawful for anyone to sell or for any licensed dealer to deliver, give away or otherwise dispose of any alcoholic beverages on Sunday. Any person selling or any licensed dealer delivering, giving away or otherwise disposing of such beverages in such jurisdictions on Sunday shall be guilty of a misdemeanor and, upon conviction thereof, shall be fined not exceeding fifty dollars ($50.00) for the first offense and for each succeeding offense shall be fined not exceeding one hundred dollars ($100.00), or imprisoned in the county jail for not more than thirty (30) days, or be both fined and imprisoned, in the discretion of the court.

"(2) This subsection shall be applicable and have effect in Caroline, Carroll, Cecil, Dorchester, Garrett, Harford, Kent, Queen Anne's, Somerset, Talbot, Washington, Wicomico and Worcester counties, provided that it shall not apply to or affect special Class C licenses

issued under the provisions of this article, nor shall it apply to special Class C licenses issued in Washington County for temporary use."

Separate opinion of MR. JUSTICE FRANKFURTER, whom MR. JUSTICE HARLAN joins.†

So deeply do the issues raised by these cases cut that it is not surprising that no one opinion can wholly express the views even of all the members of the Court who join in its result. Individual opinions in constitutional controversies have been the practice throughout the Court's history.* Such expression of differences in view or even in emphasis converging toward the same result makes for the clarity of candor and thereby enhances the authority of the judicial process.

For me considerations are determinative here which call for separate statement. The long history of Sunday legislation, so decisive if we are to view the statutes now

---

†[NOTE: This opinion applies also to No. 36, *Two Guys From Harrison-Allentown, Inc.,* v. *McGinley, District Attorney, Lehigh County, Pennsylvania, et al., post,* p. 582; No. 67, *Braunfeld et al.* v. *Brown, Commissioner of Police of Philadelphia, et al., post,* p. 599; and No. 11, *Gallagher, Chief of Police of Springfield, Massachusetts, et al.* v. *Crown Kosher Super Market, Inc., et al., post,* p. 617.]

* "In pursuance of my practice in giving an opinion on all constitutional questions, I must present my views on this." Mr. Justice Johnson, concurring, in *Cherokee Nation* v. *Georgia,* 5 Pet. 1, 20. See Mr. Justice Story, dissenting, in *Briscoe* v. *Bank of the Commonwealth of Kentucky,* 11 Pet. 257, 329; Mr. Chief Justice Taney, dissenting, *Rhode Island* v. *Massachusetts,* 12 Pet. 657, 752. And see Mr. Justice Bradley, concurring, in the *Legal Tender Cases,* 12 Wall. 457, 554: "I . . . should feel that it was out of place to add anything further on the subject were it not for its great importance. On a constitutional question involving the powers of the government it is proper that every aspect of it, and every consideration bearing upon it, should be presented, and that no member of the court should hesitate to express his views."

attacked in a perspective wider than that which is furnished by our own necessarily limited outlook, cannot be conveyed by a partial recital of isolated instances or events. The importance of that history derives from its continuity and fullness—from the massive testimony which it bears to the evolution of statutes controlling Sunday labor and to the forces which have, during three hundred years of Anglo-American history at the least, changed those laws, transmuted them, made them the vehicle of mixed and complicated aspirations. Since I find in the history of these statutes insights controllingly relevant to the constitutional issues before us, I am constrained to set that history forth in detail. And I also deem it incumbent to state how I arrive at concurrence with The Chief Justice's principal conclusions without drawing on *Everson* v. *Board of Education,* 330 U. S. 1.

## I.

Because the long colonial struggle for disestablishment—the struggle to free all men, whatever their theological views, from state-compelled obligation to acknowledge and support state-favored faiths—made indisputably fundamental to our American culture the principle that the enforcement of religious belief as such is no legitimate concern of civil government, this Court has held that the Fourteenth Amendment embodies and applies against the States freedoms that are loosely indicated by the not rigidly precise but revealing phrase "separation of church and state." *Illinois ex rel. McCollum* v. *Board of Education,* 333 U. S. 203. The general principles of church-state separation were found to be included in the Amendment's Due Process Clause in view of the meaning which the presuppositions of our society infuse into the concept of "liberty" protected by the clause. This is the source of the limitations imposed upon the States. To the extent that those limitations

are akin to the restrictions which the First Amendment places upon the action of the central government, it is because—as with the freedom of thought and speech of which Mr. Justice Cardozo spoke in *Palko* v. *Connecticut,* 302 U. S. 319—it is accurate to say concerning the principle that a government must neither establish nor suppress religious belief, that "With rare aberrations a pervasive recognition of that truth can be traced in our history, political and legal." *Id.,* at 327.

But the several opinions in *Everson* and *McCollum,* and in *Zorach* v. *Clauson,* 343 U. S. 306, make sufficiently clear that "separation" is not a self-defining concept. "[A]greement, in the abstract, that the First Amendment was designed to erect a 'wall of separation between church and State,' does not preclude a clash of views as to what the wall separates." *Illinois ex rel. McCollum* v. *Board of Education, supra,* at 213 (concurring opinion). By its nature, religion—in the comprehensive sense in which the Constitution uses that word—is an aspect of human thought and action which profoundly relates the life of man to the world in which he lives. Religious beliefs pervade, and religious institutions have traditionally regulated, virtually all human activity. It is a postulate of American life, reflected specifically in the First Amendment to the Constitution but not there alone, that those beliefs and institutions shall continue, as the needs and longings of the people shall inspire them, to exist, to function, to grow, to wither, and to exert with whatever innate strength they may contain their many influences upon men's conduct, free of the dictates and directions of the state. However, this freedom does not and cannot furnish the adherents of religious creeds entire insulation from every civic obligation. As the state's interest in the individual becomes more comprehensive, its concerns and the concerns of religion perforce overlap. State codes and the dictates of faith touch the same activities.

Both aim at human good, and in their respective views of what is good for man they may concur or they may conflict. No constitutional command which leaves religion free can avoid this quality of interplay.

Innumerable civil regulations enforce conduct which harmonizes with religious canons. State prohibitions of murder, theft and adultery reinforce commands of the decalogue. Nor do such regulations, in their coincidence with tenets of faith, always support equally the beliefs of all religious sects: witness the civil laws forbidding usury and enforcing monogamy. Because these laws serve ends which are within the appropriate scope of secular state interest, they may be enforced against those whose religious beliefs do not proscribe, and even sanction, the activity which the law condemns. *Reynolds* v. *United States,* 98 U. S. 145; *Davis* v. *Beason,* 133 U. S. 333; *Cleveland* v. *United States,* 329 U. S. 14.

This is not to say that governmental regulations which find support in their appropriateness to the achievement of secular, civil ends are invariably valid under the First or Fourteenth Amendment, whatever their effects in the sphere of religion. If the value to society of achieving the object of a particular regulation is demonstrably outweighed by the impediment to which the regulation subjects those whose religious practices are curtailed by it, or if the object sought by the regulation could with equal effect be achieved by alternative means which do not substantially impede those religious practices, the regulation cannot be sustained. *Cantwell* v. *Connecticut,* 310 U. S. 296. This was the ground upon which the Court struck down municipal license taxes as applied to religious colporteurs in *Follett* v. *Town of McCormick,* 321 U. S. 573; *Murdock* v. *Pennsylvania,* 319 U. S. 105, and *Jones* v. *Opelika,* 319 U. S. 103. In each of those cases it was believed that the State's need for revenue, which could be

satisfied by taxing any of a variety of sources, did not justify a levy imposed upon an activity which in the light of history could reasonably be viewed as sacramental. But see *Cox* v. *New Hampshire,* 312 U. S. 569, in which the Court, balancing the public benefits secured by a regulatory measure against the degree of impairment of individual conduct expressive of religious faith which it entailed, sustained the prohibition of an activity similarly regarded by its practicants as sacramental. And see *Prince* v. *Massachusetts,* 321 U. S. 158.

Within the discriminating phraseology of the First Amendment, distinction has been drawn between cases raising "establishment" and "free exercise" questions. Any attempt to formulate a bright-line distinction is bound to founder. In view of the competition among religious creeds, whatever "establishes" one sect disadvantages another, and vice versa. But it is possible historically, and therefore helpful analytically—no less for problems arising under the Fourteenth Amendment, illuminated as that Amendment is by our national experience, than for problems arising under the First—to isolate in general terms the two largely overlapping areas of concern reflected in the two constitutional phrases, "establishment" and "free exercise," [1] and which emerge more

---

[1] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." Madison had proposed an amendment that "The civil rights of none shall be abridged on account of religious belief or worship, nor shall any national religion be established, nor shall the full and equal rights of conscience be in any manner, or on any pretext, infringed." I Annals of Cong. 434. Commenting on a subsequent form of what was to become the First Amendment, he said that "he apprehended the meaning of the words to be, that Congress should not establish a religion, and enforce the legal observation of it by law, nor compel men to worship God in any manner contrary to their conscience." *Id.,* at 730.

or less clearly from the background of events and impulses which gave those phrases birth.

In assuring the free exercise of religion, the Framers of the First Amendment were sensitive to the then recent history of those persecutions and impositions of civil disability with which sectarian majorities in virtually all of the Colonies had visited deviation in the matter of conscience.[2] This protection of unpopular creeds, however, was not to be the full extent of the Amendment's guarantee of freedom from governmental intrusion in matters of faith. The battle in Virginia, hardly four years won, where James Madison had led the forces of disestablishment in successful opposition to Patrick Henry's proposed Assessment Bill levying a general tax for the support of Christian teachers,[3] was a vital and compelling

---

[2] See Cobb, The Rise of Religious Liberty in America (1902), *passim;* Sweet, The Story of Religion in America (rev. ed. 1939), 54, 76–77, 98–112, 129, 139–142; Sweet, Religion in Colonial America (1942), *passim;* I Channing, History of the United States (1933), 356–381, 470–474. And see Jefferson's Notes on Virginia, in II Writings of Thomas Jefferson (Memorial ed. 1903) 217–219. The Virginia Convention which ratified the Federal Constitution proposed as a needed amendment to it: "That religion, or the duty which we owe to our Creator, and the manner of discharging it, can be directed only by reason and conviction, not by force or violence; and therefore all men have an equal, natural, and unalienable right to the free exercise of religion, according to the dictates of conscience, and that no particular religious sect or society ought to be favored or established, by law, in preference to others." III Elliot's Debates (2d ed. 1836) 659. See also the amendment proposed by the North Carolina Convention which declined to ratify, IV *id.,* at 244, and the understanding of the Constitution expressed by Rhode Island, I *id.,* at 334, and New York, I *id.,* at 328. Cf. the amendment proposed by New Hampshire, I *id.,* at 326.

[3] See James, The Struggle for Religious Liberty in Virginia (1900); Eckenrode, Separation of Church and State in Virginia (1910); I Randall, Life of Thomas Jefferson (1858), 219–223; Cobb, The Rise of Religious Liberty in America (1902), 490–499; Sweet, The Story of Religion in America (rev. ed. 1939), 276–279.

memory in 1789. The lesson of that battle, in the words of Jefferson's Act for Establishing Religious Freedom, whose passage was its verbal embodiment,[4] was "that to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical; that even the forcing him to support this or that teacher of his own religious persuasion, is depriving him of the comfortable liberty of giving his contributions to the particular pastor, whose morals he would make his pattern, and whose powers he feels most persuasive to righteousness, and is withdrawing from the ministry those temporal rewards, which proceeding from an approbation of their personal conduct, are an additional incitement to earnest and unremitting labours for the instruction of mankind . . . ."[5] What Virginia had long practiced, and what Madison, Jefferson and others fought to end, was the extension of civil government's support to religion in a manner which made the two in some degree interdependent, and thus threatened the freedom of each. The purpose of the Establishment Clause was to assure that the national legislature would not exert its power in the service of any purely religious end; that it would not, as Virginia and virtually all of the Colonies had done, make of religion, as religion, an object of legislation.

Of course, the immediate object of the First Amendment's prohibition was the established church as it had been known in England and in most of the Colonies. But with foresight those who drafted and adopted the words, "Congress shall make no law respecting an establishment of religion," did not limit the constitutional proscription to any particular, dated form of state-supported theological venture. The Establishment Clause withdrew from

---

[4] The history of the Virginia episode is treated extensively in the opinions in *Everson* v. *Board of Education,* 330 U. S. 1.

[5] 12 Hening, Statutes of Virginia (1823), 84, 85.

the sphere of legitimate legislative concern and competence a specific, but comprehensive, area of human conduct: man's belief or disbelief in the verity of some transcendental idea and man's expression in action of that belief or disbelief. Congress may not make these matters, as such, the subject of legislation, nor, now, may any legislature in this country. Neither the National Government nor, under the Due Process Clause of the Fourteenth Amendment, a State may, by any device, support belief or the expression of belief for its own sake, whether from conviction of the truth of that belief, or from conviction that by the propagation of that belief the civil welfare of the State is served, or because a majority of its citizens, holding that belief, are offended when all do not hold it.

With regulations which have other objectives the Establishment Clause, and the fundamental separationist concept which it expresses, are not concerned. These regulations may fall afoul of the constitutional guarantee against infringement of the free exercise or observance of religion. Where they do, they must be set aside at the instance of those whose faith they prejudice. But once it is determined that a challenged statute is supportable as implementing other substantial interests than the promotion of belief, the guarantee prohibiting religious "establishment" is satisfied.

To ask what interest, what objective, legislation serves, of course, is not to psychoanalyze its legislators, but to examine the necessary effects of what they have enacted. If the primary end achieved by a form of regulation is the affirmation or promotion of religious doctrine—primary, in the sense that all secular ends which it purportedly serves are derivative from, not wholly independent of, the advancement of religion—the regulation is beyond the power of the state. This was the case in *McCollum*. Or if a statute furthers both secular and religious ends

by means unnecessary to the effectuation of the secular ends alone—where the same secular ends could equally be attained by means which do not have consequences for promotion of religion—the statute cannot stand. A State may not endow a church although that church might inculcate in its parishioners moral concepts deemed to make them better citizens, because the very *raison d'être* of a church, as opposed to any other school of civilly serviceable morals, is the predication of religious doctrine. However, inasmuch as individuals are free, if they will, to build their own churches and worship in them, the State may guard its people's safety by extending fire and police protection to the churches so built. It was on the reasoning that parents are also at liberty to send their children to parochial schools which meet the reasonable educational standards of the State, *Pierce* v. *Society of Sisters,* 268 U. S. 510, that this Court held in the *Everson* case that expenditure of public funds to assure that children attending every kind of school enjoy the relative security of buses, rather than being left to walk or hitchhike, is not an unconstitutional "establishment," even though such an expenditure may cause some children to go to parochial schools who would not otherwise have gone. The close division of the Court in *Everson* serves to show what nice questions are involved in applying to particular governmental action the proposition, undeniable in the abstract, that not every regulation some of whose practical effects may facilitate the observance of a religion by its adherents affronts the requirement of church-state separation.

In an important sense, the constitutional prohibition of religious establishment is a provision of more comprehensive availability than the guarantee of free exercise, insofar as both give content to the prohibited fusion of church and state. The former may be invoked by the corporate operator of a seven-day department store whose

state-compelled Sunday closing injures it financially—or by the department store's employees, whatever their faith, who are convicted for violation of a Sunday statute—as well as by the Orthodox Jewish retailer or consumer who claims that the statute prejudices him in his ability to keep his faith. But it must not be forgotten that the question which the department store operator and employees may raise in their own behalf is narrower than that posed by the case of the Orthodox Jew.[6] Their "establishment" contention can prevail only if the absence of any substantial legislative purpose other than a religious one is made to appear. See *Selective Draft Law Cases,* 245 U. S. 366.

In the present cases the Sunday retail sellers and their employees and customers, in attacking statutes banning various activities on a day which most Christian creeds consecrate, do assert that these statutes have no other purpose. They urge, first, that the legislators' motives

---

[6] As appellant retailers and retail employees in the *McGowan* and *McGinley* cases have urged neither here nor below any question of infringement of their own rights of conscience, I agree with THE CHIEF JUSTICE that they have no standing to raise the "free exercise" issue. *United States* v. *Raines,* 362 U. S. 17. The Court need not determine at this time what averments or what proofs, in a proper case, would be required in order to raise such issues in their behalf. Unlike appellants in *Braunfeld* and appellees in *Gallagher,* they have not urged that their remaining shut on *any* day of the week for *any* reason causes Sunday closing to disadvantage them peculiarly. They assert a right to operate *seven* days a week—a right in which they claim an economic, not a conscientious interest. Nor, on this record, is it necessary to decide whether these Sunday retail sellers might have standing to complain of the disadvantage of their enforced Sunday closing to conscientious Sabbatarian customers or potential customers. Cf. *Barrows* v. *Jackson,* 346 U. S. 249; *Pierce* v. *Society of Sisters,* 268 U. S. 510. Nowhere below have they presented evidence that any such actual or hypothetical customer is thus disadvantaged.

were religious. But the private and unformulated influences which may work upon legislation are not open to judicial probing. "The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted." *McCray* v. *United States,* 195 U. S. 27, 56. "Inquiry into the hidden motives which may move [a legislature] to exercise a power constitutionally conferred upon it is beyond the competency of courts." *Sonzinsky* v. *United States,* 300 U. S. 506, 513–514. *Veazie Bank* v. *Fenno,* 8 Wall. 533; *Arizona* v. *California,* 283 U. S. 423; *Oklahoma ex rel. Phillips* v. *Guy F. Atkinson Co.,* 313 U. S. 508. These litigants also argue, however, that when the state statutory provisions are regarded in their legislative context religion is apparent on their face: they point to the use of the terms "Lord's day" and "Sabbath" and "desecration," to exceptions whose hours permit activities only at times on Sunday when religious services are customarily not held, to explicit prohibition of otherwise permitted activity in the vicinity of churches, to regulations which condition the allowance of conduct on its consistency with the "due observance" of the day. Of course, since these various provisions regarding exemption from the Sunday ban of certain recreational activities have no possible application to the litigants in the present cases, they are not themselves before the Court, and their constitutionality is not now in issue. But they are put forward as evidence of the purpose of the statutes which are attacked here, and as such we may properly look to them, and also to the history of the body of state Sunday regulations, which, it is urged, further demonstrates sectarian creedal purpose. As a basis for appraising these arguments that the statutes are religious legislation, and pre-

liminary to determining the claims of infringement of conscience raised in the *Gallagher* and *Braunfeld* cases, it is necessary to survey the long historical development and present-day position of civil Sunday regulation.

## II.

For these purposes the span of centuries which saw the enunciation of the Fourth Commandment,[7] Constantine's edict proscribing labor on the venerable day of the Sun,[8] and the Sunday prohibitions of Carlovingian, Merovingian and Saxon rulers, and later of the English kings of the thirteenth and fourteenth centuries, may be passed over.[9] What is of concern here is the Sunday institution as it evolved in modern England, the American Colonies, and the States of the Union under the Constitution. The first significant English Sunday regulation, for this purpose, was the statute of Henry VI in 1448 which, after reciting "the abominable injuries and offences done to Almighty God, and to his Saints, . . . because of fairs and markets upon their high and principal feasts, . . . in which principal and festival days, for great earthly covetise, the people is more willingly vexed, and in bodily labour soiled, than in other . . . days, . . . as though they did nothing remember the horrible defiling of their souls in buying and selling, with many deceitful lies and false perjury, with drunkenness and strifes, and so spe-

---

[7] See Exodus 20:8–11, 23:12, 31:12–17; Deuteronomy 5:12–15.

[8] Codex Justin., liber III, Tit. XII, 3. See II Schaff, History of the Christian Church (1867), 380, n. 1. Later edicts of the emperors were more unequivocally Christian in temper, *e. g.*, that of 386 A. D., Codex Theo., liber VIII, Tit. VIII, 3. See Pharr, The Theodosian Code (1952), 209.

[9] See Lewis, A Critical History of Sunday Legislation (1888), 1–90; Neale, Feasts and Fasts (1845), 86–137; Johnson and Yost, Separation of Church and State (1948), 219–221; XII Encyclopedia of Religion and Ethics (Hastings ed. 1921), 103–106; Savage, Sunday in Church History, in How Shall We Keep Sunday (1898), 27.

cially withdrawing themselves and their servants from divine service . . . ," ordained that all fairs and markets should cease to show forth goods or merchandise on Sundays, Good Friday, and the principal feast days.[10] A short-lived ordinance of Edward VI a century later, limiting the ban on bodily labor to Sundays and enumerated holy days, demonstrated in its preamble a similar sectarian purpose,[11] and in 1625 Charles I, announcing that "there is nothing more acceptable to God than the true and sincere service and worship of him . . . and that the holy keeping of the Lord's day is a principal part of the true service of God," prohibited all meetings of the people out of their parishes for sports and pastimes on Sunday, and all bear-baiting, bull-baiting, interludes, common plays, and other unlawful exercises and pastimes on that day.[12] Several years later the same king declared it reproachful of God and religion, and hence made it un-

---

[10] 27 Henry VI, c. 5.

[11] 5 & 6 Edw. VI, c. 3. "Forasmuch as at all times men be not so mindful to laud and praise God, so ready to resort and hear God's holy word, and to come to the holy communion and other laudable rites, which are to be observed in every christian congregation, as their bounden duty doth require: . . . therefore to call men to remembrance of their duty, and to help their infirmity, it hath been wholsomly provided, that there should be some certain times and days appointed, wherein the christian should cease from all other kind of labours, and should apply themselves only and wholly unto the aforsaid holy works, properly pertaining unto true religion . . . ." Violations were to be punished by the censures of the church, administered by the bishops, archbishops and other persons having ecclesiastical jurisdiction. The purpose of this ordinance was apparently to restrict to a fixed and relatively limited number the days upon which labor should cease, the multiplication of saints' days having risen until they came to consume an alarming proportion of the year. It was repealed under Queen Mary.

[12] 1 Charles I, c. 1. This regulation, while prescribing civil penalties, preserved the concurrent jurisdiction of the ecclesiastical courts to punish Sabbath breaking.

lawful, for butchers to slaughter or carriers, drovers, waggoners, etc., to travel on the Lord's day; [13] then, in 1677,[14] "For the better Observation and keeping Holy the Lord's Day," the statute, 29 Charles II, c. 7, which is still the basic Sunday law of Britain, was enacted: "that all and every Person and Persons whatsoever, shall on every Lord's Day apply themselves to the Observation of the same, by exercising themselves thereon in the Duties of Piety and true Religion, publickly and privately; . . . and that no Tradesman, Artificer, Workman, Labourer or other Person whatsoever, shall do or exercise any worldly Labour, Business or Work of their ordinary Callings, upon the Lord's Day, or any part thereof (Works of Necessity and Charity only excepted;) . . . and that no Person or Persons whatsoever, shall publickly cry, shew forth, or expose to Sale, any Wares, Merchandizes, Fruit, Herbs, Goods or Chattels whatsoever, upon the Lord's Day . . . ." [15] In 1781, a

---

[13] 3 Charles I, c. 2.

[14] For a survey of the extensive Sunday regulations promulgated under the Commonwealth, see Lewis, *op. cit., supra,* note 9, at 115–142.

[15] Work was punished by penalty of five shillings, selling by forfeiture of the goods. The ban against butchers and herders traveling on Sunday was repeated, under fine of twenty shillings. Dressing of meat in families and dressing or selling of meat in inns and victualling houses "for such as otherwise cannot be provided" was permitted, as was the crying or selling of milk before 9 a. m. and after 4 p. m. Later statutes made numerous other exceptions to the English Sunday ban: see, *e. g.,* 9 Anne, c. 23, § 20, exempting hackney coaches; the Sunday Entertainments Act, 1932, 22 & 23 Geo. V, c. 51, exempting motion pictures at the option of local authority and under stipulated conditions, and also making lawful certain musical entertainments, lectures and debates, and the operation of museums, galleries, zoological and botanical gardens, etc.; and the evolving regulation of Sunday baking, 34 Geo. III, c. 61; 1 & 2 Geo. IV, c. 50, § 11; 3 Geo. IV, L. & P., c. 106, § 16; 6 & 7 Wm. IV, c. 37, § 14; Baking Industry (Hours of Work) Act, 1954, 2 & 3 Eliz. II, c. 57,

statute, 21 Geo. III, c. 49, reciting that various public entertainments and explications of scriptural texts by incompetent persons tended "to the great encouragement of irreligion and profaneness," closed all rooms and houses in which public entertainment, amusement or debates, for an admission charge, were held.[16]

These Sunday laws were indisputably works of the English Establishment. Their prefatory language spoke their religious inspiration,[17] exceptions made from time to time were expressly limited to preserve inviolable the hours of the divine service,[18] and in their administration

---

§ 12. The Sunday Observation Prosecution Act, 1871, 34 & 35 Vict., c. 87, provided that no prosecutions under the statute, 29 Charles II, c. 7, might be brought without the consent of a chief police officer, a stipendiary magistrate, or two justices of the peace.

[16] Common informer practice under this statute has since been abolished. Common Informers Act, 1951, 14 & 15 Geo. VI, c. 39.

[17] See *Fennell* v. *Ridler*, 5 B. & C. 406, 407–408 (1826): "The spirit of the act [of 29 Charles II] is to advance the interests of religion, to turn a man's thoughts from his worldly concerns, and to direct them to the duties of piety and religion; and the act cannot be construed according to its spirit unless it is so construed as to check the career of worldly traffic. . . . Labour may be private and not meet the public eye, and so not offend against public decency, but it is equally labour, and equally interferes with a man's religious duties."

[18] The Book of Sports published by James I in 1618 and republished by Charles I in 1633 provided: "as for our good people's lawful recreation, our pleasure . . . is, that after the end of divine service our good people be not disturbed . . . from any lawful recreation, such as dancing, . . . leaping, vaulting, or any other such harmless recreation . . . .

"And likewise we bar from the benefit and liberty all such known recusants, either men or women, as will abstain from coming to church or divine service, being therefore unworthy of any lawful recreation after said service, that will not first come to church and serve God. Prohibiting in like sort the said recreations to any that, though conform in religion, are not present in the church at the service of God, before their going to the said recreations.

"Our pleasure, likewise is, that they to whom it belongeth in office, shall present and punish sharply all such, as in abuse of this our

a spirit of inquisitorial piety was evident.[19] But even in this period of religious predominance, notes of a secondary civil purpose could be heard. Apart from the counsel of those who had from the time of the Reformation insisted that the Fourth Commandment itself embodied a precept of social rather than sacramental significance,[20] claims

---

liberty will use their exercises before the end of all divine services for that day." Lewis, *op. cit., supra,* note 9, at 106–107. See Govett, The King's Book of Sports (1890). See also the excepting proviso to the statute, 10 & 11 Wm. III, c. 24, § 14, respecting Billingsgate Market. Certain importation and selling of fish "before or after Divine Service on *Sundays*" is not to be deemed prohibited.

[19] Such a spirit may be seen in various royal proclamations enjoining strict enforcement of the Sunday laws, see Whitaker, The Eighteenth-Century English Sunday (1940), 56, 172–173, and in the language of charges to the grand juries encouraging their performance of their duties under the laws, see *id.,* at 53, 57–58. Private societies formed as self-appointed agents of administration of the Sunday laws were religious in orientation. See, *id.,* at 62, 69, 121–123, 195–197.

[20] The injunction to observe the Sabbath day in Deuteronomy 5:14 is that on that day ". . . thou shalt not do any work, thou, nor thy son, nor thy daughter, nor thy manservant, nor thy maidservant, nor thine ox, nor thine ass, nor any of thy cattle, nor thy stranger that is within thy gates; that thy manservant and thy maidservant may rest as well as thou." Among Christian explicators of the Old Testament a social inspiration was early ascribed to this language. See Milton, A Treatise on Christian Doctrine, book 2, c. 7, in V Prose Works of John Milton (Sumner trans. 1877) 67. Luther, in the Large Catechism, part I, Third Commandment, wrote: ". . . we keep holydays not for the sake of intelligent and learned Christians; for they have no need of it. We keep them, first, for the sake of bodily necessity. Nature teaches and demands that the mass of the people—servants and mechanics, who the whole week attend to their work and trades—retire for a day of rest and recreation." I Lenker, Luther's Catechetical Writings (1907), 60. See also Luther's Treatise on Good Works (1520), Third Commandment, XVII, in I Works of Martin Luther (1915), 241. Compare Calvin's Institutes: among the three reasons for Sabbath observance, the Lord "resolved to give a day of rest to servants and those who are under the authority of others, in order that they should have some

were asserted in the eighteenth century on behalf of Sunday rest, in part, in the service of health and welfare.[21] Blackstone wrote that ". . . besides the notorious indecency and scandal of permitting any secular business to be publicly transacted on that day in a country professing Christianity, and the corruption of morals which usually follows its profanation, the keeping one day in the seven holy, as a time of relaxation and refreshment as well as for public worship, is of admirable service to a state, considered merely as a civil institution. It humanizes, by the help of conversation and society, the manners of the lower classes, which would otherwise degenerate into a sordid ferocity and savage selfishness of spirit; it enables the industrious workman to pursue his occupation in the ensuing week with health and cheerfulness; it imprints on the minds of the people that sense of their duty to God so necessary to make them good citizens, but which yet

---

respite from toil." Calvin, Institutes of the Christian Religion (Battles trans. 1960), book II, c. 8, § 28, at p. 395. And see Early Writings of John Hooper, D. D. (Carr ed. 1843) 337: "Then likewise God by this commandment provideth for the temporal and civil life of man, and likewise for all things that be necessary and expedient for man in this life. If man, and beast that is man's servant, should without repose and rest always labour, they might never endure the travail of the earth. God therefore, as he that intendeth the conservation and wealth of man and the thing created to man's use, commandeth this rest and repose from labour, that his creatures may endure and serve as well their own necessary affairs and business, as preserve the youth and offspring of man and beast . . . ."

[21] In 1778 there appeared an essay by Vicesimus Knox, M. A., supporting state-enforced Sunday observance on grounds of health and custom as well as of religion. See Whitaker, The Eighteenth-Century English Sunday (1940), 148. It is reported that in 1728 the members of the Gloucester Company or Fraternity of Barbers had undertaken to enforce by fine a self-imposed prohibition of Sunday labor, apparently to assure that those who wanted a six-day work week would not be compelled by competition to labor on the whole seven. See id., at 59–60.

would be worn out and defaced by an unremitted continuance of labor, without any stated times of recalling them to the worship of their Maker." [22] In 1788 the schedule to the act, 28 Geo. III, c. 48, obligated master chimney sweeps to have their apprentices washed at least once a week, providing that on Sunday the master should send the apprentice to worship, should allow him to have religious instruction, and should not allow him to wear his sweeping dress; the act also regulated the sweeps' hours of work. In 1832 a Commons Select Committee on the Observance of the Sabbath heard the testimony of a medical doctor as to the physically injurious effects of seven-day unremitted labor,[23] and although the report of the Committee reveals a primarily religious cast of mind, it discloses also a sensitivity to the plight of the journeyman bakers, seven thousand of whom had petitioned the House for one day's repose weekly, and to the wishes of shopkeepers and tradesmen forced by competition to work on Sunday, although "most desirous of a day of rest." [24] The Committee recommended the enactment of severer sanctions for Lord's day violations: "The objects to be attained by Legislation may be considered to be, first, a solemn and decent outward Observance of the Lord's-day, as that portion of the week which is set apart by Divine Command for Public Worship; and next, the securing to every member of the Community without any exception, and however low his station, the uninterrupted enjoyment of that Day of Rest which has been in Mercy provided for him, and the privilege of employing it, as well in

---

[22] IV Blackstone Commentaries (Lewis ed. 1897) *63. Compare the Report of the Committee on the Judiciary on the petition praying "the repeal of all laws . . . enforcing the observation of a day of the week as the Sabbath . . . ," Mass. Leg. Docs., H. Doc. No. 125 (1851), 9–10.

[23] Report from Select Committee on the Observance of the Sabbath Day, in 7 H. C., Sessional Papers (1831–1832), at pp. 116–117.

[24] *Id.*, at p. 6. See *id.*, at pp. 5–8.

the sacred Exercises for which it was ordained, as in the bodily relaxation which is necessary for his well-being, and which, though a secondary end, is nevertheless also of high importance." [25]

But, whatever the nature of the propulsions underlying state-enforced Sunday labor stoppage during these centuries before the twentieth, it is clear that its effect was the creation of an institution of Sunday as a day apart. The origins of the institution were religious, certainly, but through long-established usage it had become a part of the life of the English people.[26] It was a day of rest not merely in a physical, hygienic sense, but in the sense of a recurrent time in the cycle of human activity when the rhythms of existence changed, a day of particular associations which came to have their own autonomous value for life.[27] When that value was threatened by the pressures of the Industrial Revolution, agitation began for new

---

[25] *Id.*, at pp. 9–10.

[26] See Trevelyan's comment quoted in the foreword to Skottowe, The Law Relating to Sunday (1936); Whitaker, Sunday in Tudor and Stuart Times (1933); Whitaker, The Eighteenth-Century English Sunday (1940), especially at 192, 199–201.

[27] Addison, writing in No. 112 of the Spectator, July 9, 1711: "I am always very well pleased with a country Sunday, and think, if keeping holy the seventh day were only a human institution, it would be the best method that could have been thought of for polishing and civilizing of mankind. It is certain, the country people would soon degenerate into a kind of savages and barbarians, were there not such frequent returns of a stated time, in which the whole village meet together with their best faces, and in their cleanest habits, to converse with one another upon different subjects, hear their duties explained to them, and join together in adoration of the supreme Being. Sunday clears away the rust of the whole week, not only as it refreshes in their minds the notions of religion, but as it puts both the sexes upon appearing in their most agreeable forms, and exerting all such qualities as are apt to give them a figure in the eye of the village." The Spectator (Am. ed. 1859), at 160. See the attempt to capture the peculiar atmosphere of Sunday in the opening lines to the second book of Crabbe's The Village (1783).

478

legislative action to preserve the traditional English Sunday.[28]

At the turn of the century, the Factory and Workshop Act, 1901, prohibited the Sunday employment of women and children in industrial establishments.[29] The Shops Act, 1912, in its institution of a five-and-a-half-day week for shop assistants, built upon the base of existing Sunday closing law.[30] When during the war the pressures of

---

[28] In 1895 the late president of a grocers' association testifying on a proposed bill regulating the closing hours of shops urged that the Commons Committee recommend Sunday closing to the House; the many English grocers who wanted their Sunday off were alarmed at the threat of increased trade by competitors which would force their own opening on Sunday. Report from the Select Committee on Shops (Early Closing) Bill (Commons 1895) 158–159. The Report from the Select Committee of the House of Lords on the Sunday Closing (Shops) Bill [H. L.] (1905) did recommend Sunday closing legislation, which it found supported by all but one of the more than three hundred shopkeepers associations whose views were ascertained. The Committee's Report, at VI–VII, quotes the testimony of a witness (a clergyman, it may be noted), that ". . . the great need that impresses all of us busy workers in my part of London is the fact that because of the noise and rush we do want to safeguard the lives of our people by their having one day in seven. It is necessary for brain and for body, quite apart from the religious aspect of the question, for the moment, and by the stress at which we are all living down there Sunday has become practically like any other day. . . . The British population say that they would lose their custom in a great measure if they, in self-defence, did not open on Sunday. The feeling is very dominant that the result is that many of them have to work, whether they like it or not, seven days a week." (See also testimony to the same effect, id., at 3–4, 17, 20, 30, 36, 40.)

[29] 1 Edw. VII, c. 22, § 34. Continued, as amended, in the Factories Act, 1937, 1 Edw. VIII & 1 Geo. VI, c. 67, § 77.

[30] 2 Geo. V, c. 3, §§ 1, 4, provides for a half-day closing and a half-day off for employees "On at least one week day in each week." (§ 1.) Other twentieth century legislation indicates recognition of the interweaving effects of the Sunday laws and other hours-of-labor legislation. The statute of 2 & 3 Eliz. II, c. 57, § 12, repealed the Sunday laws affecting the baking industry as part of a new program

national defense compelled continuous factory operation, a Committee of the Ministry of Munitions appointed to investigate industrial fatigue as this affected the health and efficiency of munitions workers, recommended to Parliament reinauguration of Sunday work stoppage:

". . . The problem of Sunday labour, although materially affected by various industrial questions and the established custom of Sunday rest, is—as regards Munitions Works—primarily a question of the extent to which workers actually require weekly or periodic rests if they are to maintain their health and energy over long periods. Intervals of rest are needed to overcome mental as well as physical fatigue. In this connection account has to be taken not only of the hours of labour (overtime, 12-hour shifts, 8-hour shifts), the environment of the work and the physical strain involved, but also the mental fatigue or boredom resulting from continuous attention to work. As one Manager put it, it is the monotony of the work which kills—the men get sick of it.

". . . [I]f the maximum output is to be secured and maintained for any length of time, a weekly period of rest must be allowed. . . . On economic and social grounds alike this weekly period of rest is best provided on Sunday . . . ." [31]

of hours regulation for that industry. The Sunday Entertainments Act, 1932, 22 & 23 Geo. V, c. 51, permitting Sunday cinema at local option, subjects the allowance of Sunday operation to the condition that no person may be employed therein who has worked on each of the six days next preceding, except in emergencies, in which case the employee must get his day's rest subsequently.

[31] Ministry of Munitions, Health of Munition Workers Committee, Report on Sunday Labour, Memorandum No. 1 [Cmd. 8132] (1915), 3, 5. The Committee had not been directed specifically to investigate

In 1936 the conflict between the economic pressures for seven-day commercial activity and the resistance to those pressures culminated in the Shops (Sunday Trading Restriction) Act of that year, which, with a complex pattern of exceptions, prohibited Sunday trading upon pain of penalties more severe, and hence better calculated to assure obedience, than the nominal fines which had obtained under the seventeenth century Lord's day ban.[32] The Parliamentary Debates on the 1936 Act are instructive. With extremely rare exceptions,[33] no intimation of religious purpose is to be discovered in them.[34] The opening speech by Mr. Loftus who introduced the bill is representative:

> ". . . [I]t is a Bill which is necessary to secure the family life and liberty of hundreds of thousands of our people. . . .

· · · · ·

the Sunday labor question, but in its inquiries generally into hours of labor, it discovered that "employers and workers were specially concerned at the present time with the problem of Sunday labour," and the Committee was "so impressed with the urgency and importance of this question," that it determined to submit a preliminary report on this subject alone. *Id.*, at 3.

[32] 26 Geo. V & 1 Edw. VIII, c. 53. See also the Retail Meat Dealers' Shops (Sunday Closing) Act, 1936, 26 Geo. V & 1 Edw. VIII, c. 30. These acts are continued in the Shops Act, 1950, 14 Geo. VI, c. 28, part IV.

[33] See 308 H. C. Deb. 2216 and 2223 (5th ser. 1935–1936) (suggesting that persons ought not be made to work on a day when they would want to attend religious services) ; *id.*, at 2211. The strongest Christian religious sentiment was demonstrated by an opponent of the bill, see 311, *id.*, at 497. Other opposing speakers waved the shibboleth of religious motive in an attempt to discredit the measure. See 308, *id.*, at 2190–2191; 311, *id.*, at 2097; but see 308, *id.*, at 2179–2182; 101 H. L. Deb. 262 (5th ser. 1935–1936) (two opponents admit absence of religious purpose or effect).

[34] This is especially significant in England where, of course, no constitutional compulsion exists to encourage Parliament to "make a record" concealing a clandestine sectarian aim.

"... I will explain to the House that there are thousands of shopkeepers who hate opening on Sunday—they dislike the whole idea—but are forced to open because their neighbours open. They are forced to open not for the sake of the Sunday trading, but because if they let their customers get into the habit on Sunday of going to other shops they may lose their week-day custom. .... They have the right to·a holiday on Sunday, to be able to rest from work on that day and to go out into the parks or into the country on a summer day. That is the liberty for which they are asking, and that is the liberty which this Bill would give to them. As regards the support behind the Bill, it is promoted by the Early Closing Association, with 300 affiliated associations, and the National Federation of Grocers, representing 400,000 individual shops, and is supported by the National Chamber of Trade, the Drapers' Chamber of Trade, the National Federation of the Boot Trade, and as regards the employés—and this is important—it is supported by the National Union of Shop Assistants and by the National Union of Distributive Workers." [35]

Speakers asserted the necessity for maintaining "the traditional quality of the Sunday in this country." [36] One particularly staunch Labour supporter of the measure argued:

"... Frankly, I am afraid of a seven-day week. I see it coming gradually, and a seven-day week

---

[35] 308 H. C. Deb. 2157–2159 (5th ser. 1935–1936). See also *id.*, at 2165–2167, 2174, 2183, 2186, 2207, 2211, 2213, 2223–2224; 101 H. L. Deb. 254–255, 266 (5th ser. 1935–1936).

[36] 308 H. C. Deb. 2209 (5th ser. 1935–1936). See also 311, *id.*, at 453–454, 490. Throughout the debates it is emphasized that the bill was "a Sunday Trading Restriction Bill and not ... a Bill to have one day's rest in seven." 311, *id.*, at 456; see *id.*, at 2106. Yet it was not the sacred quality of the day that was meant.

means six days' pay for seven days' work. I have worked seven days a week in my time and I say that, if I can help it, nobody else shall work seven days for six days' pay. It is clear that if one shopkeeper opens in a street, the whole street is bound to open and, if one street opens, the whole town must open automatically. . . . I am not speaking as a Sabbatarian. I stand for the six-day working week with one day's rest in seven but I do not want that day's rest arranged on the lines suggested by the hon. Member . . . who, apparently, wants to turn my Sunday into a Tuesday or a Wednesday. The argument is that all we need do is to say there shall be a six-day working week with one day's rest in seven, and that it does not matter whether the Sunday comes on a Friday or a Tuesday. As a family man let me say that my family life would be unduly disturbed if any member had his Sunday on a Tuesday. The value of a Sunday is that everybody in the family is at home on the same day. What is the use of talking about a six-day working week in which six members of a family would each have his day of rest on a different day of the week?" [37]

The bill was strongly supported by labor and trade groups [38] and passed by an overwhelming margin.[39]

Thus the English experience demonstrates the intimate relationship between civil Sunday regulation and the interest of a state in preserving to its people a recurrent time of mental and physical recuperation from the strains and pressures of their ordinary labors. It demonstrates also, of course, the intimate historical connection between the choice of Sunday as this time of rest and the doctrines

---

[37] 308, *id.*, at 2197–2198.

[38] See 308, *id.*, at 2186, 2194–2195, 2206; 311, *id.*, at 2095.

[39] Although a private member's bill, the measure passed on the second reading in Commons by a 191-to-8 vote. 308, *id.*, at 2230.

of the Christian church. Long before the emergence of modern notions of government, religion had set Sunday apart. Through generations, the people were accustomed to it as a day when ordinary uses ceased. If it might once—or elsewhere—have been equally practicable to fulfill the same need of the workers and traders for periodic relaxation by the selection of some other cycle, it was no longer practicable in England. Some hypothetical man might do better with one-day-in-eight, or one-day-in-four, but the Englishman was used to one-day-in-seven. And that day was Sunday. Through associations fostered by tradition, that day had a character of its own which became in itself a cultural asset of importance: a release from the daily grind, a preserve of mental peace, an opportunity for self-disposition. Certainly, legislative fiat could have attempted to switch the day to Tuesday. But Parliament, naturally enough, concluded that such an attempt might prove as futile as the ephemeral decade of the French Republic of 1792.[40]

---

[40] Even on the Continent the forces which in the latter half of the nineteenth century pressed for the amelioration of the working conditions of the laborer expressed themselves in part in Sunday legislation. Germany, Austria, the Swiss Federal Government, Denmark, Norway and Russia in the 1870's, 80's and 90's promulgated regulations prohibiting Sunday employment—in some cases only for women and children; in others, for all workers in enumerated industries—or closing factories or commercial establishments during part or all of the day. See Congrès International du Repos Hebdomadaire, Paris, 1889, Compte-Rendu (1890), 339–344; Congrès International du Repos du Dimanche, Bruxelles, 1897, Rapports et Compte Rendu (1898), 9–24, 139–159, 229–234; Congrès International du Repos du Dimanche, Paris, 1900, Rapports et Compte Rendu (1900), Rapports No. I, II, VII; Mackenzie, ed., The World's Rest-Day, An Account of the Thirteenth International Congress on the Lord's Day, Edinburgh, 1908 (1909), 168–187; Report of the Joint Special Committee to Revise, Consolidate and Arrange the General Laws . . . Relating to the Observance of the Lord's Day, Mass. Leg. Docs., H. Doc. No. 1160

484

■■■■■■■■■■
■■■■■■■■■■ ■■■■

## III.

In England's American settlements, too, civil Sunday regulation early became an institution of importance in shaping the colonial pattern of life. Every Colony had a law prohibiting Sunday labor. These had been enacted

---

(1907), Appendix, at 57–66. In the late 1880's a German plebiscite conducted by Bismarck showed strong popular support among both employers and employees for Sunday closing. See Congrès International du Repos Hebdomadaire, Paris, 1889, Compte-Rendu (1890), 360–364. The development of the European Sunday-closing movement is reflected in the proceedings of the various conventions of an institution which convened sometimes as the International Congress on Sunday rest, sometimes as the International Congress for weekly rest. See the reports cited, *supra;* see also, *e. g.,* Jackson, ed., Sunday Rest in the Twentieth Century, An Account of the International Sunday Rest Congress at St. Louis, 1904 (1905); Congresso Internazionale Pro Riposo Settimanale, Resoconto, Milano, 1906 (undated); Sunday, The World's Rest Day, Fourteenth International Lord's Day Congress, Oakland, California, 1915 (1916). At the first meeting of this group, in Geneva in 1876, the delegates displayed a primarily religious outlook, although much was also said of the physical and moral betterment of the worker through periodic rest. Congrès sur l'observation du Dimanche, Genève, 1876, Actes (1876), 120, 187–191, 353–367. A major objective of the Conference was to secure Sunday off for the railroad employees. When, after several intervening conventions, the International Congress met in Paris in 1889, it was under the presidency of Leon Say, and its temper was rather secular than clerical. It took the name of the Congrès International du Repos Hebdomadaire, and though it contained members both of conservative-religious and of socialist tendencies, the latter were more vocal and especially took the lead in formulating the Congress' program of state-enforced, rather than merely voluntary, industrial closing. See Congrès International du Repos Hebdomadaire, Paris 1889, Compte-Rendu (1890), 83–93, 103–108, 344–380. Yet the group resolved to demand not merely some one indiscriminate day of rest weekly, but *Sunday:* "1. Sunday rest is possible to varying degrees in every industry. 2. This is the day of rest which is most suitable both to the employer and to the worker, as well from the point of view of the individual as from that of the family, and because it is good that

in many instances prior to the last quarter of the seventeenth century, and.they were continued in force throughout the period that preceded the adoption of the Federal

---

the day of rest should be, as much as possible, the same for all." *Id.,* at 160 (translated from the French); see also *id.,* at 126, 167, 197. (Compare the Convention Concerning Weekly Rest in Commerce and Offices, 1957, Convention 106 of the General Conference of the International Labour Organization, Geneva, 1957, H. R. Doc. No. 432, 85th Cong., 2d Sess. 7–12, providing for a weekly day of rest which shall, where possible, "coincide with the day of the week established as a day of rest by the traditions or customs of.the country or district." Art. 6, § 3. So far as possible, the traditions and customs of religious minorities are to be respected. Art. 6, § 4. Similarly, The International Labour Conference's Draft Convention Concerning the Application of the Weekly Rest in Industrial Undertakings, adopted at the Third Session of the General Conference in Geneva in 1921, establishes 24 consecutive hours of rest per seven days for industrial workers, to be fixed, wherever possible "so as to coincide with the days already established by the traditions or customs of the county or district." Art. 2. International Labour Conference, 3d Sess., Draft Conventions & Recommendations (1921), 30.)

At Chicago, four years later, both clerical and laborite perspectives were again represented; George E. McNeill, one of the pioneers of the American labor movement, spoke, and the representative of the Brotherhood of Railway Trainmen and other railroad workers' organizations, L. S. Coffin, supported Sunday rest. The Sunday Problem, Its Present Day Aspects, Papers Presented at the International Congress on Sunday Rest, Chicago, 1893 (1894), 43, 95. In 1897, at Brussels, the spirit was again predominantly secular; the Congress debated extensively the question whether governmental action to compel a day of rest was advisable, or whether the matter could best be handled by persuasion of individual employers; and the sense of the meeting strongly favored governmental intervention. Congrès International du Repos du Dimanche, Bruxelles 1897, Rapports et Compte Rendu (1898), 35–47, 161–171, 377–385, 387–393, 538–559. See also Congrès International du Repos du Dimanche, Paris, 1900, Rapports et Compte Rendu (1900). Later meetings of the Congress tended to be religion-oriented, although secular interests continued to find voice. See Jackson, ed., *op. cit., supra,* at 59–77, 85–96; Mackenzie, ed., *op. cit., supra,* at 187.

486

Constitution and the Bill of Rights.[41] This is not in itself, of course, indicative of the purpose of those laws, or of their consistency with the guarantee of religious freedom which the First Amendment, restraining the power of the central Government, secured. Most of the States were only partly disestablished in 1789.[42] Only in Virginia [43] and in Rhode Island, which had never had an establishment,[44] had the ideal of complete church-state separation been realized. Other States were fast approaching that ideal, however, and everywhere the spirit of liberty in religion was in the ascendant. Ratifying Conventions in New York, New Hampshire and North Carolina, as well as in Virginia and Rhode Island, proposed an anti-establishment amendment to the Constitution or signified that in their understanding the Constitution embodied such a safeguard.[45] All of these five States had Sunday laws at the time that their Conventions spoke. Indeed, in four of the five, their legislatures had reaffirmed the Sunday labor ban within five years or less immediately prior to that date.[46]

---

[41] See Appendix I to this opinion, *post*, p. 543. Hereafter the colonial Sunday statutes will be cited by date and Colony.

[42] Cobb, The Rise of Religious Liberty in America (1902), 482–517; Sweet, The Story of Religion in America (rev. ed. 1939), 274–280.

[43] See James Madison's essay, "Monopolies. Perpetuities. Corporations. Ecclesiastical Endowments." in Fleet, Madison's "Detatched Memoranda," 3 Wm. & Mary Q. 534, 551, 554–556 (1946). See authorities cited in note 3, *supra*.

[44] See Proceedings of the First General Assembly of "The Incorporation of Providence Plantations," and the Code of Laws, 1647 (1847), 50: ". . . and, otherwise than thus what is herein forbidden, all men may walk as their consciences persuade them, every one in the name of his GOD . . . ." See Cobb, The Rise of Religious Liberty in America (1902), 423–440.

[45] See note 2, *supra*.

[46] New Hampshire enacted Sunday laws in 1785 and 1789, New York in 1788, Virginia in 1786. Rhode Island in 1784 exempted from

The earlier among the colonial Sunday statutes were unquestionably religious in purpose. Their preambles recite that profanation of the Lord's day "to the great Reproach of the Christian Religion," [47] or "to the great offence of the Godly welafected among us," [48] must be suppressed; that "the keeping holy the Lord's day, is a principal part of the true service of God"; [49] that neglecting the Sabbath "pulls downe the judgments of God upon that place or people that suffer the same . . . ." [50] The first Pennsylvania Sunday law announces a purpose "That Looseness, irreligion, and Atheism may not Creep in under pretense of Conscience . . . ." [51] Sometimes

---

her Sunday labor ban members of Sabbatarian societies, but specified that the exemption did not extend to allow such persons to keep shops open or to do mechanical labor in compact places; in 1798 Rhode Island again enacted a comprehensive Sunday law with the same exceptions.

[47] Delaware, 1740.

[48] Massachusetts (Plymouth), 1658.

[49] Georgia, 1762. See also Maryland, 1696; New York, 1685; South Carolina, 1712. See the statute of 1 Charles I, quoted in text at note 12, *supra*. The law of the Massachusetts Bay Colony in 1653 recited that playing, walking, drinking, sporting, and traveling on the Lord's day tend "much to the Dishonour of God, the Reproach of Religion, Grieving the Souls of Gods Servants, and the Prophanation of his Holy Sabbath, the Sanctification whereof is sometimes put for all Duties, immediately respecting the service of God contained in the first Table . . . ."

[50] Connecticut, 1668.

[51] Pennsylvania, 1682; see also the statutes of 1690, 1700. The "Body of Laws" of 1682 declared religious tolerance for all persons believing in a Supreme Being: "But to the end That Looseness, irreligion, and Atheism may not Creep in under pretense of Conscience in this Province, *Be It further Enacted* . . . That, according to the example of the primitive Christians, and for the ease of the Creation, Every first day of the week, called the Lord's day, People shall abstain from their usual and common toil and labour, That whether Masters, Parents, Children, or Servants, they may the better dispose themselves to read the Scriptures of truth at home, or fre-

reproach of God is made an operative element of the offense.[52] Prohibitions of Sunday labor are frequently coupled with admonitions that all persons shall "carefully apply themselves to Duties of Religion and Piety, publickly and privately . . . ,"[53] and are found in comprehensive ecclesiastical codes which also prohibit blasphemy,[54] lay taxes for the support of the church,[55] or compel attendance at divine services.[56]

---

quent such meetings of religious worship abroad, as may best sute their respective persuasions."

[52] The New Haven Code of 1656 provides: "Whosoever shal prophane the Lord's Day, or any part of it, either by sinful servile work, or by unlawful sport, recreation or otherwise, whether wilfully, or in a careless neglect, shal be duly punished by fine, imprisonment, or corporally, according to the nature and measure of the sinn, and offence. But if the court upon examination, by clear and satisfying evidence, find that the sin was proudly, presumptuously, and with a high hand committed against the known command and authority of the blessed God, such a person, therein despising and reproaching the Lord, shal be put to death, that all others may fear and shun such provoaking Rebellious courses. Numb. 15: from 30 to 36 verse." The Plymouth Colony law of 1671 is similar. And see the act published in the Bay Colony in 1647, by which to "deny the moralitie of the fourth commandement" is branded among other heresies and made punishable by banishment. Laws and Liberties of Massachusetts, 1648 (reprinted 1929), 24.

[53] Massachusetts, 1692. See also New Hampshire, 1700; North Carolina, 1741. These statutes are patterned on 29 Charles II, c. 7, quoted in text at note 15, *supra.*

[54] Maryland, 1649; cf. Virginia, 1705 (atheism).

[55] Maryland, 1692, "An Act for the Service of Almighty God and the Establishment of the Protestant Religion within this Province."

[56] See the Connecticut statute set forth in the Acts and Laws, 1750; Georgia, 1762; Massachusetts, 1761. Compulsory church-attendance laws in the New England Colonies dated from before the middle of the seventeenth century. See the Code of 1650 of the General Court of Connecticut (1822) 46; and the Bay Colony's act published in 1647, Laws and Liberties of Massachusetts, 1648 (reprinted 1929), 20.

But even the seventeenth century legislation does not show an exclusively religious preoccupation. The same Pennsylvania law which speaks of the suppression of atheism also ordains Sunday rest "for the ease of the Creation," and shows solicitude that servants, as well as their masters, may be free on that day to attend such spiritual pursuits as they may wish.[57] The Rhode Island Assembly in 1679 enacted:

"Voted, Whereas there hath complaint been made that sundry persons being evill minded, have pre-

---

[57] See note 51, *supra*. This latter object, not the compulsion of conscience but the liberation of all individuals from Sunday labor and Sunday disturbance so that they might worship God as their own consciences dictated, was, at one period, not infrequently put forward as the justifying purpose of the Sunday laws. *State* v. *Ambs,* 20 Mo. 214, 218 (1854); *George* v. *George,* 47 N. H. 27, 34 (1866); *Lindenmuller* v. *People,* 33 Barb. 548, 564 (N. Y. Sup. Ct., 1861); *Johnston* v. *Commonwealth,* 22 Pa. 102, 115 (1853). As the habits and preoccupations of the people themselves changed, it was but a short step from this reasoning to the recognition that Sunday laws serve the purpose of providing leisure and peace favorable to the pursuit of whatever aspirations, religious or secular, various individuals may choose. See text at note 35, *supra*. Sensitive to emerging new popular needs and desires, legislatures were later to reshape the Sunday laws by complex patterns of exceptions permitting numerous recreational activities which, far from according with the original puritanical inspiration of the Lord's day acts, were precisely those games and sports which colonial legislation most severely condemned. See, *e. g.,* Virginia, 1610; Connecticut, 1668. The development of these evolving exceptions is discussed briefly in text at notes 124–131, *infra;* its product may be seen in Appendix II to this opinion, *post,* p. 551. What it is significant to note at this point is that the continuity which marks the history of the Sunday laws is a continuity both of enduring and changing social demands. The enduring feature has been man's need for a day set apart, a day of community repose: this he has persistently, continuingly demanded. The changing feature has been the way in which he chooses to spend his day. The need which the "Body of Laws" recognized in Pennsylvania in 1682 was

sumed to employ in servile labor, more than necessity requireth, their servants, and alsoe hire other mens' servants and sell them to labor on the first day of the week: . . . bee it enacted . . . . That if any person or persons shall employ his servants or hire and employ any other man's servant or servants, and set them to labor as aforesaid [he shall be penalized]." [58]

---

both the same and different than that expressed by Luther, see note 20, *supra,* and that which twentieth century Sunday legislation accommodates. It is the need for a recurrent time when the common concerns of the working week cease to make their demands, and there is a peace that is general to the community—whether the individual finds it at church, at home, at the beach, in the country, or at the baseball game.

[58] 3 Records of the Colony of Rhode Island and Providence Plantations, 1678–1706 (1858), 30–31. The first Rhode Island Sunday law was an enactment of 1673 prohibiting the dispensing of alcoholic beverages on Sunday. Its preamble is this:

"Voted, this Assembly consideringe that the King hath granted us that not any in this Collony are to be molested in the liberty of their consciences, who are not disturbers of the civill peace, and wee are perswaded that a most flourishing civil government with loyalty may be best propagated where liberty of conscience by any corporall power is not obstructed that is not to any unchastness of body, and not by a body doeinge any hurt to a body, neither indeavoringe soe to doe; and although wee know by man not any can be forced to worship God or for to keep holy or not to keep holy any day; but forasmuch as the first dayes of weeks, it is usuall for parents and masters not to imploy their children or servants as upon other dayes, and some others alsoe that are not under such government, accountinge it as a spare time, and soe spend it in debaistnes or tipplinge and unlawfull games and wantonness, and most abhominably there practiced by those that live with the English at such times to resort to townes. Therefore, this Assembly, not to oppose or propagate any worship, but as by preventinge debaistnes, although wee know masters or parents cannot and are not by violence, to indeavor to force any under their government, to any worshipper from any worshipp, that is not debaistnes or disturbant to the civill peace, but they are to require them, and if that will not prevaile, if they can they should compell

In the latter half of the eighteenth century, the Sunday laws, while still giving evidence of concern for the "immorality" of the practices they prohibit, tend no longer to be prefixed by preambles in the form of theological treatises.[59] Now it appears to be the community, rather than the Deity, which is offended by Sunday labor. New York's statute of 1788 no longer refers to the Lord's day, but to "the first day of the week commonly called Sunday." [60] Where preambles do appear, they display a duplicity of purpose. The Massachusetts Act of 1792 begins:

> "Whereas the observance of the Lord's Day is highly promotive of the welfare of a community, by affording necessary seasons for relaxation from labour and the cares of business; for moral reflections and conversation on the duties of life . . . ; for public and private worship of the Maker, Governor and Judge of the world; and for those acts of charity which support and adorn a Christian society: And whereas some thoughtless and irreligious persons, inattentive to the duties and benefits of the Lord's Day, profane the same, by unnecessarily pursuing their worldly business and recreations on that day, to their own great damage, as members of a Christian

---

them not to doe what is debaistnes, or uncivill or inhuman, not to frequent any imodest company or practices."

[59] See New Jersey, 1798: Delaware, 1795 (this statute does recite that its purpose is to deter those who "profane" the Lord's day); New Hampshire, 1785 and 1789 (these acts were, however, recommended to be read by ministers to their congregations). It is true that the Pennsylvania statute of 1794 is an act for the prevention of immorality and that the New Jersey statute of 1790 is "An Act to promote the Interest of Religion and Morality, and for suppressing of Vice . . . ," but even these enactments show a very different tenor than that of earlier legislation in the same Colonies. See, e. g., Pennsylvania, 1682; New Jersey, 1693.

[60] Compare New York's legislation of 1685, 1695.

society; to the great disturbance of well-disposed persons, and to the great damage of the community, by producing dissipation of manners and immoralities of life . . . ."

An enactment of Vermont in 1797 is similar.[61]

More significant is the history of Sunday legislation in Virginia. Even before the English statute of 29 Charles II, that Colony had had laws compelling Sunday attendance at worship [62] and forbidding Sunday labor.[63] In 1776, the General Convention at Williamsburg adopted a Declaration of Rights, providing, *inter alia,* that " . . . all men are equally entitled to the free exercise of religion, according to the dictates of conscience . . . ," [64] and in the same year the acts of Parliament compelling church attendance and punishing deviation in belief were declared void, dissenters were exempted from the tax for support of the established church, and the levy of that tax was suspended.[65] Eight years later came the battle over the Assessment Bill. Under Madison's leadership the forces supporting entire freedom of religion wrote the definitive quietus to the Virginia establishment, and Jefferson's Bill for Establishing Religious Freedom was enacted in 1786:

"I. Whereas Almighty God hath created the mind free; that all attempts to influence it by temporal

---

[61] An Act to enforce the due observation of the Sabbath. 1 Laws of Vermont (1808) 275.

[62] The earliest law was that of 1610. For the Colony in Virginea Britannia, Lawes Divine, Morall and Martiall (1612), in 3 Force, Tracts Relating to the Colonies in North America (1844), II, 10–11. This was followed by an Act of 1623–1624. 1 Hening, Statutes of Virginia (1823), 123. And see *id.,* at 144.

[63] See Appendix I to this opinion, *post,* p. 549. The most important statutes are those of 1629 and 1705, 1 Hening, Statutes of Virginia (1823), 144; 3 Hening, Statutes of Virginia (1823), 358.

[64] 9 Hening, Statutes of Virginia (1821), 109, 111–112.

[65] *Id.,* at 164.

punishments or burthens, or by civil incapacitations, tend only to beget habits of hypocrisy and meanness, and are a departure from the plan of the Holy author of our religion, who being Lord both of body and mind, yet chose not to . . . propagate it by coercions on either, as was in his Almighty power to do; that the impious presumption of legislators and rulers, civil as well as ecclesiastical, who being themselves but fallible and uninspired men, have assumed dominion over the faith of others, setting up their own opinions and modes of thinking as the only true and infallible, and as such endeavouring to impose them on others, hath established and maintained false religions over the greatest part of the world, and through all time; . . . that to suffer the civil magistrate to intrude his powers into the field of opinion, and to restrain the profession or propagation of principles on supposition of their ill tendency, is a dangerous fallacy, . . . that it is time enough for the rightful purposes of civil government, for its officers to interfere when principles break out into overt acts against peace and good order; and finally, that truth is great and will prevail if left to herself, . . . .

"II. *Be it enacted* . . . That no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief; but that all men shall be free to profess, and by argument to maintain, their opinion in matters of religion, and that the same shall in no wise diminish, enlarge, or affect their civil capacities." [66]

In this bill breathed the full amplitude of the spirit which inspired the First Amendment, and this Court has looked

[66] 12 Hening, Statutes of Virginia (1823), 84–86.

to the bill, and to the Virginia history which surrounded its enactment, as a gloss on the signification of the Amendment. See the opinions in *Everson* v. *Board of Education*, 330 U. S. 1. The bill was drafted for the Virginia Legislature as No. 82 of the Revised Statutes returned to the Assembly by Jefferson and Wythe on June 18, 1779.[67] Bill No. 84 of the Revision provided:

> "If any person on Sunday shall himself be found labouring at his own or any other trade or calling, or shall employ his apprentices, servants or slaves in labour, or other business, except it be in the ordinary household offices of daily necessity, or other work of necessity or charity, he shall forfeit the sum of ten shillings . . . ."[68]

This bill was presented to the Assembly by Madison in 1785,[69] and was enacted in 1786.[70] Apparently neither Thomas Jefferson nor James Madison regarded it as

---

[67] 2 Papers of Thomas Jefferson (Boyd ed. 1950) 305–324, 545–553. For the story of the Revision, see Jefferson's Autobiography, in I Writings of Thomas Jefferson (Memorial ed. 1903) 62–67; I Randall, Life of Thomas Jefferson (1858), 202–203, 208, 216 *et seq.*

[68] 2 Papers of Thomas Jefferson (Boyd ed. 1950) 555. The bill was entitled: "A Bill for Punishing Disturbers of Religious Worship and Sabbath Breakers." It also forbade the arrest for any civil cause of any minister of the gospel while engaged in public preaching or performing religious worship in any church, and punished any person who should maliciously disturb any worshipping congregation or misuse any minister therein. There is evidence to attribute the original draft of the provision to Jefferson, *id.*, at 314–321; in any event, we know that, with the other revisers, he studied and reworked every bill in the revision until it satisfied him. Autobiography, in I Writings of Thomas Jefferson (Memorial ed. 1903) 66.

[69] Journal of the House of Delegates, Commonwealth of Virginia, Oct. 17, 1785 (1828), 12–14.

[70] 12 Hening, Statutes of Virginia (1823), 336. The wording of the statute as passed differs slightly from that of the bill reported by the revisers.

repugnant to religious freedom. Nor did the Virginia legislators who thirteen years later reaffirmed the Bill for Establishing Religious Freedom as "a true exposition of the principles of the bill of rights and constitution," by repealing all laws which they deemed inconsistent with it.[71] The Sunday law of 1786 was not among those repealed.

## IV.

Legislation currently in force in forty-nine of the fifty States illegalizes on Sunday some form of conduct lawful if performed on weekdays.[72] In several States only one or a few activities are banned—the sale of alcoholic beverages,[73] hunting,[74] barbering,[75] pawnbroking,[76] trad-

---

[71] 2 Shepherd, Statutes of Virginia (1835), 149.

[72] Appendix II to this opinion, *post,* p. 551. Only Alaska has no such legislation.

[73] See Delaware, Iowa, Wyoming. Many States which have broader Sunday statutes also provide special regulations for the sale of intoxicants on Sunday. Significantly, even those who have assailed the ban on Sunday labor as an unconstitutional religious establishment assert the constitutionality of Sunday alcohol control. See, *e. g.,* Lewis, A Critical History of Sunday Legislation (1888), ix. They point to the contemporary justification for the prohibition of liquor sales on that day: the greater danger of abusive use of alcohol during a time when virtually all persons are at leisure. Admitting that there are also cogent contemporary reasons for a Sunday labor ban, they assert that the history of Sunday labor legislation reveals that these legitimate reasons are not those which in fact underlie it. But the roots of Sunday alcohol control are as deeply bedded in early Sabbath anti-tippling statutes as are those of Sunday labor laws in Lord's day acts. See the Connecticut statute set forth in the Acts and Laws, 1750; Delaware, 1740; Maryland, 1674; Massachusetts Bay, 1653; Massachusetts, 1761; New Hampshire, 1715; New York, 1685. See *State* v. *Eskridge,* 31 Tenn. 413 (1852). Indeed, the most severe efforts to enforce Sunday prohibitions in England were for centuries directed against tippling. See Whitaker, The Eighteenth-Century English Sunday (1940), passim; Whitaker, Sunday in Tudor and Stuart Times (1933), passim.

ing in automobiles [77]—but thirty-four jurisdictions broadly ban Sunday labor, or the employment of labor, or selling or keeping open for sale, or some two or more of these comprehensive categories of affairs. In many of these States, and in others having no state-wide prohibition of industrial or commercial activity, municipal Sunday ordinances are ubiquitous.[78] Most of these regulations are the product of many re-enactments and amendments. Although some are still built upon the armatures

[74] See North Carolina. Many States with more comprehensive bans also specifically proscribe hunting. See, *e. g.*, Connecticut, Kentucky, Mississippi, Tennessee, Virginia.

[75] See, *e. g.*, Arizona, Colorado, Montana.

[76] Oregon. Cf. Michigan, New Jersey, Pennsylvania, Rhode Island.

[77] Colorado, Wisconsin. Cf., *e. g.*, Connecticut, Maine, Michigan, Pennsylvania.

[78] Some States have specific legislation enabling municipalities to. regulate Sunday business (*e. g.*, Nebraska, North Dakota), or to suppress desecration of the Sabbath (*e. g.*, Michigan, Mississippi, Rhode Island). Often such authority is written into a city's charter. See, *e. g.*, *State* v. *McGee,* 237 N. C. 633, 75 S. E. 2d 783 (1953), app. dism'd for want of a substantial federal question, 346 U. S. 802. In some cases charter authority to regulate a given business or activity has been held to support Sunday regulation of that business or activity. See, *e. g.*, *Hicks* v. *City of Dublin,* 56 Ga. App. 63, 191 S. E. 659 (1937). Where no other enabling provision is found, it is virtually unanimously held that power to enact Sunday ordinances exists under the general grant of police power to a municipality. *E. g.*, *In re Sumida,* 177 Cal. 388, 170 P. 823 (1918); *Theisen* v. *McDavid,* 34 Fla. 440, 16 So. 321 (1894); *Karwisch* v. *Mayor of Atlanta,* 44 Ga. 204 (1871); *Humphrey Chevrolet, Inc.,* v. *City of Evanston,* 7 Ill. 2d 402, 131 N. E. 2d 70 (1955); *Komen* v. *City of St. Louis,* 316 Mo. 9, 289 S. W. 838 (1926) (subsequently overruled on another point); *City of Elizabeth* v. *Windsor-Fifth Avenue, Inc.,* 31 N. J. Super. 187, 106 A. 2d 9 (1954); *Ex parte Johnson,* 20 Okla. Cr. 66, 201 P. 533 (1921); *Mayor of Nashville* v. *Linck,* 80 Tenn. 499 (1852); *City of Seattle* v. *Gervasi,* 144 Wash. 429, 258 P. 328 (1927); *State ex rel. Smith* v. *Wertz,* 91 W. Va. 622, 114 S. E. 242 (1922).

of earlier statutes, they are all, like the laws of Maryland, Massachusetts and Pennsylvania which are before us in these cases,[79] recently reconsidered legislation. As expressions of state policy, they must be deemed as contemporary as their latest-enacted exceptions in favor of moving pictures[80] or severer bans of Sunday motor vehicle trading.[81] In all, they reflect a widely felt present-day need, for whose satisfaction old laws are shaped and new laws enacted.

To be sure, the Massachusetts statute now before the Court, and statutes in Pennsylvania and Maryland, still call Sunday the "Lord's day" or the "Sabbath." So do the Sunday laws in many other States.[82] But the con-

---

[79] There have been more than seventy amendments to the Massachusetts Sunday regulation over the past century. See the opinion below, 176 F. Supp. 466, 472, n. 2. The latest amendments prior to the bringing of suit in the *Gallagher* case were in 1957. Mass. Acts 1957, cc. 300, 356, §§ 16, 17, 18. By Mass. Acts 1960, c. 812, § 3, the provisions of chapter 136, Massachusetts' general Sunday regulations, were made applicable to all or part of certain legal holidays, *e. g.*, January first, July fourth, Thanksgiving Day. The Pennsylvania statute which is considered here was enacted in 1959. Pa. Laws 1959, No. 212. And in the same year that State's Lord's Day statute was three times amended. Pa. Laws 1959, Nos. 278, 540, 684. Maryland amended the provisions which are now its Code, Art. 27, §§ 492 to 534A, seven times in 1959. Maryland Laws 1959, cc. 232, 236, 248, 503, 510, 715, 811.

[80] *E. g.*, N. D. Laws 1959, c. 131; Tenn. Acts 1957, c. 219.

[81] *E. g.*, Fla. Laws 1959, c. 59–295; Me. Laws 1959, c. 302; Okla. Laws 1959, p. 210.

[82] Maine, Minnesota, Mississippi, North Dakota, Oklahoma, West Virginia. Cf. Indiana, Missouri. But see Alabama, Illinois, New Mexico, Ohio.

Language can also be found in judicial opinions interpreting Sunday statutes which attributes religious purpose to them. See *O'Donnell* v. *Sweeney*, 5 Ala. 467, 469 (1843); *Weldon* v. *Colquitt*, 62 Ga. 449, 451–452 (1879); *State* v. *Beaudette*, 122 Me. 44, 45, 118 A. 719, 720 (1922); *Pearce* v. *Atwood*, 13 Mass. 324, 346–348 (1816); *Bennett* v. *Brooks*, 91 Mass. 118, 119–121 (1864); *Davis* v. *City of Somerville*,

tinuation of seventeenth century language does not of itself prove the continuation of the purposes for which the colonial governments enacted these laws, or that these are the purposes for which their successors of the twentieth have retained them and modified them. We know,

128 Mass. 594, 596 (1880); *Commonwealth* v. *White*, 190 Mass. 578, 580–582, 77 N. E. 636, 637 (1906); *Commonwealth* v. *McCarthy*, 244 Mass. 484, 486, 138 N. E. 835, 836–837 (1923); *Allen* v. *Duffie*, 43 Mich. 1, 7–9, 4 N. W. 427, 431–433 (1880); *Brimhall* v. *Van Campen*, 8 Minn. 13, 22 (1862); *Kountz* v. *Price*, 40 Miss. 341, 348 (1866); *People* v. *Ruggles*, 8 Johns. 290, 296–297 (N. Y. Sup. Ct. 1811); *Sellers* v. *Dugan*, 18 Ohio 489, 490, 492 (1849); *Commonwealth* v. *American Baseball Club*, 290 Pa. 136, 143, 138 A. 497, 499 (1927); *Commonwealth* v. *Coleman*, 60 Pa. Super. 380, 385–386 (1915); *Parker* v. *State*, 84 Tenn. 476, 477–479, 1 S. W. 202–203 (1886); *Graham* v. *State*, 134 Tenn. 285, 292, 183 S. W. 983, 985 (1915). And see *Smith* v. *Boston & Maine R. Co.*, 120 Mass. 490, 493 (1876); *Society for the Visitation of the Sick* v. *Commonwealth*, 52 Pa. 125, 135 (1866). Even some decisions sustaining the constitutionality of the statutes have found their justification, in part, in the preservation of Christian traditions. *Shover* v. *State*, 10 Ark. 259 (1850); *State* v. *Ambs*, 20 Mo. 214 (1854); *State ex rel. Temple* v. *Barnes*, 22 N. D. 18, 132 N. W. 215 (1911); *City Council* v. *Benjamin*, 2 Strob. L. 508 (S. C. 1848). Cf. *Varney* v. *French*, 19 N. H. 233 (1848); *Adams* v. *Gay*, 19 Vt. 358, 366 (1847). But most of these latter decisions date from an era when day-of-rest conceptions were not yet fully developed: the then prevailing notions of the police power did not accord to state legislatures authority to protect a man from the harm to himself of uninterrupted labor. Compare *Thomasson* v. *State*, 15 Ind. 449, 454 (1860) (speaking of the "patriarchal theory of government") with, *e. g., People* v. *Klinck Packing Co.*, 214 N. Y. 121, 108 N. E. 278 (1915) (sustaining New York's six-day-week statute by analogy to the Sunday law cases). The large majority of decisions applying the Sunday laws in cases where their constitutionality as possible infringements of religious liberty was not in issue have regarded the laws as having either an exclusively secular function or a function accommodating both the civil and religious needs of the community. As to the former, see, *e. g., State* v. *Shuster*, 145 Conn. 554, 145 A. 2d 196 (1958); *Rogers* v. *State*, 60 Ga. App. 722, 4 S. E. 2d 918 (1939); *Carr* v. *State*, 175 Ind. 241, 93 N. E. 1071 (1911);

for example, that Committees of the New York Legislature, considering that State's Sabbath Laws on two occasions more than a century apart, twice recommended no repeal of those laws, both times on the ground that the laws did not involve "any partisan religious issue, but

*Tinder* v. *Clarke Auto Co.*, 238 Ind. 302, 149 N. E. 2d 808 (1958); *City of Harlan* v. *Scott*, 290 Ky. 585, 162 S. W. 2d 8 (1942); *Levering* v. *Park Commissioners*, 134 Md. 48, 106 A. 176 (1919); *State ex rel. Hoffman* v. *Justus*, 91 Minn. 447, 98 N. W. 325 (1904); *City of St. Louis* v. *DeLassus*, 205 Mo. 578, 104 S. W. 12 (1907) (subsequently overruled on another point); *State* v. *Chicago, Burlington & Quincy R. Co.*, 239 Mo. 196, 143 S. W. 785 (1912); *State* v. *Malone*, 238 Mo. App. 939, 192 S. W. 2d 68 (1946); *More* v. *Clymer*, 12 Mo. App. 11 (1882); *Auto-Rite Supply Co.* v. *Mayor of Woodbridge*, 25 N. J. 188, 135 A. 2d 515 (1957); *Rodman* v. *Robinson*, 134 N. C. 503, 47 S. E. 19 (1904); *State* v. *Ricketts*, 74 N. C. 187 (1876); *Bloom* v. *Richards*, 2 Ohio St. 387 (1853); *McGatrick* v. *Wason*, 4 Ohio St. 566 (1855); *Krieger* v. *State*, 12 Okla. Cr. 566, 160 P. 36 (1916); *State* v. *Smith*, 19 Okla. Cr. 184, 198 P. 879 (1921); *State* v. *James*, 81 S. C. 197, 62 S. E. 214 (1908); *Francisco* v. *Commonwealth*, 180 Va. 371, 23 S. E. 2d 234 (1942); *State* v. *Baltimore & Ohio R. Co.*, 15 W. Va. 362 (1879); *State ex rel. Smith* v. *Wertz*, 91 W. Va. 622, 114 S. E. 242 (1922); and see *Stark* v. *Backus*, 140 Wis. 557, 123 N. W. 98 (1909). As to the latter, see *Rosenbaum* v. *State*, 131 Ark. 251, 199 S. W. 388 (1917); *State* v. *Hurliman*, 143 Conn. 502, 123 A. 2d 767 (1956); *Richmond* v. *Moore*, 107 Ill. 429 (1883); *State* v. *Mead*, 230 Iowa 1217, 300 N. W. 523 (1941); *Cleveland* v. *City of Bangor*, 87 Me. 259, 32 A. 892 (1895); *Matter of Rupp*, 33 App. Div. 468, 53 N. Y. S. 927 (1898); *People* v. *Moses*, 140 N. Y. 214, 35 N. E. 499 (1893); *Moore* v. *Owen*, 58 Misc. 332, 109 N. Y. S. 585 (N. Y. Sup. Ct. 1908); *Melvin* v. *Easley*, 52 N. C. 356 (1860); *Johnston* v. *Commonwealth*, 22 Pa. 102 (1853). Cf. the cases finding foundation for the laws in long-established usage. *Commonwealth* v. *Louisville & Nashville R. Co.*, 80 Ky. 291 (1882); *Mohney* v. *Cook*, 26 Pa. 342 (1855); *Commonwealth* v. *Nesbit*, 34 Pa. 398 (1859); *Commonwealth* v. *Jeandelle*, 3 Phila. 509 (Pa. Q. S. 1859). And see *People* v. *Law*, 142 N. Y. S. 2d 440 (Spec. Sess. 1955); *People* v. *Binstock*, 7 Misc. 2d 1039, 170 N. Y. S. 2d 133 (Spec. Sess. 1957).

rather economic and health regulation of the activities of the people on a universal day of rest," [83] and that a Massachusetts legislative committee rested on the same views.[84] Sunday legislation has been supported not only

[83] State of New York, Second Report of the Joint Legislative Committee on Sabbath Law, N. Y. Leg. Doc. No. 48 (1953), 9. See Report of the Committee on the Judiciary, on the petition praying the repeal of the laws for the observance of the sabbath, &c., 5 State of New York, Assembly Docs., Doc. No. 262 (1838). This latter report, denying any intention to enforce the duties of religious conscience, *id.*, at 7, regarded retention of the Sunday law as advisable, "Viewing the sabbath merely as a civil institution, venerable from its age, consecrated as a day of rest by the usage of our fathers, and cherished by the common consent of mankind throughout the nations of christendom . . . ." *Id.*, at 5. "The experience of mankind has shewn that occasional rest is necessary for the health of the laborer and for his continued ability to toil; that 'the interval of relaxation which Sunday affords to the laborious part of mankind, contributes greatly to the comfort and satisfaction of their lives, both as it refreshes them for the time, and as it relieves their six days' labor by the prospect of a day of rest always approaching . . . .' " *Id.*, at 7. The Committee did regard as a third consideration of importance the necessity of taking account of the moral temper of the Christian majority of the community, and of affording the laborer an opportunity to attend church if he so wished. *Id.*, at 6–8.

[84] "The committee are of one mind as to the need of a weekly day of rest for the preservation of the health and strength of the community, and would therefor recommend legislation to secure to all citizens the right of one clear day's rest in seven. In so far as possible, Sunday should be maintained as the weekly day of rest; and whenever the needs of the community, public convenience or demand compel labor on Sunday, persons thus employed should be given a legal right to rest on some other day of the week." Report of the Joint Special Committee to Revise, Consolidate and Arrange the General Laws . . . Relating to the Observance of the Lord's Day, Mass. Leg. Docs., H. Doc. No. 1160 (1907), 9. For a similar, more recent expression, see Report Submitted by the Legislative Research Council Relative to Legal Holidays and Their Observance, Mass. Leg. Docs., S. Doc. No. 525 (1960), 24–25.

In the legislative debates on the bill which became the 1959 Pennsylvania Sunday retail sales act, the charge of religious purpose

by such clerical organizations as the Lord's Day Alliance, but also by labor and trade groups.[85] The interlocking sections of the Massachusetts Labor Code construct their six-day-week provisions upon the basic premise of Sunday

was persistently made by the bill's opponents, but such a purpose was disavowed by every speaker who favored the bill. 36 Pennsylvania Legislative Journal, 143d General Assembly (1959), 1137–1140, 2564–2565, 2682–2685. See, e. g., the remarks of Mr. Walker, id., at 1139: "As I read this bill, I find nothing in it which is of a religious nature. The bill is prompted by the thousands of letters that we have all received in the Senate of Pennsylvania, asking us to do something for the men and women who work in the department stores. These people are not asking to go to church; they are asking for a day of rest." It is apparent even from the objections raised by the opponents that various economic interests, among them those of organized retailers' and labor groups, were influential in supporting the measure. See especially id., at 2682–2683.

[85] Jacoby, Remember the Sabbath Day?—The Nature and Causes of the Changes in Sunday Observance Since 1800 (Dissertation in Sociology, Microfilm, University of Pennsylvania Library (1942)), pp. 137–140, 147–148, 154–155, 200–202, c. 9; Kirstein, Stores and Unions (1950), 19–21; State of New York, Second Report of the Joint Legislative Committee on Sabbath Law, N. Y. Leg. Doc. No. 48 (1953), 16 et seq.; Report of the Unpaid Special Commission to Investigate . . . the Laws Relating to the Observance of the Lord's Day, Mass. Leg. Docs., H. Doc. No. 2413 (1954), 6; 36 Pennsylvania Legislative Journal, 143d General Assembly (1959), 1139, 2553. See the Sunday Business resolution of the 1959 and 1960 Conventions of the National Retail Merchants Association, 41 Stores 6–7 (Feb. 1959); 42 Stores 13 (Feb. 1960); and see note 40 supra. Frequently legislation closing establishments of a given trade is the product of lobbying efforts by associations of traders seeking to quash the competitive pressures which force unwanted Sunday labor. See Gundaker Central Motors, Inc., v. Gassert, 23 N. J. 71, 127 A. 2d 566 (1956), app. dism'd for want of a substantial federal question, 354 U. S. 933; Breyer v. State, 102 Tenn. 103, 50 S. W. 769 (1899). But see Sunday Observance, Hearings before the Subcommittee on Judiciary of the Committee on the District of Columbia, House of Representatives, on H. R. 7189 and H. R. 10311, 69th Cong., 1st

rest.[86] Other States have similar laws.[87] When in Pennsylvania motion pictures were excepted from the Lord's day statute, a day-of-rest-in-seven clause for motion picture personnel was written into the exempting statute to

Sess. (1926) (labor and trade groups oppose Sunday legislation supported primarily by clerical faction). Increasingly, the religious proponents of Sunday legislation have themselves come to couch their arguments in terms of hygienic and social, rather than transcendental, values. See Gilfillan, The Sabbath Viewed in the Light of Reason, Revelation, and History (Am. ed. 1862), 209–227; Floody, Scientific Basis of Sabbath and Sunday (2d ed. 1906), 311–315; McMillan, Influence of the Weekly Rest-Day on Human Welfare (1927).

[86] Mass. Gen. Laws Ann., 1958, c. 149, §§ 47 to 51. Section 47 provides:

"Whoever, except at the request of the employee, requires an employee engaged in any commercial occupation or in the work of any industrial process not subject to the following section or in the work of transportation or communication to do on Sunday the usual work of his occupation, unless he is allowed during the six days next ensuing twenty-four consecutive hours without labor, shall be punished by a fine of not more than fifty dollars; but this and the following section shall not be construed as allowing any work on Sunday not otherwise authorized by law."

Section 48 provides:

"Every employer of labor engaged in carrying on any manufacturing, mechanical or mercantile establishment or workshop . . . shall allow every person . . . [with exceptions: see §§ 49, 50] employed in such manufacturing, mechanical or mercantile establishment or workshop at least twenty-four consecutive hours of rest, which shall include an unbroken period comprising the hours between eight o'clock in the morning and five o'clock in the evening, in every seven consecutive days. No employer shall operate any such manufacturing, mechanical or mercantile establishment or workshop on Sunday unless he has complied with section fifty-one. . . ."

Section 51 is:

"Before operating on Sunday, every employer subject to section forty-eight . . . shall post in a conspicuous place on the premises a schedule containing a list of his employees who are required or allowed to work on Sunday, and designating the day of rest for each. No

fill the gap.[88] Puerto Rico's closing law, which limits the weekday hours of commercial establishments as well as proscribing their Sunday operation, does not express a religious purpose.[89] Rhode Island and South Carolina now enforce portions of their Sunday employment bans through their respective Departments of Labor.[90] It cannot be fairly denied that the institution of Sunday as a time whose occupations and atmosphere differ from those of other days of the week has now been a portion of the American cultural scene since well before the Constitution; that for many millions of people life has a hebdomadal rhythm in which this day, with all its particular associations, is the recurrent note of repose.[91] Cultural history establishes not a few practices and prohibitions religious in origin which are retained as secular

employee shall be required or allowed to work on the day of rest designated for him."

Note the evolution of these sections through Mass. Acts 1907, c. 577, codified in the Labor Code of 1909, Mass. Acts 1909, c. 514, § 52; Mass. Acts 1913, c. 619.

[87] See Ill. Rev. Stat., 1959, c. 48, §§ 8a to 8g; N. H. Rev. Stat. Ann., 1955, §§ 275.32, 275.33; N. Y. Lab. Law § 161; Ore. Wage and Hour Comm'n Orders Nos. 8 (1959), 9 (1952), 12 (1953), CCH Lab. Law Rep., State Laws (1960), pp. 57,561, 57,562, 57,564. Cf. West's Wis. Stat. Ann., 1957, § 103.85. And see Purdon's Pa. Stat. Ann., 1952, Tit. 43, § 361.

[88] Purdon's Pa. Stat. Ann., 1960 Supp., Tit. 4, § 60. See also Me. Rev. Stat., 1954, c. 134, § 41; Sunday Entertainments Act, 1932, 22 & 23 Geo. V, c. 51, § 1 (1) (a). Cf. P. R. Laws Ann., 1955, Tit. 29, § 295.

[89] P. R. Laws Ann., 1955, Tit. 33, § 2201. Cf. Colo. Rev. Stat. Ann., 1953, § 27–1–4; R. I. Gen. Laws, 1956, § 5–16–5.

[90] R. I. Gen. Laws, 1956, §§ 25–1–6, 25–1–8; S. C. Code, 1952, Tit. 64, § 5. See also *Mullis* v. *Celanese Corp.*, 234 S. C. 380, 108 S. E. 2d 547 (1959).

[91] See Mead, The Pattern of Leisure in Contemporary American Culture, 313 Annals of The American Academy of Political and Social Science 11–12 (Sept. 1957).

institutions and ways long after their religious sanctions and justifications are gone.[92] In light of these considerations, can it reasonably be said that no substantial non-

[92] Among the many examples that might be found in Frazer's Golden Bough, see his discussions of incest and murder, The Golden Bough (3d ed., Am. reprint 1951), II The Magic Art 107–117; Taboo and the Perils of the Soul 218–219. For other classic instances in various fields, see Weston, From Ritual to Romance (Anchor ed. 1957), passim, especially 81–100; Gilbert Murray, "Excursus on the Ritual Forms Preserved in Greek Tragedy," in Harrison, Themis (1912), 341 et seq.; Kluckhohn and Leighton, The Navaho (1946), 162–163; Tawney, Religion and The Rise of Capitalism (3d Mentor ed. 1950), passim.

See Weekly Rest in Commerce and Offices, Report A, International Labour Conference, 26th Sess., Geneva, 1940 (1939), 2: "Sunday rest laws, from the Fourth Commandment downwards, have always been social as well as religious in intention, seeking to provide a periodic rest from daily toil as well as an opportunity for religious observance." Among the weekly-rest legislation of the many nations surveyed by the International Labor Organization's pertinent reports, the system most common is to provide for a uniform rest day, usually on Sunday. See, id., passim, especially at 71–74; Weekly Rest in Commerce and Offices, Report VII (1), International Labour Conference, 39th Sess., Geneva, 1956 (1955), passim, especially at 18, 24–26. "This tendency to ensure that the weekly rest is taken at the same time by all workers on the day established by tradition or custom has an obvious social purpose, namely to enable the workers to take part in the life of the community and in the special forms of recreation which are available on certain days." Id., at 24. Commenting on the world-wide practice of weekly rest, the ILO reporters observe: "Quite often the practice originated as a religious observance and developed into a tradition which has persisted despite the disappearance of the original reasons or the decline in the part played by religious institutions in the social structure. At a very early stage this religious observance was backed by civil law and even today traces of this can often be found in constitutions and civil codes, in municipal by-laws and in the regulations of many countries concerning opening and closing hours of commercial and other establishments. Labour legislation has endeavoured to maintain and extend this practice in the light of the economic needs of modern society . . . ." Id., at 3.

ecclesiastical purpose relevant to a well-ordered social life exists for Sunday restrictions?

It is urged, however, that if a day of rest were the legislative purpose, statutes to secure it would take some other form than the prohibition of activity on Sunday.[93] Such statutes, it is argued, would provide for one day's labor

---

[93] The District Court in the *Gallagher* case believed that the Massachusetts Lord's day statute could not reasonably be regarded as a day-of-rest provision, first, because its extensive exceptions allowed many persons to labor seven days a week and, second, because Massachusetts has other statutes providing for twenty-four consecutive hours of rest every seven days. Mass. Gen. Laws Ann., 1958, c. 149, §§ 47 to 51. These latter provisions, however, by their express terms, supplement, do not supplant, the Sunday prohibitions. The two objections to some extent answer each other: the existence of the six-day law is justified by, and in part provides for, the deficiencies of the Lord's day statute as day-of-rest legislation. But, in any event, the Lord's day statute is not merely day-of-rest legislation. It is common-day-of-rest legislation. To certain persons who, for reasons deemed compelling by the Massachusetts Legislature, cannot share in this common day—simply because not all activity can cease, even on Sunday—the Labor Code at least assures a day of physical rest. Compare the conclusions found in Weekly Rest in Commerce and Offices, Report VII (1), International Labour Conference, 39th Sess., Geneva, 1956 (1955), 52. It may be noted that a large majority of the thirty-four States having comprehensive Sunday restrictions also have some six-day-week provisions in their labor or child-labor codes or regulations. See Appendix II to this opinion, *post*, p. 551.

The District Court, in concluding that the Massachusetts Lord's day statute is religious legislation, took account of its origins in colonial laws, of its language and the language of the Massachusetts courts in cases applying it, of the statutory exceptions permitting certain recreational activity only in the afternoon hours and, in some cases, at a designated distance from places of worship, and of statements in an *amicus* brief indicating that *amici* had an interest in preventing the secularization of Sunday. The implications of history and of the statutory language have already been discussed herein. The opinions in the Massachusetts cases adverted to by the court below, the latest decided in 1923, are insufficient to establish that the Massa-

stoppage in seven, leaving the choice of the day to the individual; or, alternatively, would fix a common day of rest on some other day—Monday or Tuesday. But, in all fairness, certainly, it would be impossible to call unreasonable a legislative finding that these suggested alternatives were unsatisfactory. A provision for one day's closing per week, at the option of every particular enterpriser, might be disruptive of families whose members are employed by different enterprises.[94] Enforcement might be more difficult, both because violation would be less easily discovered and because such a law would not be seconded, as is Sunday legislation, by the community's moral temper. More important, one-day-a-week laws do not accomplish all that is accomplished by Sunday laws. They provide only a periodic physical rest, not that atmosphere of entire community repose which Sunday has traditionally brought and which, a legislature might reasonably believe, is necessary to the welfare of those who for

chusetts legislation as applied in 1960 to prohibit the Sunday operation of supermarkets lacks substantial secular purposes and effects. See note 101, *infra*. The validity of applications of the statute possibly affected by the afternoon-hour exceptions is not now presented; suffice to say that these exceptions do not render the legislation unconstitutional in its entirety or in the circumstances of this litigation. And the purposes, views and intentions of *amici*, of course, cannot be attributed to the legislature of the State of Massachusetts.

[94] See text at note 37, *supra*. Cf. Report of the Unpaid Special Commission to Investigate . . . the Laws Relating to the Observance of the Lord's Day, Mass. Leg. Docs., H. Doc. No. 2413 (1954), 9: "The wave of materialism which is sweeping the country makes it most important that one day be set aside for worship, rest and to give all persons an opportunity to strengthen the bulwark of our American civilization—the home." Compare Report on the Weekly Rest-Day in Industrial and Commercial Employment, Report VII, International Labour Conference, 3d Sess., Geneva, 1921 (1921), 127: "Social custom requires that the same rest-day should as far as possible be accorded to the members of the same working family and to the working class community as a whole."

many generations have been accustomed to its recuperative effects.

The same considerations might also be deemed to justify the choice of Sunday as the single common day when labor ceases. For to many who do not regard it sacramentally, Sunday is nevertheless a day of special, long-established associations, whose particular temper makes it a haven that no other day could provide. The will of a majority of the community, reflected in the legislative process during scores of years, presumably prefers to take its leisure on Sunday.[95] The spirit of any people expresses in goodly measure the heritage which links it to its past. Disruption of this heritage by a regulation which, like the unnatural labors of Claudius' shipwrights, does not divide the Sunday from the week, might prove a measure ill-designed to secure the desirable community repose for which Sunday legislation is designed. At all events, Maryland, Massachusetts and Pennsylvania, like thirty-one other States with similar regulations, could reasonably so find. Certainly, from failure to make a substitution for Sunday in securing a socially desirable day of surcease from subjection to labor and routine a purpose cannot be derived to establish or promote religion.

The question before the Court in these cases is not a new one. During a hundred and fifty years Sunday laws have been attacked in state and federal courts as disregarding constitutionally demanded Church-State separation, or infringing protected religious freedoms, or on the ground that they subserved no end within the legitimate compass of legislative power. One California court in 1858 held California's Sunday statute unconstitutional.[96]

---

[95] See note 92, *supra*. See also the resolution of the International Congress for weekly rest, 1889, quoted in note 40, *supra*.

[96] *Ex parte Newman*, 9 Cal. 502. Justice Field's dissent in this case has become a leading pronouncement on the constitutionality of Sunday laws.

That decision was overruled three years later.[97] Every other appellate court that has considered the question has found the statutes supportable as civil regulations [98] and

[97] *Ex parte Andrews*, 18 Cal. 678. The controlling California constitutional guarantee of religious freedom comports only an analogue to the First Amendment's "free exercise," not an analogue to the "establishment" clause.

[98] *E. g., Petit* v. *Minnesota,* 177 U. S. 164. Cf. *Hennington* v. *Georgia,* 163 U. S. 299; *Soon Hing* v. *Crowley,* 113 U. S. 703, 710. *In re Sumida,* 177 Cal. 388, 170 P. 823 (1918) ; *McClelland* v. *City of Denver,* 36 Colo. 486, 86 P. 126 (1906) (barbering prohibited); *Rosenbaum* v. *City & County of Denver,* 102 Colo. 530, 81 P. 2d 760 (1938) (automobile sales prohibited); *Mosko* v. *Dunbar,* 135 Colo. 172, 309 P. 2d 581 (1957) (automobile sales prohibited); *Walsh* v. *State,* 33 Del. [3 W. W. Harr.] 514, 139 A. 257 (1927), *semble; Gillooley* v. *Vaughan,* 92 Fla. 943, 956, 110 So. 653, 657 (1926) (cabarets and cinema prohibited) ; *State* v. *Dolan,* 13 Idaho 693, 92 P. 995 (1907) ; *State* v. *Cranston,* 59 Idaho 561, 85 P. 2d 682 (1938) ; *McPherson* v. *Village of Chebanse,* 114 Ill. 46, 28 N. E. 454 (1885) (ordinance held authorized by police power); *Voglesong* v. *State,* 9 Ind. 112 (1857); *Foltz* v. *State,* 33 Ind. 215 (1870); *State* v. *Linsig,* 178 Iowa 484, 159 N. W. 995 (1916) ; *People* v. *DeRose,* 230 Mich. 180, 203 N. W. 95 (1925) (ordinance closing markets held authorized by police power); *In re Berman,* 344 Mich. 598, 75 N. W. 2d 8 (1956) (ordinance prohibiting sale of furniture held authorized by police power) ; *State* v. *Dean,* 149 Minn. 410, 184 N. W. 275 (1921) ; *Power* v. *Nordstrom,* 150 Minn. 228, 184 N. W. 967 (1921) (ordinance closing cinema, shows, theater, held authorized by police power) ; *Paramount-Richards Theatres, Inc.,* v. *City of Hattiesburg,* 210 Miss. 271, 49 So. 2d 574 (1950) ; *State* v. *Loomis,* 75 Mont. 88, 242 P. 344 (1925) (closing dance halls); *Gundaker Central Motors, Inc.,* v. *Gassert,* 23 N. J. 71, 127 A. 2d 566 (1956), app. dism'd for want of a substantial federal question, 354 U. S. 933 (automobile trading prohibited); *People* v. *Havnor,* 149 N. Y. 195, 43 N. E. 541 (1896), writ of error dism'd, 170 U. S. 408 (barbering prohibited); *State* v. *Weddington,* 188 N. C. 643, 125 S. E. 257 (1924) (ordinance held authorized by police power); *State* v. *Haase,* 97 Ohio App. 377, 116 N. E. 2d 224 (1953) ; *Ex parte Johnson,* 20 Okla. Cr. 66, 201 P. 533 (1921) (ordinance closing cinema and theaters held authorized by police power) ; *Ex parte Johnson,* 77 Okla. Cr. 360, 141 P. 2d 599 (1943) (barbering prohibited); *Ex parte Northrup,* 41 Ore. 489, 69

not repugnant to religious freedom.[99] These decisions
are assailed as latter-day justifications upon specious civil
grounds of legislation whose religious purposes were either
overlooked or concealed by the judges who passed upon it.

P. 445 (1902) (barbering prohibited); *State* v. *Nicholls,* 77 Ore. 415,
151 P. 473 (1915); *Breyer* v. *State,* 102 Tenn. 103, 50 S. W. 769
(1899) (barbering prohibited); *State* v. *Sopher,* 25 Utah 318, 71 P.
482 (1903); *Norfolk & Western R. Co.* v. *Commonwealth,* 93 Va. 749,
24 S. E. 837 (1896) (statute prohibiting operation of railroads held
sustainable as exercise of police power); *State* v. *Nichols,* 28 Wash.
628, 69 P. 372 (1902); *City of Seattle* v. *Gervasi,* 144 Wash. 429,
258 P. 328 (1927) (comprehensive ordinance found authorized by
police power). See also *Kreider* v. *State,* 103 Ark. 438, 440, 147
S. W. 449, 450 (1912); *State* v. *Miller,* 68 Conn. 373, 377–378, 36 A.
795, 796 (1896); *State* v. *Diamond,* 56 N. D. 854, 857–858, 219 N. W.
831, 832–833 (1928); *Rich* v. *Commonwealth,* 198 Va. 445, 449, 453,
94 S. E. 2d 549, 552, 555 (1956). Compare *Pacesetter Homes, Inc.,*
v. *Village of South Holland,* 18 Ill. 2d 247, 163 N. E. 2d 464 (1960),
admitting legislative power to prohibit Sunday activity disturbing to
the community, but striking down a blanket closing ordinance with
virtually none of the usual exceptions as too extreme to be justified
under this rationale.

[99] *E. g., Frolickstein* v. *Mayor of Mobile,* 40 Ala. 725 (1867); *Lane*
v. *McFadyen,* 259 Ala. 205, 66 So. 2d 83 (1953) (issue not raised by
litigants; court nevertheless considers it); *Elliott* v. *State,* 29 Ariz.
389, 242 P. 340 (1926) (dictum); *Shover* v. *State,* 10 Ark. 259 (1850);
*Scales* v. *State,* 47 Ark. 476, 1 S. W. 769 (1886); *Ex parte Koser,*
60 Cal. 177 (1882); *Karwisch* v. *Mayor of Atlanta,* 44 Ga. 204
(1871), settling the issue left open in *Sanders* v. *Johnson,* 29 Ga. 526
(1859); *Humphrey Chevrolet, Inc.,* v. *City of Evanston,* 7 Ill. 2d
402, 131 N. E. 2d 70 (1955) (at least as applied to corporate and non-
Sabbatarian parties); *State* v. *Blair,* 130 Kan. 863, 288 P. 729 (1930);
*State* v. *Haining,* 131 Kan. 853, 293 P. 952 (1930); *Strand Amuse-
ment Co.* v. *Commonwealth,* 241 Ky. 48, 43 S. W. 2d 321 (1931),
*semble; State* v. *Bott,* 31 La. Ann. 663 (1879) (forbidding liquor
sales); *State ex rel. Walker* v. *Judge,* 39 La. Ann. 132, 1 So. 437
(1887); *Judefind* v. *State,* 78 Md. 510, 28 A. 405 (1894) (considered
dictum); *Hiller* v. *State,* 124 Md. 385, 92 A. 842 (1914) (prohibiting
sports); *Commonwealth* v. *Has,* 122 Mass. 40 (1877); *Common-
wealth* v. *Chernock,* 336 Mass. 384, 145 N. E. 2d 920 (1957); *Scougale*
v. *Sweet,* 124 Mich. 311, 82 N. W. 1061 (1900) (considered dictum);

510

Of course, it is for this Court ultimately to determine whether federal constitutional guarantees are observed or undercut. But this does not mean that we are to be indifferent to the unanimous opinion of genera-

*State* v. *Petit*, 74 Minn. 376, 77 N. W. 225 (1898), aff'd, 177 U. S. 164; *State* v. *Weiss*, 97 Minn. 125, 105 N. W. 1127 (1906); *State* v. *Ambs*, 20 Mo. 214 (1854); *Komen* v. *City of St. Louis*, 316 Mo. 9, 289 S. W. 838 (1926) (closing bakeries) (subsequently overruled on another point); *In re Caldwell*, 82 Neb. 544, 118 N. W. 133 (1908), *semble*; *Stewart Motor Co.* v. *City of Omaha*, 120 Neb. 776, 235 N. W. 332 (1931) (prohibiting automobile sales), *semble*; *Two Guys from Harrison, Inc.*, v. *Furman*, 32 N. J. 199, 160 A. 2d 265 (1960); *Lindenmuller* v. *People*, 33 Barb. 548 (N. Y. Sup. Ct. 1861) (closing theaters); *Neuendorff* v. *Duryea*, 69 N. Y. 557 (1877) (same); *People* v. *Friedman*, 302 N. Y. 75, 96 N. E. 2d 184 (1950), app. dism'd for want of a substantial federal question, 341 U. S. 907; *State* v. *McGee*, 237 N. C. 633, 75 S. E. 2d 783 (1953), app. dism'd for want of a substantial federal question, 346 U. S. 802; *State ex rel. Temple* v. *Barnes*, 22 N. D. 18, 132 N. W. 215 (1911) (closing theaters); *State* v. *Powell*, 58 Ohio St. 324, 50 N. E. 900 (1898) (prohibiting sports); *State* v. *Kidd*, 167 Ohio St. 521, 150 N. E. 2d 413 (1958), app. dism'd for want of a substantial federal question, 358 U. S. 131, 132; *Commonwealth* v. *Wolf*, 3 S. & R. 48 (Pa. 1817); *Specht* v. *Commonwealth*, 8 Pa. 312 (1848); *Commonwealth* v. *Bauder*, 188 Pa. Super. 424, 145 A. 2d 915 (1958); *City Council* v. *Benjamin*, 2 Strob. L. 508 (S. C. 1848); *Xepapas* v. *Richardson*, 149 S. C. 52, 146 S. E. 686 (1929); *Ex parte Sundstrom*, 25 Tex. App. 133, 8 S. W. 207 (1888); *Sayeg* v. *State*, 114 Tex. Cr. R. 153, 25 S. W. 2d 865 (1930), *semble*; *Clark* v. *State*, 167 Tex. Cr. R. 204, 319 S. W. 2d 726 (1959), *semble*; *Pirkey Bros.* v. *Commonwealth*, 134 Va. 713, 114 S. E. 764 (1922) (issue not raised by litigants; court nevertheless considers it); *Crook* v. *Commonwealth*, 147 Va. 593, 136 S. E. 565 (1927) (same); *State* v. *Bergfeldt*, 41 Wash. 234, 83 P. 177 (1905), writ of error dism'd, 210 U. S. 438 (prohibiting barbering); *State* v. *Grabinski*, 33 Wash. 2d 603, 206 P. 2d 1022 (1949). Following the decision in the *Gallagher* case below, and relying on it, a Pennsylvania Court of Quarter Sessions recently held the 1959 Pennsylvania Sunday retail sales act unconstitutional on the grounds that its incidence is discriminatory and arbitrary and that it operates to prefer Sunday-observing religions. *Common-*

tions of judges who, in the conscientious discharge of obligations as solemn as our own, have sustained the Sunday laws as not inspired by religious purpose. The Court did not ignore that opinion in *Friedman* v. *New York,* 341 U. S. 907; *McGee* v. *North Carolina,* 346 U. S. 802; *Kidd* v. *Ohio,* 358 U. S. 132; and *Ullner* v. *Ohio,* 358 U. S. 131, dismissing for want of a substantial federal question appeals from state decisions sustaining Sunday laws which were obnoxious to the same objections urged in the present cases.[100] I cannot ignore that consensus of view now. The statutes of Maryland, Massachusetts and Pennsylvania which we here examine are not constitutionally forbidden fusions of church and state.[101]

---

*wealth* v. *Cavalerro,* 142 Legal Intelligencer 519 (Phila., Ap. 22, 1960) (Pa. Q. S. 1960). Another Pennsylvania court of first impression shortly thereafter reached the same conclusions. *Bargain City U. S. A., Inc.,* v. *Dilworth,* 142 Legal Intelligencer 813 (Phila., June 22, 1960) (Pa. C. P. 1960). These appear to be the only two standing state-court decisions striking down Sunday laws, as, in part, violative of religious freedom, in a century and a half of litigation.

In *District of Columbia* v. *Robinson,* 30 App. D. C. 283 (1908), the Court of Appeals, while recognizing the validity as civil regulations of modern Sunday closing statutes, held the 1723 Maryland Sunday law obsolete and inapplicable in the District of Columbia, largely on the ground that its purpose was religious. Compare *O'Hanlon* v. *Myers,* 10 Rich. L. 128 (S. C. 1856). In *Brunswick-Balke-Collander Co.* v. *Evans,* 228 F. 991 (D. C. D. Ore. 1916), app. dism'd, 248 U. S. 587, a Federal District Court sustained Oregon's general closing law against contentions that it violated religious freedom. Cf. *Swann* v. *Swann,* 21 F. 299 (C. C. E. D. Ark. 1884); *In re King,* 46 F. 905 (C. C. W. D. Tenn. 1891).

[100] Appeals in cases challenging Sunday laws as violative of the Due Process Clause were also dismissed for want of a substantial federal question in *Gundaker Central Motors, Inc.,* v. *Gassert,* 354 U. S. 933, and *Grochowiak* v. *Pennsylvania,* 358 U. S. 47.

[101] This does not, of course, imply an opinion of the legitimacy of all the Sunday provisions of all the States, or of every application of the statutes now before this Court. It is true that the Massachu-

## V.

Appellees in the *Gallagher* case and appellants in the *Braunfeld* case contend that, as applied to them, Orthodox Jewish retailers and their Orthodox Jewish customers, the Massachusetts Lord's day statute and the Pennsylvania Sunday retail sales act violate the Due Process Clause of the Fourteenth Amendment because, in effect, the statutes deter the exercise and observance of their religion. The argument runs that by compelling the Sunday closing of retail stores and thus making unavailable for business and shopping uses one-seventh part of the week, these statutes force them either to give up the Sabbath observance—an essential part of their faith—or to forego advantages enjoyed by the non-Sabbatarian majority of the community. They point out, moreover, that because of the prevailing five-day working week of a large proportion of the population, Sunday is a day peculiarly profitable to retail sellers and peculiarly convenient to retail shoppers. The records in these cases support them in this.

The claim which these litigants urge assumes a number of aspects. First, they argue that any one-common-day-

setts courts have at times expressed an intention to apply the Massachusetts Lord's day statute in accordance with the temper in which its historical antecedents were enacted. Compare the language of *Davis* v. *City of Somerville,* 128 Mass. 594 (1880); *Commonwealth* v. *Dextra,* 143 Mass. 28, 8 N. E. 756 (1886); *Commonwealth* v. *White,* 190 Mass. 578, 77 N. E. 636 (1906); *Commonwealth* v. *McCarthy,* 244 Mass. 484, 138 N. E. 835 (1923), with the Virginia cases, *Francisco* v. *Commonwealth,* 180 Va. 371, 23 S. E. 2d 234 (1942), and *Rich* v. *Commonwealth,* 198 Va. 445, 94 S. E. 2d 549 (1956). See *Commonwealth* v. *Sampson,* 97 Mass. 407 (1867). But see *Stone* v. *Graves,* 145 Mass. 353, 13 N. E. 906 (1887). It will be time enough to pass upon the constitutionality of such applications as do not reasonably come within the rationale of the present decision, and of *Commonwealth* v. *Has,* 122 Mass. 40, 42 (1877), if and when those cases arise. See *Brattle Films, Inc.,* v. *Commissioner of Public Safety,* 333 Mass. 58, 127 N. E. 2d 891 (1955).

of-closing regulation which selected a day other than their Sabbath would be *ipso facto* unconstitutional in its application to them because of its effect in preferring persons who observe no Sabbath, therefore creating economic pressures which urge Sabbatarians to give up their usage. The creation of this pressure by the Sunday statutes, it is said, is not so necessary a means to the achievement of the ends of day-of-rest legislation as to justify its employment when weighed against the injury to Sabbatarian religion which it entails. Six-day-week regulation, with the closing day left to individual choice, is urged as a more reasonable alternative.

Second, they argue that even if legitimate state interests justify the enforcement against persons generally of a single common day of rest, the choice of Sunday as that day violates the rights of religious freedom of the Sabbatarian minority. By choosing a day upon which Sunday-observing Christians worship and abstain from labor, the statutes are said to discriminate between religions. The Sunday observer may practice his faith and yet work six days a week, while the observer of the Jewish Sabbath, his competitor, may work only during five days, to the latter's obvious disadvantage. Orthodox Jewish shoppers whose jobs occupy a five-day week have no week-end shopping day, while Sunday-observing Christians do. Leisure to attend Sunday services, and relative quiet throughout their duration, is assured by law, but no equivalent treatment is accorded to Friday evening and Saturday services. Sabbatarians feel that the power of the State is employed to coerce their observance of Sunday as a holy day; that the State accords a recognition to Sunday Christian doctrine which is withheld from Sabbatarian creeds. All of these prejudices could be avoided, it is argued, without impairing the effectiveness of common-day-of-rest regulation, either by fixing as the rest time some day which is held sacred by no sect, or by pro-

viding for a Sunday work ban from which Sabbatarians are excepted, on condition of their abstaining from labor on Saturday. Failure to adopt these alternatives in lieu of Sunday statutes applicable to Sabbatarians is said to constitute an unconstitutional choice of means.

Finally, it is urged that if, as means, these statutes *are* necessary to the goals which they seek to attain, nevertheless the goals themselves are not of sufficient value to society to justify the disadvantage which their attainment imposes upon the religious exercise of Sabbatarians.

The first of these contentions has already been discussed. The history of Sunday legislation convincingly demonstrates that Sunday statutes may serve other purposes than the provision merely of one day of physical stoppage in seven. These purposes fully justify common-day-of-rest statutes which choose Sunday as the day.

In urging that an exception in favor of those who observe some other day as sacred would not defeat the ends of Sunday legislation, and therefore that failure to provide such an exception is an unnecessary—hence an unconstitutional—burden on Sabbatarians, the *Gallagher* appellees and *Braunfeld* appellants point to such exceptions in twenty-one of the thirty-four jurisdictions which have statutes banning labor or employment or the selling of goods on Sunday.[102] Actually, in less than half of these twenty-one States does the exemption extend to

---

[102] Wisconsin, which does not have a general ban on Sunday labor, but does have a statute prohibiting automobile trading on that day, also makes an exception in favor of those who conscientiously observe the Jewish Sabbath. West's Wis. Stat. Ann., 1961 Supp., § 218.01 (3) (a) 21. Other jurisdictions having statutes which cover only one or a few enumerated activities provide no Sabbatarian exception. Fla. Laws 1959, Special Acts, c. 59–1650, a local-option shop-closing statute applicable to Orange County, does contain such an exception, and in Michigan there are similar excepting clauses attached to barbering and auto-trading bans as well as to the general Sunday laws. Mich. Stat. Ann., 1957 Rev. Vol., §§ 18.122, 9.2702.

sales activity as well as to labor.[103] There are tenable reasons why a legislature might choose not to make such an exception. To whatever extent persons who come within the exception are present in a community, their activity would disturb the atmosphere of general repose and reintroduce into Sunday the business tempos of the week. Administration would be more difficult, with violations less evident and, in effect, two or more days to police

---

[103] In Kansas, Massachusetts, Missouri, New Jersey, New York, North Dakota, Rhode Island, South Dakota, Texas, Washington, and probably in Connecticut and Maine, the exception does not cover the sale of goods. Kan. Gen. Stat. Ann., 1949, § 21–953, *State* v. *Haining*, 131 Kan. 853, 293 P. 952 (1930) ; Mass. Gen. Laws Ann., 1958, c. 136, § 6, *Commonwealth* v. *Has*, 122 Mass. 40 (1877) ; *Commonwealth* v. *Starr*, 144 Mass. 359, 11 N. E. 533 (1887) ; *Commonwealth* v. *Kirshen*, 194 Mass. 151, 80 N. E. 2 (1907) ; Vernon's Mo. Stat. Ann., 1953, § 563.700; N. J. Stat. Ann., 1953, § 2A:171–4; McKinney's N. Y. Laws, Pen. Law § 2144, *People* v. *Friedman*, 302 N. Y. 75, 96 N. E. 2d 184 (1950), app. dism'd for want of a substantial federal question, 341 U. S. 907; cf. *People* v. *Adler*, 174 App. Div. 301, 160 N. Y. S. 539 (1916) (manufacturing activities) ; N. D. Century Code, 1960, § 12–21–17; R. I. Gen. Laws, 1956, § 11–40–4 (shops, mechanical work in compact places, etc.) ; S. D. Code, 1939, § 13.1710; Vernon's Tex. Stat., 1952, Pen. Code, Art. 284; Wash. Rev. Code, 1959, § 9.76.020, *State* v. *Grabinski*, 33 Wash. 2d 603, 206 P. 2d 1022 (1949) ; Conn. Gen. Stat. Rev., 1958, § 53–303; Me. Rev. Stat., 1954, c. 134, § 44. Cf. *State* v. *Weiss*, 97 Minn. 125, 105 N. W. 1127 (1906). The exemption in Indiana, Kentucky, Michigan, Nebraska, Ohio, Oklahoma, Virginia and West Virginia does extend to selling, but in the last two named States an exempted person may not employ other persons not of his belief on Sunday. Burns' Ind. Stat. Ann., 1956 Replacement Vol., § 10–4301; Ky. Rev. Stat., 1960, § 436.160, *Cohen* v. *Webb*, 175 Ky. 1, 192 S. W. 828 (1917) ; Mich. Stat. Ann., 1957 Rev. Vol., §§ 18.855, 18.856 (1), *Builders Assn.* v. *City of Detroit*, 295 Mich. 272, 294 N. W. 677 (1940), *semble;* Neb. Rev. Stat., 1956 Reissued Vol., § 28–940; Page's Ohio Rev. Code Ann., 1954, § 3773.24; Okla. Stat. Ann., 1958, Tit. 21, § 909, *Krieger* v. *State*, 12 Okla. Cr. 566, 160 P. 36 (1916) ; Va. Code, 1960 Replacement Vol., § 18.1–359; W. Va. Code Ann., 1955, c. 61, Art. 8, § 18 [6073]. The meaning of the provision in Illinois, Ill. Rev. Stat., 1959, c. 38, § 549, is not clear.

instead of one. If it is assumed that the retail demand for consumer items is approximately equivalent on Saturday and on Sunday, the Sabbatarian, in proportion as he is less numerous, and hence the competition less severe, might incur through the exception a competitive advantage over the non-Sabbatarian, who would then be in a position, presumably, to complain of discrimination against *his* religion.[104] Employers who wished to avail themselves of the exception would have to employ only their co-religionists,[105] and there might be introduced into private employment practices an element of religious differentiation which a legislature could regard as undesirable.[106]

Finally, a relevant consideration which might cause a State's lawmakers to reject exception for observers of another day than Sunday is that administration of such a provision may require judicial inquiry into religious belief. A legislature could conclude that if all that is made requisite to qualify for the exemption is an abstinence from labor on some other day, there would be nothing to prevent an enterpriser from closing on his slowest business day, to take advantage of the whole of

---

[104] See 101 H. L. Deb. 430 (5th ser. 1935–1936); 311 H. C. Deb. 492 (5th ser. 1935–1936). On this ground some state courts have even held Sabbatarian exceptions invalid as discriminatory. *City of Shreveport* v. *Levy*, 26 La. Ann. 671 (1874); *Kislingbury* v. *Treasurer of Plainfield*, 10 N. J. Misc. 798, 160 A. 654 (C. P. 1932). See *State* v. *Grabinski*, 33 Wash. 2d 603, 206 P. 2d 1022 (1949), reserving the question. However, in *Johns* v. *State*, 78 Ind. 332 (1881), the exemption was sustained.

[105] See Va. Code, 1960 Replacement Vol., § 18.1–359; W. Va. Code Ann., 1955, c. 61, Art. 8, § 18 [6073]; Factories Act, 1937, 1 Edw. VIII & 1 Geo. VI, c. 67, § 91.

[106] Both Pennsylvania and Massachusetts have fair employment practices acts prohibiting religious discrimination in hiring. Purdon's Pa. Stat. Ann., 1960 Supp., Tit. 43, §§ 951 to 963; Mass. Gen. Laws Ann., 1958, c. 151B, §§ 1 to 10.

the profitable week-end trade, thereby converting the Sunday labor ban, in effect, into a day-of-rest-in-seven statute, with choice of the day left to the individual. All of the state exempting statutes seem to reflect this consideration. Ten of them require that a person claiming exception "conscientiously" believe in the sanctity of another day or "conscientiously" observe another day as the Sabbath.[107] Five demand that he keep another day as "holy time."[108] Three allow the exemption only to members of a "religious" society observing another day,[109] and a fourth provides for proof of membership in such a society by the certificate of a preacher or of any three adherents.[110] In Illinois the claimant must observe some day as a "Sabbath," and in New Jersey he must prove that he devotes that day to religious exercises.[111] Connecticut, one of the jurisdictions demanding conscientious belief, requires in addition that he who seeks the benefit of the exception file a notice of such belief with the prosecuting attorney.[112]

---

[107] Connecticut, Indiana, Maine, Massachusetts, Michigan, Nebraska, Ohio, Texas, Virginia, West Virginia. Wisconsin's statute is similar.

[108] New York, North Dakota, Oklahoma, South Dakota, Washington.

[109] Kansas, Kentucky, Missouri.

[110] Rhode Island.

[111] This New Jersey excepting statute appears to be currently inoperative. The State's general labor ban has recently been held impliedly repealed by the enactment of a Sunday retail sales prohibition, *Two Guys from Harrison, Inc.,* v. *Furman,* 32 N. J. 199, 160 A. 2d 265 (1960), and the excepting provision, by its terms, does not extend to Sunday selling by Sabbatarians.

[112] And see *In re Berman,* 344 Mich. 598, 75 N. W. 2d 8 (1956), determining the posture under a conscientious-Sabbatarian exception of a Sabbatarian owner of three stores who operated one himself, closing on Saturdays and opening on Sundays, and the other two through agents, opening Saturdays and closing Sundays.

Indicative of the practical administrative difficulties which may arise in attempts to effect, consistently with the purposes of Sunday closing legislation, an exception for persons conscientiously observing another day as Sabbath, are the provisions of § 53 of the British Shops Act, 1950,[113] continuing in substance § 7 of the Shops (Sunday Trading Restriction) Act, 1936.[114] These were the product of experience with earlier forms of exemptions which had proved unsatisfactory,[115] and the new 1936 provisions were enacted only after the consideration and rejection of a number of proposed alternatives.[116] They allow shops

[113] 14 Geo. VI, c. 28.

[114] 26 Geo. V & 1 Edw. VIII, c. 53.

[115] Principally the Jewish exemption in the Hairdressers' and Barbers' Shops (Sunday Closing) Act, 1930, 20 & 21 Geo. V, c. 35, § 3. See 101 H. L. Deb. 439, 442 (5th ser. 1935–1936); 311 H. C. Deb. 502 (5th ser. 1935–1936). The 1930 act was repealed by the Shops Act, 1950, 14 Geo. VI, c. 28, Eighth Schedule, although § 67 of the latter act continues similar provisions for Scotland. The problem of special Sunday regulation for the Jewish population had involved Parliament at least since the turn of the century. Sections 47, 48 of the Factory and Workshop Act, 1901, 1 Edw. VII, c. 22, permitted Jewish employers certain exemptions from that act's prohibition of Sunday employment of women and children. The terms of the exemption are altered by the Factories Act, 1937, 1 Edw. VIII & 1 Geo. VI, c. 67, § 91. See also Report from the Select Committee of the House of Lords on the Sunday Closing (Shops) Bill [H. L.] (1905), 71–83, 142–147, 153–157.

[116] Among these was a provision permitting any shopkeeper in London to elect to close on Saturdays instead of Sundays. See 311 H. C. Deb. 447–461 (5th ser. 1935–1936). The Jewish exemption provisions of § 7 were the most strenuously debated provisions of the Shops (Sunday Trading Restriction) Act. See 308 H. C. Deb. 2188–2192, 2202–2203, 2217 (5th ser. 1935–1936); 101 H. L. Deb. 263, 270, 427–434 (5th ser. 1935–1936); 311 H. C. Deb. 447–461, 478–507 (5th ser. 1935–1936). The recognized inadequacy of the exemption was in part responsible for the act's special provisions (§ 8) for the London area, where the bulk of the English Jewish trading population does business. *Id.*, at 2087, 2090–2091, 2103–2104.

which are registered under the section and which remain closed on Saturday to open for trade until 2 p. m. on Sunday. Applications for registration must contain a declaration that the shop occupier "conscientiously objects on religious grounds to carrying on trade or business on the Jewish Sabbath," [117] and any person who, to procure registration, "knowingly or recklessly makes an untrue statement or untrue representation," is subject to fine and imprisonment. Whenever upon representations made to them the local authorities find reason to believe that a registered occupier is not a person of the Jewish religion or "that a conscientious objection on religious grounds . . . is not genuinely held," the authorities may furnish particulars of the case to a tribunal established after consultation with the London Committee of Deputies of the British Jews,[118] which tribunal, if in their opinion the occupier is not a person of the Jewish religion or does not genuinely hold a conscientious objection to trade on the Jewish Sabbath, shall so report to the local authorities; and upon this report the occupier's registration is to be revoked.[119] Surely, in light of the delicate

[117] See the statutory form prescribed by the Shops Regulations, 1937, S. R. & O., 1937, No. 271, Schedules IV (a) and IV (b).

[118] The constitution of the tribunals for Jews and for Seventh Day Adventists (see note 119, *infra*) and the procedures of the tribunals are prescribed by the Shops Regulations, 1937, S. R. & O., 1937, No. 271, Reg. 4, and the Shops (Procedure for Jewish Tribunals) Regulations, 1937, S. R. & O., 1937, No. 1038.

[119] Other provisions indicate the intricate problems of administration which the exemption raises. Section 53 (3) provides that in the case of shops occupied by a partnership or company the application of the exemption is determined by the religion of the majority of the partners or directors. Section (5) prohibits the occupier of a shop registered for the exemption from keeping open any other shop on Saturday, and prohibits any person who has made a statutory declaration of conscientious objection for purposes of registration from working in, or employing any other person in, or being concerned in the control of a firm which employs any other person in, a shop open on

enforcement problems to which these provisions bear witness, the legislative choice of a blanket Sunday ban applicable to observers of all faiths cannot be held unreasonable. A legislature might in reason find that the alternative of exempting Sabbatarians would impede the effective operation of the Sunday statutes, produce harmful collateral effects, and entail, itself, a not inconsiderable intrusion into matters of religious faith. However preferable, personally, one might deem such an exception, I cannot find that the Constitution compels it.

It cannot, therefore, be said that Massachusetts and Pennsylvania have imposed gratuitous restrictions upon the Sunday activities of persons observing the Orthodox Jewish Sabbath in achieving the legitimate secular ends at which their Sunday statutes may aim. The remaining question is whether the importance to the public of those ends is sufficient to outweigh the restraint upon the religious exercise of Orthodox Jewish practicants which the restriction entails. See *Prince* v. *Massachusetts,* 321 U. S. 158; *Cox* v. *New Hampshire,* 312 U. S. 569. The nature of the legislative purpose is the preservation of a traditional institution which assures to the community a time during which the mind and body are released from the demands and distractions of an increasingly mechanized and competition-driven society. The right to this

---

Saturday. Compare *In re Berman,* note 112, *supra.* Subsection (9) permits cancellation of the registration of any shop at the application of the occupier, but provides that registration shall not be cancelled within twelve months of the date upon which application for registration was made; and subsection (10) precludes the same occupier's again registering the shop for exemption. Section 53 (12) makes the exception provisions applicable as well to members of any religious body regularly observing the Jewish Sabbath as to Jews, and provides that for such persons the function served in the case of Jews by the London Committee of Deputies of the British Jews shall be served by "such body as appears to the Secretary of State to represent such persons."

release has been claimed by workers and by small enterprisers, especially by retail merchandisers, over centuries, and finds contemporary expression in legislation in three-quarters of the States. The nature of the injury which must be balanced against it is the economic disadvantage to the enterpriser, and the inconvenience to the consumer, which Sunday regulations impose upon those who choose to adhere to the Sabbatarian tenets of their faith.

These statutes do not make criminal, do not place under the onus of civil or criminal disability, any act which is itself prescribed by the duties of the Jewish or other religions. They do create an undeniable financial burden upon the observers of one of the fundamental tenets of certain religious creeds, a burden which does not fall equally upon other forms of observance. This was true of the tax which this Court held an unconstitutional infringement of the free exercise of religion in *Follett* v. *Town of McCormick,* 321 U. S. 573. But unlike the tax in *Follett,* the burden which the Sunday statutes impose is an incident of the only feasible means to achievement of their particular goal. And again unlike *Follett,* the measure of the burden is not determined by fixed legislative decree, beyond the power of the individual to alter. Upon persons who earn their livelihood by activities not prohibited on Sunday, and upon those whose jobs require only a five-day week, the burden is not considerable. Like the customers of Crown Kosher Super Market in the *Gallagher* case, they are inconvenienced in their shopping. This is hardly to be assessed as an injury of preponderant constitutional weight. The burden on retail sellers competing with Sunday-observing and non-observing retailers is considerably greater, But, without minimizing the fact of this disadvantage, the legislature may have concluded that its severity might be offset by the industry and commercial initiative of the individual merchant. More is demanded of him, admittedly, whether in the

form of additional labor or of material sacrifices, than is demanded of those who do not choose to keep his Sabbath. More would be demanded of him, of course, in a State in which there were no Sunday laws and in which his competitors chose—like "Two Guys from Harrison-Allentown"—to do business seven days a week. In view of the importance of the community interests which must be weighed in the balance, is the disadvantage wrought by the non-exempting Sunday statutes an impermissible imposition upon the Sabbatarian's religious freedom? Every court which has considered the question during a century and a half has concluded that it is not.[120] This Court so concluded in *Friedman* v. *New York*, 341 U. S. 907. On the basis of the criteria for determining constitutionality, as opposed to what one might desire as a matter of legislative policy, a contrary conclusion cannot be reached.

## VI.

Two further grounds of unconstitutionality are urged in all these cases, based upon the selection in the challenged statutes of the activities included in, or excluded

---

[120] *Frolickstein* v. *Mayor of Mobile*, 40 Ala. 725 (1867); *Scales* v. *State*, 47 Ark. 476 (1886); *State* v. *Haining*, 131 Kan. 853, 293 P. 952 (1930); *Commonwealth* v. *Has*, 122 Mass. 40 (1877); *Commonwealth* v. *Chernock*, 336 Mass. 384, 145 N. E. 2d 920 (1957); *State* v. *Weiss*, 97 Minn. 125, 105 N. W. 1127 (1906); *Komen* v. *City of St. Louis*, 316 Mo. 9, 289 S. W. 838 (1926) (subsequently overruled on another point); *State* v. *Fass*, 62 N. J. Super. 265, 162 A. 2d 608 (County Ct. 1960); *People* v. *Friedman*, 302 N. Y. 75, 96 N. E. 2d 184 (1950), app. dism'd for want of a substantial federal question, 341 U. S. 907; *Silverberg Bros.* v. *Douglass*, 62 Misc. 340, 114 N. Y. S. 824 (Sup. Ct. 1909); *Commonwealth* v. *Wolf*, 3 S. & R. 48 (Pa. 1817); *Specht* v. *Commonwealth*, 8 Pa. 312 (1848); *City Council* v. *Benjamin*, 2 Strob. L. 508 (S. C. 1848); *Xepapas* v. *Richardson*, 149 S. C. 52, 146 S. E. 686 (1929), *semble; State* v. *Bergfeldt*, 41 Wash. 234, 83 P. 177 (1905), writ of error dism'd, 210 U. S. 438 (prohibiting barbering). And see *State ex rel. Walker* v. *Judge*, 39 La. Ann. 132, 141, 1 So. 437, 444 (1887); cf. *Ex parte Sundstrom*, 25 Tex. App. 133 (1888).

from, the Sunday ban. First it is argued that, if the aim of the statutes is to secure a day of peace and repose, the laws of Massachusetts and Maryland, by their exceptions, and the retail sales act of Pennsylvania, by its enumeration of the articles whose sale is forbidden, operate so imperfectly in the service of this aim—show so little rational relation to it—that they must be accounted as arbitrary and therefore violative of due process. The extensive range of recreational and commercial Sunday activity permitted in these States is said to deprive the statutes of any reasonable basis. The distinctions drawn by the laws between what may be sold or done and what may not, it is claimed, are unsupported by reason. Second, these claimants argue that the same discriminations between items which may and may not be sold, and in some cases between the persons who may and those who may not sell identical items, deprive them of the equal protection of the laws.

Although these contentions require the Court to examine separately and with particularity the provisions of each of the three States' statutes which are attacked, the general considerations which govern these cases are the same. It is clear that in fashioning legislative remedies by fine distinctions to fit specific needs, "The range of the State's discretion is large." *Bain Peanut Co.* v. *Pinson,* 282 U. S. 499, 501. This is especially so where, by the nature of its subject, regulation must take account of traditional and prevailing local customs. See *Kotch* v. *Board of River Port Pilot Comm'rs,* 330 U. S. 552. "The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner* v. *Texas,* 310 U. S. 141, 147. "Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. . . . Or the reform may take one step at a time, addressing itself to the phase of the

problem which seems most acute to the legislative mind. . . . The legislature may select one phase of one field and apply a remedy there, neglecting the others." *Williamson* v. *Lee Optical, Inc.,* 348 U. S. 483, 489.

Neither the Due Process nor the Equal Protection Clause demands logical tidiness. *Metropolis Theatre Co.* v. *City of Chicago,* 228 U. S. 61. No finicky or exact conformity to abstract correlation is required of legislation. The Constitution is satisfied if a legislature responds to the practical living facts with which it deals. Through what precise points in a field of many competing pressures a legislature might most suitably have drawn its lines is not a question for judicial re-examination. It is enough to satisfy the Constitution that in drawing them the principle of reason has not been disregarded. See *Goesaert* v. *Cleary,* 335 U. S. 464. And what degree of uniformity reason demands of a statute is, of course, a function of the complexity of the needs which the statute seeks to accommodate.

In the case of Sunday legislation, an extreme complexity of needs is evident. This is so, first, because one of the prime objectives of the legislation is the preservation of an atmosphere—a subtle desideratum, itself the product of a peculiar and changing set of local circumstances and local traditions. But in addition, in the achievement of that end, however formulated, numerous compromises must be made. Not all activity can halt on Sunday. Some of the very operations whose doings most contribute to the rush and clamor of the week must go on throughout that day as well, whether because life depends upon them, or because the cost of stopping and restarting them is simply too great, or because to be without their services would be more disruptive of peace than to have them continue. Many activities have a double aspect: providing entertainment or recreation for some persons, they

entail labor and workday tedium for others.[121] Cogent expression of the intricate problems which these various countervalent pressures pose was given by Mr. Lloyd in the course of the debate in Commons on the English Sunday closing act of 1936:

> ". . . We should all like to see shopkeepers and their staffs as far as possible in a position to observe Sunday in a normal way like most other people. . On the other hand, we know that there are certain reasonable needs of the public which require to be met even on a Sunday, and I think we should also all agree that the fewest possible number of people should have to give up their Sunday in order to cater for those public needs. I think we should probably reach a large measure of general agreement on the principle that only those shops should remain open which are essential to meet the requirements of the public and only to the extent that they are essential . . . . Therefore, the problem is to strike a just balance between the reasonable needs of the

---

[121] Consider Mr. Loftus' comments on the proposed Shops (Sunday Trading Restriction) Bill before the House of Commons in 1936: "During the last 20 years there has been a very great change in the habits of our people—a change for the better. Vast masses of our people, in fact, literally millions, go out into the countryside on fine Sunday afternoons in the Summer, and that is good for their health; it is good for the mind as well as the body that they should do so. Going into the country . . . they have been accustomed to certain facilities in the way of obtaining refreshment, fresh fruit, flowers and vegetables to bring home, and it would be regretted, particularly by the working classes, if there was any interference by legislation that would stop those facilities or check the tendency of our people to go into the country and to take advantage of the amenities of the countryside. . . .

". . . The first principle is to frame such exemptions as will not unduly interfere with the ordinary health and habits of our people. . . ." 308 H. C. Deb. 2159 (5th ser. 1935–1936).

public and the equally reasonable desire of the great bulk of those engaged in the distributive trades to enjoy their share of Sunday rest and recreation.

"If that is accepted, it follows at once that the crux of any Bill of this kind lies in the scope and the nature of the exemptions to the general principle of closing on Sunday. . . ." [122]

Moreover, the variation from activity to activity in the degree of disturbance which Sunday operation entails, and the similar variation in degrees of temptation to flout the law, and in degrees of ability to absorb and ignore various legal penalties, make exceedingly difficult the devising of effective, yet comprehensively fair, schemes of sanctions.

Early in the history of the Sunday laws there developed mechanisms which served to adapt their wide general prohibitions both to practical exigencies and to the evolving concerns and desires of the public. Where it was found that persons in certain activities tended with particular frequency to engage in violations, those activities were singled out for harsher punishment.[123] On the other hand, practices found necessary or convenient to popular habits were specifically excepted from the ban.[124] Under the basic English Sunday statute, 29 Charles II, c. 7, a wide general exception obtained for "Works of Necessity

---

[122] *Id.*, at 2200–2201.

[123] The statute 29 Charles II, c. 7, punished worldly labor of one's ordinary calling by a forfeiture of five shillings, punished traveling by drovers or butchers by a forfeiture of twenty shillings, and punished the exhibition of merchandise for sale by forfeiture of the goods. Early American colonial legislation similarly provided greater fines for engaging in some than in other Sunday activity. See, *e. g.*, Delaware, 1740; Massachusetts, 1692; New Hampshire, 1700; New Jersey, 1798.

[124] The statute 29 Charles II, c. 7, itself contained several exceptions, and subsequent statutes added others. See notes 15, 18, *supra.* The original Sunday edict of Constantine in 321 A. D. had exempted farm labor.

and Charity";[125] this provision found its way into the American colonial laws,[126] and has descended into all of their successors currently in force.[127] The effect of the phrase has been to give the courts a wide range of discretion in determining exceptions. But reasonable men can and do differ as to what is "necessity."[128] In every juris-

[125] The statute 27 Henry VI, c. 5, had excepted "necessary victual" from its prohibition of sales at fairs and markets; 5 & 6 Edw. VI, c. 3, had contained a broad exception for labor at harvest or at any other time in the year when necessity required.

[126] See, *e. g.*, Jefferson's bill quoted in text at note 68, *supra.* Other laws made specific exceptions as well: the Pennsylvania statute of 1705, for example, exempted not only works of necessity and charity but the dressing of victuals in cookshops, watermen landing passengers, butchers slaughtering and selling meat or fishermen selling fish in the morning in summer, and the sale of milk before 9 a. m. and after 5 p. m.

[127] Where statutes ban the keeping open of places of business as well as laboring, the exception is frequently worded to apply only to the latter. See *Commonwealth* v. *Dextra,* 143 Mass. 28 (1886).

[128] See *Williams* v. *State,* 167 Ga. 160, 144 S. E. 745 (1928) (sale of gasoline is necessity); *Jacobs* v. *Clark,* 112 Vt. 484, 28 A. 2d 369 (1942) (same is not necessity); *Commonwealth* v. *Louisville & Nashville R. Co.,* 80 Ky. 291 (1882) (operating railroad is necessity); cf. *Philadelphia, W. & B. R. Co.* v. *Lehman,* 56 Md. 209 (1881); *Sparhawk* v. *Union Passenger R. Co.,* 54 Pa. 401 (1867) (same is not necessity); *State* v. *Needham,* 134 Kan. 155, 4 P. 2d 464 (1931) (distribution of newspapers is necessity); *Commonwealth* v. *Matthews,* 152 Pa. 166, 25 A. 548 (1893) (same is not necessity); *Augusta & S. R. Co.* v. *Renz,* 55 Ga. 126 (1875) (operating streetcar is necessity); *Johnston* v. *Commonwealth,* 22 Pa. 102 (1853) (operating bus is not necessity); *Turner* v. *State,* 67 Ind. 595 (1879) (cutting ripe wheat is necessity); *State* v. *Goff,* 20 Ark. 289 (1859) (same is not necessity); *Wilkinson* v. *State,* 59 Ind. 416 (1877) (hauling ripe watermelons is necessity); *Commonwealth* v. *White,* 190 Mass. 578, 77 N. E. 636 (1906) (picking ripe cranberries is not necessity); *Rich* v. *Commonwealth,* 198 Va. 445, 94 S. E. 2d 549 (1956) (where evidence of widespread retail sale of groceries is not rebutted, jury cannot find that sale of groceries is not necessity); *State* v. *James,* 81 S. C. 197, 62 S. E. 214 (1908) (sale of ice and meat is not necessity);

diction legislatures, presumably deeming themselves fitter tribunals for decisions of this sort than were courts, acted to resolve the question against, or in favor of, various particular activities. Some pursuits were expressly declared not works of necessity, or were specially banned.[129]

*State* v. *Corologos*, 101 Vt. 300, 143 A. 284 (1928) (sale of confectionery is not necessity as matter of law, although jury could so find); cf. *State ex rel. Smith* v. *Wertz*, 91 W. Va. 622, 114 S. E. 242 (1922); *Thompson* v. *City of Atlanta*, 178 Ga. 281, 172 S. E. 915 (1934), and *Rosenbaum* v. *State*, 131 Ark. 251, 199 S. W. 388 (1917) (operation of motion picture theater is not necessity); *Williams* v. *Commonwealth*, 179 Va. 741, 750, 20 S. E. 2d 493, 496 (1942) (concurring opinion) (operation of motion picture theater is necessity); *McGatrick* v. *Wason*, 4 Ohio St. 566 (1855) (loading ship with navigation-closing weather impending is necessity); *Commonwealth* v. *Sampson*, 97 Mass. 407 (1867) (gathering seaweed which tide threatens to float away is not necessity); *Hennersdorf* v. *State*, 25 Tex. App. 597, 8 S. W. 926 (1888) (manufacturing ice is necessity); *State* v. *McBee*, 52 W. Va. 257, 43 S. E. 121 (1902) (pumping oil is not necessity as matter of law, although jury could so find); *State* v. *Ohmer*, 34 Mo. App. 115 (1889) (retail sale of tobacco is not necessity); *Francisco* v. *Commonwealth*, 180 Va. 371, 23 S. E. 2d 234 (1942) (jury may find retail sale of beer necessity).

[129] In *Petit* v. *Minnesota*, 177 U. S. 164, this Court sustained against a claim of arbitrary classification a statute which in express terms provided that its exception for works of necessity should not include barbering. In other jurisdictions the same result was reached by judicial interpretation of the "necessity" clause. *State* v. *Linsig*, 178 Iowa 484, 159 N. W. 995 (1916); *Ex parte Kennedy*, 42 Tex. Cr. R. 148, 58 S. W. 129 (1900); *State* v. *Sopher*, 25 Utah 318, 71 P. 482 (1903). Cf. *Commonwealth* v. *Dextra*, 143 Mass. 28, 8 N. E. 756 (1886); *Stark* v. *Backus*, 140 Wis. 557, 123 N. W. 98 (1909). Statutes prohibiting Sunday barbering were enacted in a number of States. These were voided as discriminatory in *Ex parte Jentzsch*, 112 Cal. 468, 44 P. 803 (1896); *Eden* v. *People*, 161 Ill. 296, 43 N. E. 1108 (1896); *Armstrong* v. *State*, 170 Ind. 188, 84 N. E. 3 (1908); *State* v. *Granneman*, 132 Mo. 326, 33 S. W. 784 (1896); cf. *Ragio* v. *State*, 86 Tenn. 272, 6 S. W. 401 (1888), but have been generally sustained. *McClelland* v. *City of Denver*, 36 Colo. 486, 86 P. 126 (1906); *State* v. *Murray*, 104 Neb. 51, 175 N. W. 666

Others were expressly permitted: series of exceptions, giving the laws resiliency in the course of cultural change, proliferated.[130] Today, as Appendix II to this opinion, *post*, p. 551, shows, the general pattern in over half of the States and in England [131] is similar. Broad general pro-

---

(1919); *People* v. *Bellet*, 99 Mich. 151, 57 N. W. 1094 (1894); *People* v. *Havnor*, 149 N. Y. 195, 43 N. E. 541 (1896), writ of error dism'd, 170 U. S. 408; *Ex parte Johnson*, 77 Okla. Cr. 360, 141 P. 2d 599 (1943); *Ex parte Northrup*, 41 Ore. 489, 69 P. 445 (1902); *Breyer* v. *State*, 102 Tenn. 103, 50 S. W. 769 (1899); *State* v. *Bergfeldt*, 41 Wash. 234, 83 P. 177 (1905), overruling *City of Tacoma* v. *Krech*, 15 Wash. 296, 46 P. 255 (1896).

[130] One may trace in these exceptions the evolving habits of life of the people. Compare *State* v. *Hogreiver*, 152 Ind. 652, 53 N. E. 921 (1899), sustaining a statute specifically prohibiting Sunday baseball, with *Carr* v. *State*, 175 Ind. 241, 93 N. E. 1071 (1911), sustaining a statute excepting baseball from the general Sunday prohibition.

[131] The Shops Act, 1950, 14 Geo. VI, c. 28, excepts from the general Sunday ban the keeping open of a shop to sell liquor, meals or refreshments (whether or not for consumption on the premises, but excluding fried fish and chips sold at a fish and chip shop), newly cooked provisions and cooked tripe, table waters, chocolates, sweets, sugar confectionery and ice cream, flowers, fruit and vegetables (other than tinned), milk and cream (other than tinned), medicines and medical and surgical appliances (by certain registered shops), aircraft, motor or cycle supplies or accessories, tobacco and smokers' requisites, newspapers, periodicals and magazines, books and stationery at rail and bus terminals and aerodromes, guide books, photographs, reproductions, photographic films and plates and souvenirs at public or specially approved galleries, museums, etc., passport photos, requisites for games or sports sold on the premises where the sport is played, fodder for horses, mules, etc. Post office and funeral business is permitted. (§ 47 & Fifth Schedule.) Local authority may permit the opening of shops before 10 a. m. for the sale of bread and flour, confectionery, fish, groceries and grocer's products. (§ 48 & Sixth Schedule.) Local authority may prohibit sales of meals and refreshments for consumption off the premises (exempted by the Fifth Schedule) in the case of classes of shops in which sales for on-the-premises consumption do not constitute a substantial part of the business carried on. (§ 49.) Where the area

hibitions are qualified by numerous precise exemptions, often with provision for local variation within a State, and are frequently bolstered by special provisions more heavily penalizing named activities. The regulations of Maryland, Massachusetts and Pennsylvania are not atypical in this regard, although they are undoubtedly among the more complex of the statutory patterns.

The degree of explicitness of these provisions in so many jurisdictions demonstrates the intricacy of the adjustments which they are designed to make. How delicate those adjustments can be is strikingly illustrated, once again, by a remark of the sponsor of the British closing bill of 1936, the most extensively documented modern Sunday statute. Supporting an amendment which permitted local authority to authorize the opening, during

of a local authority is a district frequented as a holiday resort during certain seasons of the year, the local authority may provide by order that shops of such classes as it designates may open on specified Sundays (not to exceed eighteen per year) for the sale of bathing and fishing articles, photographic requisites, toys, souvenirs and fancy goods, books, stationery, photographs, reproductions and postcards, and food. (§ 51 & Seventh Schedule.) Special provisions applicable to the London area permit local councils to authorize the opening before 2 p. m. of shops where street markets or (in some regions) shops were customarily opened on Sunday prior to the date of the original act, 1936, where, in the latter case, the councils find that "having regard to the character and habits of the population in the district," Sunday closing would cause undue hardship; but if such an exempting order is made, it must fix some weekday closing day for these shops, which may differ for different classes of shops. (§ 54.) In the case of these local exempting orders, provision is made for a plebiscite among the shopkeepers affected. (§§ 52, 54 (1), par. 2.) The act further excepts the sale and delivery of stores or necessaries to arriving or departing ships and aircraft and of goods to private clubs for club purposes, the cooking before 1:30 p. m. of food brought by customers to be cooked for consumption that day, and attendance as a barber upon invalids or upon residents of hotels or clubs therein. (§ 56.) This summary digest can scarcely suggest the complexity of the text.

a portion of the year, of shops in areas frequented as seaside resorts, Mr. Loftus said:

> ". . . In a Bill such as this one must have elasticity. . . . We had a unanimous demand from the Association of Fish Fryers, representing the trade all over England, asking that fish-frying shops should be closed on Sundays, and we agreed and took them out of the First Schedule [which exempts shops selling meals or refreshments]. But then we heard from Blackpool, which is visited every year by, I suppose, millions of poor people, cotton operatives and others, who like to get cheap meals of fried fish on Sunday afternoons and Sunday evenings, and we feel there must be some provision in the Bill to allow the grant of exemptions in such a case. The difficulty is to avoid putting in a Clause which is open to abuse and I submit that there are two provisions which provide a safeguard. The first is that the local authority must approve the granting of exemptions, and the second is that the local authority cannot approve unless two-thirds of those particular shops in its locality are in favour of exemption. Having no desire that hardships should be inflicted on poor class people I would ask the House to accept the Clause." [132]

Certainly, when relevant considerations of policy demand decisions and distinctions so fine, courts must accord to the legislature a wide range of power to classify and to delineate. It is true that, unlike their virtually unanimous attitude on the issue of religious freedom, state courts have not always sustained Sunday legislation against the charge of unconstitutional discrimination. Statutes and ordinances have been struck down as arbitrary [133] or as violative of state constitutional prohibitions

[132] 311 H. C. Deb. 465 (5th ser. 1935–1936).

[133] *Elliott* v. *State,* 29 Ariz. 389, 242 P. 340 (1926) (banning enumerated businesses; court distinguishes general closing statute with

of special legislation.[134] A far greater number of courts, in similar classes of cases, have sustained the legislation.[135] But the very diversity of judicial opinion as to what is rea-

exceptions); *Bocci & Sons Co.* v. *Town of Lawndale,* 208 Cal. 720, 284 P. 654 (1930) (exceptions for classes of businesses); *Justesen's Food Stores, Inc.,* v. *City of Tulare,* 12 Cal. 2d 324, 84 P. 2d 140 (1938) (closing food stores; exceptions for classes of businesses); *Deese* v. *City of Lodi,* 21 Cal. App. 2d 631, 69 P. 2d 1005 (1937) (exceptions for classes of businesses); *Allen* v. *City of Colorado Springs,* 101 Colo. 498, 75 P. 2d 141 (1937) (exceptions for classes of businesses and commodities); *Henderson* v. *Antonacci,* 62 So. 2d 5 (Fla. 1952) (exceptions for classes of businesses and commodities); *Kelly* v. *Blackburn,* 95 So. 2d 260 (Fla. 1957) (exceptions for newspapers and cinema); *City of Mt. Vernon* v. *Julian,* 369 Ill. 447, 17 N. E. 2d 52 (1938) (exceptions for classes of businesses); *Auto-Rite Supply Co.* v. *Mayor of Woodbridge,* 41 N. J. Super. 303, 124 A. 2d 612 (1956), aff'd on other grounds, 25 N. J. 188, 135 A. 2d 515 (1957) (banning sale of enumerated classes of commodities); *Chan Sing* v. *Astoria,* 79 Ore. 411, 155 P. 378 (1916) (closing shops selling enumerated classes of commodities); *Broadbent* v. *Gibson,* 105 Utah 53, 140 P. 2d 939 (1943) (exceptions for classes of businesses, some restricted to sale of specified commodities); *Gronlund* v. *Salt Lake City,* 113 Utah 284, 194 P. 2d 464 (1948) (sales ban with exceptions for classes of commodities; court distinguishes statutory scheme banning all labor and sales with exceptions). Cf. *State* v. *Trahan,* 214 La. 100, 36 So. 2d 652 (1948), and *Arrigo* v. *City of Lincoln,* 154 Neb. 537, 48 N. W. 2d 643 (1951) (exceptions for classes of businesses), holding unconstitutional Sunday statutes in particular applications deemed discriminatory.

[134] *City of Denver* v. *Bach,* 26 Colo. 530, 58 P. 1089 (1899) (closing classes of businesses); *City of Springfield* v. *Smith,* 322 Mo. 1129, 19 S. W. 2d 1 (1929) (banning enumerated entertainments); *Ex parte Ferguson,* 62 Okla. Cr. 145, 70 P. 2d 1094 (1937) (banning sale of enumerated commodities) (alternative holding); *Ex parte Hodges,* 65 Okla. Cr. 69, 83 P. 2d 201 (1938) (exceptions for classes of businesses) (alternative holding). Cf. *McKaig* v. *Kansas City,* 363 Mo. 1033, 256 S. W. 2d 815 (1953) (automobile sales), disapproving *City of St. Louis* v. *DeLassus,* 205 Mo. 578, 104 S. W. 12 (1907), and *Komen* v. *City of St. Louis,* 316 Mo. 9, 289 S. W. 838 (1926).

[135] *Lane* v. *McFadyen,* 259 Ala. 205, 66 So. 2d 83 (1953) (banning merchandising with exceptions for classes of businesses); *Taylor* v.

sonable classification—like the conflicting views on what is such "necessity" as will justify Sunday operations—testifies that the question of inclusion with regard to Sunday bans is one where judgments rationally differ, and hence

*City of Pine Bluff,* 226 Ark. 309, 289 S. W. 2d 679 (1956) (ordinance applied only to single class of business); *Hickinbotham* v. *Williams,* 227 Ark. 126, 296 S. W. 2d 897 (1956) (banning enumerated businesses); *Ex parte Koser,* 60 Cal. 177 (1882) (exceptions for classes of businesses); *In re Sumida,* 177 Cal. 388, 170 P. 823 (1918) (exceptions for classes of businesses); *State* v. *Hurliman,* 143 Conn. 502, 123 A. 2d 767 (1956) (exceptions for classes of services, activities and commodities, the latter to be sold by persons who sell them on weekdays); *State* v. *Shuster,* 145 Conn. 554, 145 A. 2d 196 (1958) (same); *Theisen* v. *McDavid,* 34 Fla. 440, 16 So. 321 (1894) (excepting sales of classes of commodities); *State* v. *Dolan,* 13 Idaho 693, 92 P. 995 (1907) (exceptions for classes of services and commodities); *State* v. *Cranston,* 59 Idaho 561, 85 P. 2d 682 (1938) (exceptions for classes of businesses, services and commodities); *Humphrey Chevrolet, Inc.,* v. *City of Evanston,* 7 Ill. 2d 402, 131 N. E. 2d 70 (1955) (exceptions for classes of commodities); *Ness* v. *Supervisors of Elections,* 162 Md. 529, 160 A. 8 (1932) (unspecified); *People* v. *DeRose,* 230 Mich. 180, 203 N. W. 95 (1925) (banning classes of businesses and sales of classes of commodities); *People* v. *Krotkiewicz,* 286 Mich. 644, 282 N. W. 852 (1938) (banning sales of classes of commodities); *People's Appliance, Inc.,* v. *City of Flint,* 358 Mich. 34, 99 N. W. 2d 522 (1959) (banning businesses selling classes of commodities); *State ex rel. Hoffman* v. *Justus,* 91 Minn. 447, 98 N. W. 325 (1904) (exceptions for classes of commodities); *Liberman* v. *State,* 26 Neb. 464, 42 N. W. 419 (1889) (exceptions for classes of businesses and commodities); *In re Caldwell,* 82 Neb. 544, 118 N. W. 133 (1908) ("common" labor banned); *State* v. *Somberg,* 113 Neb. 761, 204 N. W 788 (1925) (banning classes of businesses and sales of classes of commodities); *City of Elizabeth* v. *Windsor-Fifth Avenue, Inc.,* 31 N. J. Super. 187, 106 A. 2d 9 (1954) (banning businesses selling classes of commodities); *Masters-Jersey, Inc.,* v. *Mayor of Paramus,* 32 N. J. 296, 160 A. 2d 841 (1960) (exceptions for classes of commodities); *Richman* v. *Board of Comm'rs,* 122 N. J. L. 180, 4 A. 2d 501 (1939) (banning businesses selling a class of commodities, *semble*); *People* v. *Friedman,* 302 N. Y. 75, 96 N. E. 2d 184 (1950), app. dism'd for want of a substantial federal question, 341 U. S. 907 (exceptions for classes of businesses, commodities, other activities); *State* v. *Medlin,* 170 N. C. 682, 86

where a State's determinations must be given every fair presumption of a reasonable support in fact. The restricted scope of this Court's review of state regulatory legislation under the Equal Protection Clause is of long

S. E. 597 (1915) (exception for a class of business, restricted to sale of specified classes of commodities); *State* v. *Trantham,* 230 N. C. 641, 55 S. E. 2d 198 (1949) (exceptions for classes of commodities to be sold by classes of businesses); *State* v. *McGee,* 237 N. C. 633, 75 S. E. 2d 783 (1953), app. dism'd for want of a substantial federal question, 346 U. S. 802 (exceptions for classes of businesses, commodities, other activities); *State* v. *Towery,* 239 N. C. 274, 79 S. E. 2d 513 (1954), app. dism'd for want of a substantial federal question, 347 U. S. 925 (exceptions for classes of businesses, some restricted to sales of specified classes of commodities); *State* v. *Diamond,* 56 N. D. 854, 219 N. W. 831 (1928) (exceptions for classes of commodities); *State* v. *Haase,* 97 Ohio App. 377, 116 N. E. 2d 224 (1953) (exceptions for classes of recreational activities); *State* v. *Kidd,* 167 Ohio St. 521, 150 N. E. 2d 413 (1958), app. dism'd for want of a substantial federal question, 358 U. S. 132 (exceptions for classes of recreational activities); *Commonwealth* v. *Bauder,* 188 Pa. Super. 424, 145 A. 2d 915 (1958) (exceptions for classes of recreational activities); *Bothwell* v. *York City,* 291 Pa. 363, 140 A. 130 (1927) (banning classes of recreational activities); *Mayor of Nashville* v. *Linck,* 80 Tenn. 499 (1883) (exceptions for sales of classes of commodities by classes of businesses); *Kirk* v. *Olgiati,* 203 Tenn. 1, 308 S. W. 2d 471 (1957) (banning classes of businesses); *Ex parte Sundstrom,* 25 Tex. App. 133, 8 S. W. 207 (1888) (exceptions for classes of commodities); *Searcy* v. *State,* 40 Tex. Cr. R. 460, 51 S. W. 1119 (1899) (exceptions for classes of commodities); *Sayeg* v. *State,* 114 Tex. Cr. R. 153, 25 S. W. 2d 865 (1930) (exceptions for classes of commodities); *City of Seattle* v. *Gervasi,* 144 Wash. 429, 258 P. 328 (1927) (exceptions for classes of commodities); *State* v. *Grabinski,* 33 Wash. 2d 603, 206 P. 2d 1022 (1949) (exceptions for classes of commodities). See also *Rosenbaum* v. *City & County of Denver,* 102 Colo. 530, 81 P. 2d 760 (1938) (banning automobile trading); *Mosko* v. *Dunbar,* 135 Colo. 172, 309 P. 2d 581 (1957) (banning automobile trading); *Gillooley* v. *Vaughan,* 92 Fla. 943, 110 So. 653 (1926) (banning classes of amusements); *Stewart Motor Co.* v. *City of Omaha,* 120 Neb. 776, 235 N. W. 332 (1931) (banning automobile trading); *ABC Liquidators, Inc.,* v. *Kansas City,* 322 S. W. 2d 876 (Mo. 1959) (banning auctions); *State* v. *Loomis,* 75 Mont. 88, 242 P. 344 (1925)

standing. *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 78–79. The applicable principles are that a state statute may not be struck down as offensive of equal protection in its schemes of classification unless it is obviously arbitrary, and that, except in the case of a statute whose discriminations are so patently without reason that no conceivable situation of fact could be found to justify them, the claimant who challenges the statute bears the burden of affirmative demonstration that in the actual state of facts which surround its operation, its classifications lack rationality.

When these standards are applied, first, to the Maryland statute challenged in the *McGowan* case, appellants' claims under the Due Process and Equal Protection Clauses show themselves clearly untenable. Counsel contend that the Sunday sales prohibition, Md. Code Ann., 1957, Art. 27, § 521, is rendered arbitrary by its exception of retail sales of tobacco items and soft drinks,

---

(banning, *e. g.,* classes of dance halls) ; *Gundaker Central Motors, Inc.,* v. *Gassert,* 23 N. J. 71, 127 A. 2d 566 (1956), app. dism'd for want of a substantial federal question, 354 U. S. 933 (banning automobile trading) ; *Ex parte Johnson,* 20 Okla. Cr. 66, 201 P. 533 (1921) (banning cinema and theaters) ; *Consolidated Enterprises, Inc.,* v. *State,* 150 Tenn. 148, 263 S. W. 74 (1924) (banning cinema and theaters). Statutory provisions whose effect was to punish some Sunday activities more severely than others have been sustained. *State* v. *Hogreiver,* 152 Ind. 652, 53 N. E. 921 (1899) ; *Tinder* v. *Clarke Auto Co.,* 238 Ind. 302, 149 N. E. 2d 808 (1958) ; *State* v. *Murray,* 104 Neb. 51, 175 N. W. 666 (1919) ; *Commonwealth* v. *Grochowiak,* 184 Pa. Super. 522, 136 A. 2d 145 (1957), app. dism'd for want of a substantial federal question, 358 U. S. 47; *Breyer* v. *State,* 102 Tenn. 103, 50 S. W. 769 (1899). Cf. *Sherman* v. *Mayor of Paterson,* 82 N. J. L. 345, 82 A. 889 (1912). For cases sustaining state statutes applicable in some, but not all, localities, see *People* v. *Havnor,* 149 N. Y. 195, 43 N. E. 541 (1896); *Bohl* v. *State,* 3 Tex. App. 683 (1878) ; and compare *Sarner* v. *Township of Union,* 55 N. J. Super. 523, 151 A. 2d 208 (1959), with *Two Guys from Harrison, Inc.,* v. *Furman,* 32 N. J. 199, 160 A. 2d 265 (1960).

ice and ice cream, confectionery, milk, bread, fruit, gasoline products, newspapers and periodicals, and of drugs and medical supplies by apothecaries—by the further exemption in Anne Arundel County, under § 509, of certain recreational activities and sales incidental to them—and by the permissibility under other state and local regulations of various amusements and public entertainments on Sunday, Sunday beer and liquor sales, and Sunday pinball machines and bingo. The short answer is that these kinds of commodity exceptions, and most of these exceptions for amusements and entertainments, can be found in the comprehensive Sunday statutes of England, Puerto Rico, a dozen American States, and many other countries having uniform-day-of-rest legislation.[136] Surely unreason cannot be so widespread. The notion that, with these matters excepted, the Maryland statute lacks all rational foundation is baseless. The exceptions relate to products and services which a legislature could reasonably find necessary to the physical and mental health of the people or to their recreation and relaxation on a day of repose. Other sales activity and, under Art. 27, § 492, all other labor, are forbidden. That more or fewer activities than fall within the exceptions could with equal rationality have been excluded from the general ban does not make irrational the selection which has actually been made. There is presented in this record not a trace of evidence as to the habits and customs of the population of Maryland or of Anne Arundel County, nothing that suggests that the pattern of legislation which their representatives have devised is not reasonably related to local circumstances determining their ways of

---

[136] See note 131, supra; Appendix II to this opinion, post, p. 551; Weekly Rest in Commerce and Offices, Report VII (1), International Labour Conference, 39th Sess., Geneva, 1956 (1955), 27–52; Weekly Rest in Commerce and Offices, Report A, International Labour Conference, 26th Sess., Geneva, 1940 (1939), 82–127.

life. Appellants have wholly failed to meet their burden of proof.

Counsel for McGowan urge that the allowance, limited to Anne Arundel County, of retail sales of merchandise customarily sold at bathing beaches, bathhouses, amusement parks and dancing saloons, violates the equal protection of the laws both by discriminating between Anne Arundel retailers and those in other counties, and by discriminating among classes of persons within Anne Arundel County who compete in sales of the same articles.[137] Clearly appellants, who were convicted for selling within the county, would not ordinarily have standing to raise the issue of possible discrimination against out-of-county merchants; in any event, on this record, it is dubious that the contention was adequately raised below. Suffice to say, for purposes of the due process issue which appellants did raise, that the provision of different Sunday regulations for different regions of a State is not *ipso facto* arbitrary. See *Salsburg* v. *Maryland,* 346 U. S. 545; *Missouri* v. *Lewis,* 101 U. S. 22, 31.[138]

As for the asserted discrimination in favor of those who sell at the beach or the park articles not permitted to

---

[137] It is unclear whether the exception here assailed permits the sale of merchandise essential to, or customarily sold at, bathing beaches, bathhouses, etc., *only* at those enumerated places or by all retailers within the county. Since the Maryland Court of Appeals left this question of construction open below, I assume the interpretation most favorable to appellants' claim.

[138] Many of the jurisdictions which have Sunday laws provide some form of local option procedure for the creation of exceptions. This is only to recognize the obvious fact that conditions of limited geographical range may be determinative in striking the balance of forbidden and permissible Sunday activity which best accords with popular habits and desires. In Maryland the State Legislature itself does the job of adapting the general state-wide law to local circumstances. This difference in method can scarcely entail different federal constitutional consequences.

be sold elsewhere, the answer must be that between such beach-side enterprisers and the general suburban merchandising store at which appellants are employed there is a reasonable line of demarcation. The reason of the exemption dictates the human logic of its scope. The legislature has found it desirable that persons seeking certain forms of recreation on Sunday have the convenience of purchasing on that day items which add enjoyment to the recreation and which, perhaps, could not or would not be provided for by a vacationer prior to the day of his Sunday outing. On the other hand, the policy of securing to the maximum possible number of distributive employees their Sunday off might reasonably preclude allowing every retail establishment in the county to open to serve this convenience. A tenable resolution, surely, is to permit these particular sales only on the premises where the items will be needed and used. The enforcement problem which could arise from permitting general merchandising outlets to open for the sale of these items alone, but not for the sale of thousands of other items at adjacent counters and shelves, might in itself justify the limitation of the exception to the group of on-the-premises merchants who are less likely to stock articles extraneous to the use of the enumerated amusement facilities.

The Massachusetts statute attacked in the *Gallagher* case contains a wider range of exceptions but, again, none that this record shows to be patently baseless and therefore constitutionally impermissible. The court below believed that reason was offended by such provisions as those which allow, apparently, digging for clams but not dredging for oysters, or which permit certain professional sports during the hours from 1:30 to 6:30 p. m. while restricting their amateur counterparts to 2 to 6, or which make lawful (as the court below read the statute) Sunday pushcart vending by conscientious Sabbatarians, but not

Sunday vending within a building. But the record below, on the basis of which a federal court has been asked to enjoin the enforcement of a state statute, contains no evidence concerning clam-digging or oyster-dredging, nothing to indicate that these two activities have anything more in common—requiring similar treatment—than that in each there is involved the pursuit of mollusca. There is nothing in the record concerning professional or amateur athletic events, and certainly nothing to support the conclusion that the problem of Sunday regulation of pushcarts is so similar to the problem of Sunday regulation of indoor markets as to require uniform treatment for both.[139] These various differently treated situations may be different in fact, or they may not. A statute is not to be struck down on supposition.

It is true, as appellees there claim, that Crown Kosher Super Market may not sell on Sunday products which other retail establishments may sell on that day: bread (which may be sold during certain hours by innkeepers, common victuallers, confectioners and fruiterers, and, along with other bakery products, by bakers), confectionery, frozen desserts and dessert mix, and soda water (which may be sold by innkeepers, common victuallers, confectioners and fruiterers, and druggists), tobacco (which may be sold by innkeepers, common victuallers, druggists, and regular newsdealers), etc. (The sale of drugs and newspapers on Sunday is permitted generally.) But although Crown Kosher undoubtedly suffers an element of competitive disadvantage from these provisions, the provisions themselves are not irrational. Their purpose, apparently, is to permit dealers specializing in certain products whose distribution on Sunday is regarded as necessary, to sell those products and also such other among the same group

---

[139] See *Eldorado Ice Cream Co.* v. *Clark*, [1938] 1 K. B. 715, holding the sale of ice cream from a box tricycle without the prohibition of the Shops (Sunday Trading Restriction) Act.

of necessaries as are generally found sold together with the products in which they specialize, thus fostering the maximum dissemination of the permitted products with the minimum number of retail employees required to work to disseminate them. Shops such as newsdealers, druggists, and confectioners may in Massachusetts tend, for all we know, to be smaller, less noisy, more widely distributed so that access to them from residential areas entails less traveling, than is the case with other stores. They may tend to hire fewer employees. They may present, because they specialize in products whose sale is permitted, less of a policing problem than would general markets selling these and many other products.[140] Again there is nothing in the record to support the conclusion that Massachusetts has failed to afford to the Crown Kosher Super Market treatment which is equivalent to that enjoyed by all other retailers of a class not rationally distinguishable from Crown. "The prohibition of the Equal Protection Clause goes no further than the invidious discrimination. We cannot say that that point has been reached here." *Williamson* v. *Lee Optical, Inc.,* 348 U. S. 483, 489.

Nor, on the record of the *McGinley* case, can any other conclusion be reached as to the 1959 Pennsylvania Sunday retail sales act. Appellants in this case argue that to punish by a fine of up to one hundred dollars per sale—or two hundred dollars per sale within one year after the first offense—the retail selling of some twenty enumerated broad categories of commodities, while punishing all other sales and laboring activity by the four-dollars-per-Sunday

---

[140] Consider the alternative suggested by the ordinance sustained in *In re Sumida,* 177 Cal. 388, 170 P. 823 (1918), requiring that where an establishment housing both permitted and prohibited businesses remains open on Sunday for transaction of the former, a five-foot-high permanent partition or screen must be erected to separate the two business areas.

fine fixed by the earlier Lord's day statute,[141] is arbitrary and violative of equal protection. But the court below found, and in this it is supported by the legislative history of the 1959 act,[142] that the enactment providing severer penalties for these classes of sales was responsive to the appearance in the Commonwealth, only shortly before the act's passage, of a new kind of large-scale mercantile enterprise which, absorbing without difficulty a four-dollar-a-week fine, made a profitable business of persistent violation of the earlier statute. These new enterprises may have attracted a disturbing volume of Sunday traffic; they may have employed more retail salesmen, and under different conditions, than other kinds of businesses in the State; some of the legislators, apparently, so believed.[143] The danger may have been apprehended that not only would these violations of long-standing State legislation continue, but that competition would force open other enterprises which had for years closed on Sunday. Under this threat the 1959 statute was designed. It applies not only to the new merchandisers—if that were so, quite obviously, different constitutional problems would arise. Rather it singles out the area where a danger has been made most evident, and within that area treats all business enterprises equally. That in so doing it may have drawn the line between the sale of a sofa cover, punished by a hundred-dollar fine, and the sale of an automobile seat cover, punished by a four dollar fine, is not sufficient to void the legislation. "[A] State may classify with reference to the evil to be prevented, and . . . if the class discriminated against is or reasonably might be considered to define those from whom the evil mainly is to be feared, it properly may be

---

[141] See *Friedeborn* v. *Commonwealth*, 113 Pa. 242, 6 A. 160 (1886).

[142] See 36 Pennsylvania Legislative Journal, 143d General Assembly (1959), 1139.

[143] See *id.*, at 1142–1143, 2568.

picked out. A lack of abstract symmetry does not matter. The question is a practical one dependent upon experience. The demand for symmetry ignores the specific difference that experience is supposed to have shown to mark the class. It is not enough to invalidate the law that others may do the same thing and go unpunished, if, as a matter of fact, it is found that the danger is characteristic of the class named." Mr. Justice Holmes, in *Patsone* v. *Pennsylvania,* 232 U. S. 138, 144.

Even less should a legislature be required to hew the line of logical exactness where the statutory distinction challenged is merely one which sets apart offenses subject to penalties of differing degrees of severity, not one which divides the lawful from the unlawful. "Judgment on the deterrent effect of the various weapons in the armory of the law can lay little claim to scientific basis. Such judgment as yet is largely a prophecy based on meager and uninterpreted experience. . . .

". . . Moreover, the whole problem of deterrence is related to still wider considerations affecting the temper of the community in which law operates. The traditions of a society, the habits of obedience to law, the effectiveness of the law-enforcing agencies, are all peculiarly matters of time and place. They are thus matters within legislative competence." *Tigner* v. *Texas,* 310 U. S. 141, 148, 149. Appellants in *McGinley,* like appellants in the *McGowan* and appellees in the *Gallagher* cases, have had full opportunity to demonstrate the arbitrariness of the statute which they challenge. On this record they have entirely failed to satisfy the burden which they carry. *Friedman* v. *New York,* 341 U. S. 907; *McGee* v. *North Carolina,* 346 U. S. 802; *Towery* v. *North Carolina,* 347 U. S. 925. Cf. *Missouri, K. & T. R. Co.* v. *Cade,* 233 U. S. 642.

The *Braunfeld* case, however, comes here in a different posture. Appellants, plaintiffs below, allege in their

amended complaint that the 1959 Pennsylvania Sunday retail sales act is irrational and arbitrary. The three-judge court dismissed the amended complaint for failure to state a claim. Speaking for myself alone and not for MR. JUSTICE HARLAN on this point, I think that this was too summary a disposition. However difficult it may be for appellants to prove what they allege, they must be given an opportunity to do so if they choose to avail themselves of it, in view of the Court's decisions in this series of cases. I would remand No. 67 to the District Court.

## APPENDIX I TO OPINION OF MR. JUSTICE FRANKFURTER.

PRINCIPAL COLONIAL SUNDAY STATUTES AND THEIR CONTINUATION UNTIL THE END OF THE EIGHTEENTH CENTURY.

CONNECTICUT:

*New Haven Colony:*

1656: Prophanation of the Lord's Day, New Haven's Settling in New England. And Some Laws for Government (1656), reprinted in Hinman, The Blue Laws (1838), 132, 206.

See also Prince, An Examination of Peters' "Blue Laws," H. R. Doc. No. 295, 55th Cong., 3d Sess. 95, 109, 113–114, 123–125.

*Connecticut Colony:*

1668: 2 Public Records of the Colony of Connecticut, 1665–1678 (1852), 88 (traveling, playing).

1672: Prophanation of the Sabbath, Laws of Connecticut, 1673 (Brinley reprint 1865), 58.

1676: 2 Public Records of the Colony of Connecticut, 1665–1678 (1852), 280.

See An Act for the due Observation, and keeping the Sabbath, or Lord's Day; and for Preventing, and Punishing Disorders, and Prophaneness on the same, Acts and Laws of His Majesty's English Colony of Connecticut in New-England (1750), 139; An Act for the due Observation of the Sabbath or Lord's-Day, Acts and Laws of the State of Connecticut (1784), 213; An Act for the due Observation of the Sabbath or Lord's-Day, Acts and Laws of the State of Connecticut (1796), 368.

DELAWARE:

1740: An Act to prevent the Breach of the Lord's Day commonly called Sunday, Laws of the Government of New-Castle, Kent and Sussex Upon Delaware (1741), 121.

1795: An Act more effectually to prevent the profanation of the Lord's day, commonly called Sunday, 2 Laws of Delaware, 1700–1797 (1797), 1209.

GEORGIA:

1762: An Act For preventing and punishing Vice, Profaneness, and Immorality, and for keeping holy the Lord's Day, commonly called Sunday, Acts Passed by the General Assembly of Georgia, 1761–1762 (ca. 1763), 10.

See Marbury and Crawford, Digest of the Laws of Georgia, 1755–1800 (1802), 410.

MARYLAND:

1649: An Act concerning Religion, 1 Archives of Maryland (Proceedings and Acts of the General Assembly), 1637/8–1664 (1883), 244.

1654: Concerning the Sabboth Day, id., at 343.

1674: An Act against the Prophaning of the Sabbath day, 2 Archives of Maryland (Proceedings and Acts of

the General Assembly), 1666–1676 (1884), 414 (inn-keepers).

1692: An Act for the Service of Almighty God and the Establishment of the Protestant Religion within this Province, 13 Archives of Maryland (Proceedings and Acts of the General Assembly), 1684–1692 (1894), 425.

1696: An Act for Sanctifying & keeping holy the Lord's Day Comonly called Sunday, 19 Archives of Maryland (Proceedings and Acts of the General Assembly), 1693–1697 (1899), 418.

1723: An Act to punish Blasphemers, Swearers, Drunkards, and Sabbath-Breakers . . . , Bacon, Laws of Maryland (1765), Sf2.

See 1 Dorsey, General Public Statutory Law of Maryland, 1692–1839 (1840), 65.

MASSACHUSETTS:

*Plymouth Colony:*

1650: Prophanacon the Lord's Day, Compact with the Charter and Laws of the Colony of New Plymouth (1836), 92.

1658: *Id.,* at 113 (traveling).

1671: General Laws of New Plimouth, c. III, §§ 9, 10 (1672), in *id.,* at 247.

*Massachusetts Bay Colony:*

1653: Sabbath, Colonial Laws of Massachusetts (reprinted from the edition of 1672 with the supplements through 1686) (1887), 132 (traveling, sporting, drinking).

1668: For the better Prevention of the Breach of the Sabbath, *id.,* at 134.

1692: An Act for the better Observation and Keeping the Lord's Day, Acts and Laws of His Majesty's Province

of the Massachusetts-Bay in New-England, in Charter of the Province of the Massachusetts-Bay in New-England (1759 [*sic*]), 13.

1761: An Act for Repealing the several Laws now in Force which relate to the Observation of the Lord's-Day, and for making more effectual Provision for the due Observation thereof, *id.*, at 392.

1782: An Act for Making More Effectual Provision for the Due Observation of the Lord's Day . . . , Acts and Laws of Massachusetts, 1782 (reprinted 1890), 63.

1792: An Act providing for the due Observation of the Lord's Day, 2 Laws of Massachusetts, 1780–1800 (1801), 536.

See also the act of 1629 set forth in Blakely, American State Papers on Freedom in Religion (4th rev. ed. 1949), at 29–30.

NEW HAMPSHIRE:

1700: An Act for the better Observation and Keeping the Lords Day, Acts and Laws Passed by the General Court of His Majesties Province of New-Hampshire in New-England, 1726 (reprinted 1886), 7.

1715: An Act for the Inspecting, and Supressing of Disorders in Licensed Houses, *id.*, at 57 (innkeepers).

1785: An Act for the Better Observation and Keeping the Lords Day, 5 Laws of New Hampshire (First Constitutional Period), 1784–1792 (1916), 75.

1789: An Act for the better Observation of the Lord's day . . . , *id.*, at 372.

1799: An Act for the better observation of the Lords day . . . , 6 Laws of New Hampshire (Second Constitutional Period), 1792–1801 (1917), 592.

NEW JERSEY:

1675: Leaming and Spicer, Grants, Concessions and Original Constitutions of the Province of New-Jersey with the Acts Passed during the Proprietary Governments (ca. 1752), 98.

1683: Against prophaning the Lord's Day, *id.*, at 245.

1693: An Act for preventing Profanation of the Lords Day, *id.*, at 519.

1704: An Act for Suppressing of Immorality, 1 Nevill, Acts of the General Assembly of the Province of New-Jersey, 1703–1752 (1752), 3.

1790: An Act to promote the Interest of Religion and Morality, and for suppressing of Vice . . . , Acts of the Fourteenth General Assembly of the State of New Jersey, c. 311 (1790), 619.

1798: An Act for suppressing vice and immorality, Laws of New Jersey, Revised and Published under the Authority of the Legislature (1800), 329.

NEW YORK:

1685: A Bill against Sabbath breaking, 1 Colonial Laws of New York, 1664–1775 (1894), 173.

1695: An Act against profanation of the Lords Day, called Sunday, *id.*, at 356.

1788: An Act for suppressing immorality, Laws of New York, 1785–1788 (1886), 679.

NORTH CAROLINA:

1741: An Act for the better observation and keeping of the Lord's day, commonly called Sunday; and for the more effectual suppression of vice and immorality, 1 Laws of North Carolina (1821), 142.

PENNSYLVANIA:

1682: The Great Law or The Body of Laws, in Charter and Laws of the Province of Pennsylvania, 1682–1700 (with the Duke of Yorke's Book of Laws, 1676–1682) (1879), 107.

1690: The Law Concerning Liberty of Conscience (A Petition of Right, First Law), *id.*, at 192.

1700: The Law Concerning Liberty of Conscience, 2 Statutes at Large of Pennsylvania (1896), 3.

1705: An Act to Restrain People from Labor on the First Day of the Week, *id.*, at 175.

1779: An Act for the Suppression of Vice and Immorality, 9 Statutes at Large of Pennsylvania (1903), 333.

1786: An Act for the Prevention of Vice and Immorality . . . , 12 Statutes at Large of Pennsylvania (1906), 313.

1794: An Act for the Prevention of Vice and Immorality . . . , 15 Statutes at Large of Pennsylvania (1911), 110.

RHODE ISLAND:

1673: 2 Records of the Colony of Rhode Island and Providence Plantations, 1664–1677 (1857), 503 (alcoholic beverages).

1679: 3 Records of the Colony of Rhode Island and Providence Plantations, 1678–1706 (1858), 30 (employing servants).

1679: An Act Prohibiting Sports and Labours on the First Day of the Week, Acts and Laws, of His Majesty's Colony of Rhode-Island and Providence-Plantations (1730), 27.

1784: Rhode Island Acts and Resolves, Aug. 1784 (1784), 9 (excepting members of Sabbatarian societies; but exception does not extend to opening shops, to mechanical work in compact places, etc.).

1798: An Act prohibiting Sports and Labour on the first Day of the Week, Public Laws of Rhode-Island and Providence Plantations (1798), 577.

SOUTH CAROLINA:

1692: An Act for the better Observance of the Lord's Day, commonly called Sunday, 2 Statutes at Large of South Carolina (1837), 74.

1712: An Act for the better observation of the Lord's Day, commonly called Sunday, *id.*, at 396.

See Grimke, Public Laws of South-Carolina (1790), 19.

VIRGINIA:

1610: For the Colony in Virginea Britannia, Lawes Divine, Morall and Martiall (1612), in 3 Force, Tracts Relating to the Colonies in North America (1844), II, 10 (gaming).

1629: 1 Hening, Statutes of Virginia (1823), 144.

1642–1643: *Id.*, at 261 (traveling, shooting).

1657: The Sabboth to bee kept holy, *id.*, at 434 (traveling, shooting, lading).

1661–1662: Sundays not to bee profaned, 2 Hening, Statutes of Virginia (1823), 48.

1691: An act for the more effectual suppressing the severall sins and offences of swaring, cursing, profaineing Gods holy name, Sabbath abuseing, drunkenness, ffornication, and adultery, 3 Hening, Statutes of Virginia (1823), 71.

1705: An act for the effectual suppression of vice, and restraint and punishment of blasphemous, wicked, and dissolute persons, *id.*, at 358.

1786: An act for punishing disturbers of Religious Worship and Sabbath breakers, 12 Hening, Statutes of Virginia (1823), 336.

In some of the Colonies the English Sunday laws were also in effect. See, *e. g.*, Martin, Collection of the Statutes of England in Force in North-Carolina (1792), 379.

## APPENDIX II TO OPINION OF MR. JUSTICE FRANKFURTER.

### ANALYSIS OF IMPORTANT STATE SUNDAY STATUTES CURRENTLY IN FORCE.

This Appendix sets forth the important state legislative provisions currently in force prohibiting or regulating private activity on Sunday. In reducing these often complex laws to tabular form, a certain simplification has been required. Provisions in different States which are found in a single category, *e. g.,* "Trade in Alcoholic Beverages," or "Racing," may differ considerably in detail. This Appendix does not include references to: (1) provisions declaring Sunday a holiday or non-business day; (2) provisions closing the courts on Sunday or prohibiting the service of judicial process on that day; (3) provisions giving various government employees Sunday off or excepting Sunday from the days of labor for state prisoners; (4) penalty sections where Sunday laws are parts of general regulatory codes, *e. g.,* fish and game laws; (5) jurisdictional provisions or provisions authorizing arrest and detention on Sunday of offenders against the various Sunday laws, unless these are of special interest; and (6) definition provisions, statutes of limitation of prosecution, and similar ancillary provisions.

552

Appendix II to Opinion of Frankfurter, J.

| State | Code (and Supps.) | "Work" or "Labor" | Keeping Open Shop or Selling Goods | Permitting Child or Servant To Work or Labor | Public Entertainment | Miscellaneous | Trade in Alcoholic Beverages | Automobile Trading | Barbering | Boxing, Wrestling | Hunting, Shooting, and Fishing | Racing | Miscellaneous | Works of Necessity and Charity | Drug Stores; Sale of Drugs, Medical Supplies | Preparation, Distribution or Sale of Newspapers, Magazines | Operation of Railroads, Vessels, Tollgates, Ferries; "Families Removing" | Operation of Gasoline Stations; Auto Repairs; Livery Stables | Sale of Ice, Ice Cream, Soda, Confectionery, Fresh Fruit | Sale of Tobacco | Operation of Restaurants, Inns, Hotels | Sale of Milk, Bread, Eggs | Sports | Entertainments | Operation of Manufacturing Processes Requiring Constant Operation | Miscellaneous | Exception for Observers of Other Days | Regulation of Sunday Business | Suppression of Sabbath Desecration | Provisions for 6-Day Week for Employees |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALABAMA | Ala. Code (1940) (Recomp. 1958) | | T. 14, §§ 420, 422 | T. 14, § 420 | T. 9, § 420 (gaming); T. 14, § 421 (various public sports) | T. 9, § 21 (contracts void) | T. 29, §§ 36, 36 (1) (sale or public consumption) | | | T. 55, § 346 | T. 14, § 420 (hunt & shoot) | T. 14, § 420 | T. 5, § 131 (banks) | (Yes) | (Druggists) | (Newsstands; sale of newspapers) | (R. R., stages; steamboats & vessels) | [Excepted commodities may not be sold in connection with prohibited activities] | (Fruit stands; ice cream shops; ice mfg. plants; sale of ice) | | (Lunchstands; restaurants; delicatessens) | | (Various local option provisions for cities of two classes; various sports, some may be authorized by all cities; others only by cities of one class) | (Local option provisions for cities of two classes; cinema; cinema-vaudeville) | (Yes) | (Communications; public utilities; florists) | | | | T. 26, § 244 (children) |
| ALASKA | Alaska Comp. Laws Ann. (1958 Cum. Supp.) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | § 43-2-112 (children) |
| ARIZONA | Ariz. Rev. Stat. Ann. (1956) | | | | | | § 4-244 (15) (permitted hours) | | § 22-357 | § 5-202 | | | | | | | | | | | | | | | | | | | | § 23-281 (women) |
| ARKANSAS | Ark. Stat. Ann. (1947) (Replacement Vols. 1950 & 1960) | | | | § 41-3809 (card games) | | §§ 48-901 (b), 48-904 to 48-906 | | | §§ 84-2901, 84-2902 | §§ 41-3807, 41-3808 | §§ 41-3807, 41-3808 (horse race and cock fight); see § 84-2828 (dog race) | | | | | | | | | | | | §§ 19-2338, 41-3805 (cinema cannot be banned locally) | | | | § 19-2338 | | §§ 81-706, 81-707 (children); 81-901 (women, unless paid overtime) |
| CALIFORNIA | Codes | | | | | | | | | | F. G. Code §§ 864, 865 (net salmon & shad Sat., Sun.) | | Pen. Code § 4135½; Ag. Code § 309 (slaughtering Sun. & hols.) | | | | | | | | | | | | | | | | Lab. Code §§ 551 to 556; Lab. Code § 851 (12 days in 14; pharmacists) |
| COLORADO | Colo. Rev. Stat. Ann. (1953) | | | | | | §§ 75-2-3 (2), 75-2-3 (4) (permitted hours) | §§ 13-20-1 to 13-20-3 | §§ 40-12-20, 40-12-21 (1st & 2d class cities) | § 129-1-16 | | § 129-2-10 | | | | | | (Sale of petrol products, tires; auto accessories; repairs; towing, wrecking) | | | | | | | § 27-1-4 (cleaning & dyeing trade—section of comprehensive hours-of-labor provisions) | | | | Indust. Comm'n Orders Nos. 10, 13 (1956), CCH Lab. Law Rep., State Laws (1960) ¶¶ 53,768, 52,758 (women & children in specified occups.) |
| CONNECTICUT | Conn. Gen. Stat. Rev. (1958) | § 53-300 ("secular") | § 53-300 | § 53-300 (permitting industrial or commercial employee to work from, unless relieved one day in next six; does not make lawful activity prohibited under § 53-300); § 53-302 | § 53-300 (sport; presence at concert, dance, public diversion) | | § 53-301 | § 20-246 (& hols.) | | § 19-334 (& hols.) | § 26-73 (hunt, with exception); § 26-262 (clam on Fairfield beach) | | | (Yes) | (Sale of medical supplies) § 53-300 (druggists) | (Production, distribution & sale of newspapers & periodicals) | § 16-72 (street R. R.; & bus) | (Emergency repair to auto, motor, aircraft, boats, etc., "including" sale of gas, towing & washing, sale of supplies, repair parts) | (Sale of fruit, ice, ice cream, confectionery, non-alcoholic beverages) [Sales exceptions limited to those who sell products on secular days] | (Sale of tobacco & smokers' supplies) | | (Sale of dairy prods., eggs, bakery prods.) | § 53-300 (amateur ball games & outdoor sports not involving quiet or worship; park comm'rs may permit free concerts & athletics) § 7-148 (local option diversion 1-11:30 p.m.) | § 7-164 (local option indoor concerts 2-6 p.m.—permitting quiet or worship); § 7-148 (local option cinema 1-11:30 p.m.) § 7-166 (local option theater & vaudeville 2-11 p.m.) | § 53-302 | § 53-300 (sale of fresh agricultural & horticultural products, antiques) § 53-302 (farm & personal services; watchmen; janitors & superintendents; transportation; sale & delivery of newspapers, milk & food; necessary repairs) | § 53-303 (conscientious observer of 7th day or Jewish sabbath who disturbs no other person at public worship not subject to penalty for laboring if notice of belief filed) | | | §§ 31-13, 31-18 (women & children in specified occups.) |
| DELAWARE | Del. Code Ann. (1953) | | | | T. 28, § 906 (public dance, theater or cinema outside town limits or during hours specified, differing for two classes of cities) | | T. 4, § 717 (& hols.) | | | T. 7, § 151 | T. 7, § 714 (hunt, with exception) | T. 28, § 906 outside town limits or during hours specified, differing for two classes of cities | | | | | | | | | | | | T. 28, § 906 (public auction outside town limits or during hours specified, differing for two classes of cities) T. 28, § 1139 (bingo) | (Cinema outside towns during specified hours, differing in second and third named counties) | | | | T. 28, § 906 (in effect, any "worldly activity" not to conflict with state prohibitions) | | T. 19, § 515 (children); T. 19, § 302 (women in specified occups.) |
| DISTRICT OF COLUMBIA | D.C. Code (1951) (Supp. VIII, 1960); D.C. Police Regs. (1955) | | | | Pol. Regs., art. 6, § 4 (d) (circus, carnival, etc.); art. 17, § 18 (paid public entertainment, cinema, etc., in place of public amusement) | | | | | | | | § 25-107 (comm'rs may forbid sale) | | | | | | | | | | Pol. Regs., art. 6, § 4 (d) (circus, etc., 9-11 p.m.); art. 17, § 18 (public entertainment, etc., before 3 a.m. & after 1 p.m.) | | | | | | §§ 36-203 (children); 36-301 (women in specified occups.); 2-1134 (barber: one-day closing) |
| FLORIDA | Fla. Stat. Ann. (1943) | § 855.01 (held unconstitutional as arbitrary in view of exceptions, Kelly v. Blackburn, So. 2d 260; see Henderson v. Antonacci, 62 So. 2d 5) Fla. Laws 1959, Special Acts, c. 59-1650 (one county) | § 855.02 | § 855.03 | § 855.05 (game; sport) | | § 562.14 (with local option provisions) | § 320.272 (& hols.) (2d hand dealers) | | | § 855.04 (hunt & shoot) § 370.11 (shad) | § 855.05 § 550.04 (with exception) | § 551.11 (fronton) | (Yes) | [Exceptions to §§ 855.01, 855.03 omitted] L. 1959, c. 59-1650 (sale of drugs) | L. 1959, c. 59-1650 (sale of newspapers) | | L. 1959, c. 59-1650 (sale of heating fuel, gas) | | L. 1959, c. 59-1650 (sale of tobacco) | L. 1959, c. 59-1650 (sale of meals) | | § 855.06 (skeet & trap) § 550.02 (baseball 2-6 p.m.) See also L. 1959, c. 59-1650 | L. 1959, c. 59-1650 (theater) | | § 855.07 | See L. 1959, c. 59-1650. | | | § 450.081(1) (children) |

The table below groups columns under: **STATES**; **GENERAL PROHIBITIONS**; **SPECIAL REGULATIONS OR PROHIBITIONS**; **EXCEPTIONS TO GENERAL PROHIBITIONS**; **EXCEPTION FOR OBSERVERS OF OTHER DAYS**; **MUNICIPAL ENABLING PROVISIONS**; **PROVISIONS FOR 6-DAY WEEK FOR EMPLOYEES**.

| State | Code (and Supps.) | "Work" or "Labor" | Keeping Open Shop or Selling Goods | Permitting Child or Servant To Work or Labor | Public Entertainment | Miscellaneous | Trade in Alcoholic Beverages | Automobile Trading | Barbering | Boxing, Wrestling | Hunting, Shooting, and Fishing | Racing | Miscellaneous | Works of Necessity and Charity | Drug Stores; Sale of Drugs, Medical Supplies | Preparation, Distribution or sale of Newspapers, Magazines | Operation of Railroads, Vessels, Tollgates, Ferries; "Families Removing" | Operation of Gasoline Stations; Provision of Automobile Repairs, Service and Accessories; Operation of Livery Stables | Sale of Ice, Ice Cream, Soda, Confectionery, Fresh Fruit | Sale of Tobacco | Operation of Restaurants, Inns, Hotels | Sale of Milk, Bread, Eggs | Sports | Entertainments | Operation of Manufacturing Processes Requiring Constant Operation | Miscellaneous | Exception for Observers of Other Days | Regulation of Sunday Business | Suppression of Sabbath Desecration | Provisions for 6-Day Week for Employees |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GEORGIA | Ga. Code Ann. (1936) | § 26-6905 (business or work of "ordinary calling") | | | § 26-6914 (public dancing) See also Ga. Laws 1906, No. 206 (amusements in certain non-urban areas without neighbors' approval) | § 14-1810 (Sunday only religious holiday) | §§ 26-6105; 58-738; 58-925; 58-1060; 58-1079 (male & purchase) | | | | §§ 26-6906 (hunt); 26-6907 (shoot); 26-6908 (fish) | § 26-6915 | § 26-6910 (bathing in view of road to place of worship) | (Yes) | | | | | | | | | | Ga. Laws 1941, No. 112 (outdoor entertainments & sports 1-6 p.m. in cities above specified population); § 26-6916 (local option athletics) | | § 26-6916 (local option cinema; if authorized to operate, cinema must show one religious or educational film per month) | | | § 5-613 (perishable farm produce & seed & growing plants) | |
| HAWAII | Hawaii Rev. Laws (1955) | | | | § 144-33 (county boards of supervisors may provide for exhibition of cinema after 12:30 p.m. & theater after 6:30 p.m. under such restrictions as they prescribe) | | § 159-77 (clubs may be licensed) | | | § 165-9 | | | | | | | | | | | | | | | | [See heading "General Prohibitions: Public Entertainment"] | | | | § 88-22 (children) |
| IDAHO | Idaho Code Ann. (1947) | | | | § 18-6203 (dance hall after 1 a.m.; merry-go-round before 1 p.m.; circus, show, concert saloon, variety hall) | § 18-6202 (Sun. set aside as day of public rest; no penalty) | §§ 23-307, 23-927 (& hols.) | | | § 54-413 | | § 18-4503 (race track except auto 1-4:30 p.m.) | §§ 18-6203, 18-1301 (pool, billiard & card room) | | | | | | | | | | | | | | | | |
| ILLINOIS | Ill. Rev. Stat. (1959) | C. 38, § 549 (disturbing peace and good order of society by labor) | | C. 48, § 8d (unlawful to operate specified establishments then, unless vent due exercise of alternative day off for Sun. employees) | C. 38, § 550 (disturbing peace, etc. by any amusement or diversion) | C. 38, § 549 (disturbing private family) | C. 43, § 129 (with local option provisions) | | | | C. 61, § 187 (hunting by nonresidents unless State affords reciprocity) | C. 8, § 37b.7 | | (Yes) | | | (R. R. & watermen unloading; ferrymen; families removing) | | | | | | | | | | | C. 38, § 549 (section shall not be construed to bar rights of conscience by person keeping another day as sabbath) | | C. 48, § 31.3 (children); C. 48, §§ 8a-8j (employees in specified occups.; except employees working less than 5 Sun.) |
| INDIANA | Burns' Ind. Stat. Ann. (Replacement Vols. 1948, 1951, 1956) | § 10-4301 ("common" labor; "usual vocation") | | | § 10-4302 (professional games; football) | § 10-4301 (rioting; quarreling) | §§ 63-265, 63-216, 63-217 | | § 10-4305 | §§ 12-436 (& hols.), 12-917 | §§ 10-4301, 10-4303 (hunt) | | | (Yes) | | [Persons engaged in publication & distribution of news] | [Travelers & those conveying them; families removing; tollgates, ferrymen] | | | | | | (Baseball & ice hockey after 1 p.m. more than 1000' from place of worship or hospital) | | | | § 10-4301 (nonadulterous observer of seventh day) | | | § 28-521 (children) |
| IOWA | Iowa Code Ann. (1949) | | | | | | §§ 123.33, 124.20 (& hols.; sale & consumption) | | | | | | | | | | | | | | | | | | | | | | | |
| KANSAS | Kan. Gen. Stat. Ann. (1949) & Supps. (1959) | § 21-952 | § 21-953 | § 21-952 | § 21-954 (cockfight, card games or other games); § 19-2220 (dance halls) | | §§ 41-712; 41-2704 | | | | | § 21-954 | | (& sale of articles of immediate necessity) | § 21-955 (sale of drugs, medicines) | | § 21-953 (ferrymen) | | | | | | | (See heading "Miscellaneous") | | | § 21-953 (§ 21-952 penalties not applicable to member of religious society observing another day) | §§ 14-417; 19-422; 13-430 (& theater) | § 21-956 (sale of provisions) | Lab. Dept' Orders Nos. 2, 3, 5 (1936), CCH Lab. Law Rep., State Laws (1960) (tr. Nos. 54,328, 54,209, 54,330) (women & children in specified occups.) |
| KENTUCKY | Ky. Rev. Stat. (1960) | § 436.160 (working at "occupation") | | | § 436.160 | | §§ 244.290, 244.480 (same local option) | | | § 436.160 | | § 436.160 | § 436.160 (pool or billiards) | (Yes) | | | | (Gas stations) | | | | | (Amateur sports; athletics) | (Cinema & opera) | | (Public services or public utilities) | § 436.160 (member of religious society observing another day) | | | § 339.280 (children); § 337.050(1) (overtime for 7th day employ't) |
| LOUISIANA | La. Rev. Stat. (1950) | | § 51:191 (stores, shops, saloons & licensed places of public business) | § 33:401 (7) | § 51:193 | §§ 26:89, 26:286, 51:192 | | | § 51:193 | | | § 4:151 | § 23:216 (hours for children in street trades) | | (Drug stores; apothecaries; sale of anything necessary in sickness) | (Newsdealers; newspaper offices) | (R. R.; boats) | (Watering places; livery stables) | (Sale of ice; soda fountains) | | (Hotels; boarding houses; restaurants) | (Bakers; dairies) | | (Theaters; any place of amusement not serving alcohol; parks; resorts for recreation & health) | | (Bookstores; printing offices; undertakers; markets; freight warehouses; telegraph; sale of burial items) | [All exemptions contained in § 51:192] | § 33:4763 (two classes of cities by population may provide (1) that markets & bakers; (2) same & sale & delivery of bakery prods.) | | § 23:211 (children); § 23:332 (women in specified occups.) |
| MAINE | Me. Rev. Stat. (1954) | C. 134, § 38 | C. 134, § 38; C. 134, § 43 (innholders cannot entertain other person than travelers, lodgers) | | C. 134, § 38 (sport, game, recreation; presence at dance, public diversion, show, entertainment) | C. 134, § 38 (travelling) | C. 61, § 27 (sale & purchase) | C. 134, § 38-A (& mobile homes) | | C. 134, §§ 38, 39 | C. 37, § 76 (hunt); C. 37, § 120 (hunt fox; but digging out fox permitted) | C. 134, §§ 38, 39 | | (Yes) | (Drug stores) | (Printing & selling Sun. newspapers) | (Vehicles; common carriers; cabs; carriages; airplanes) | (Garages; sale of gas) | (See heading "Drug Stores") | | (Hotels; restaurants) | (See heading "Miscellaneous") | C. 134, § 39 (outdoor amateur sports & games with exceptions 1-9 p.m. at local option; locality cannot restrict area to avoid disturbance to worshippers); C. 134, § 40 (local option bowling, 3-11 p.m.) | (Concerts; theaters; scientific, philosophical, religious, educational lectures); C. 134, § 41 (cinema 3-11:30 p.m. at local option; but cinema employees may not be employed more than 6-day week) | | Grocery | C. 134, § 44 (conscientious observer of Sat. as Sabbath not disturbing others) | | | C. 30, § 24 (children) |

| STATES | | GENERAL PROHIBITIONS | | | | | SPECIAL REGULATIONS OR PROHIBITIONS | | | | | | | EXCEPTIONS TO GENERAL PROHIBITIONS | | | | | | | | | | | | | EXCEPTION FOR OBSERVERS OF OTHER DAYS | MUNICIPAL ENABLING PROVISIONS | | PROVISIONS FOR 6-DAY WEEK FOR EMPLOYEES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| State | Code (and Supps.) | "Work" or "Labor" | Keeping Open Shop or Selling Goods | Permitting Child or Servant To Work or Labor | Public Entertainment | Miscellaneous | Trade in Alcoholic Beverages | Automobile Trading | Barbering | Boxing, Wrestling | Hunting, Shooting, and Fishing | Racing | Miscellaneous | Works of Necessity and Charity | Drug Stores; Sale of Drugs, Medical Supplies | Preparation, Distribution or Sale of Newspapers, Magazines | Operation of Railroads, Vessels, Tollgates, Ferries; "Families Removing" | Operation of Gasoline Stations; Provision of Automobile Repairs, Service and Accessories; Operation of Livery Stables | Sale of Ice, Ice Cream, Soda, Confectionery, Fresh Fruit | Sale of Tobacco | Operation of Restaurants, Inns, Hotels | Sale of Milk, Bread, Eggs | Sports | Entertainments | Operation of Manufacturing Processes Requiring Constant Operation | Miscellaneous | Regulation of Sunday Business | Suppression of Sabbath Desecration | |
| MARYLAND | Md. Code Ann. (1957) | Art. 27, § 492 | Art. 27, § 521 | Art. 27, § 492 | Art. 27, § 522 (keeping dancing saloon, opera, ball or bowling alley) | Art. 27, § 492 (permit child or servant to profane day by gaming) | Art. 2B, §§ 90 to 106 (provisions of local application banning sales with various exceptions differing as to hours, geographic scope, sales permitted, establishments which may sell) | | Art. 27, § 522 | | Art. 66C, § 132(d) (hunt) Art. 66C, § 698 (d) (take oysters) | | Art. 27, § 232 (c) (bingo in Baltimore County) Art. 27, § 492 | (Yes) | (Apothecaries may sell drugs, medicines, patent medicines) | (Sale of newspapers; periodicals) | | (Retail sale of gasoline, oil, grease) | (Retail sale of candy, soda, soft drinks, ice, ice cream, ices, confectionery, fruits) | (Retail sale of tobacco, cigars, cigarettes) | | (Retail sale of milk, bread) | Art. 27 §§ 495 to 534C (various provisions of local application, permitting amusement activities: athletic contests, theater, amusement parks, swimming pools, beaches, dancing, music, etc., in some county) | | | Art. 27, § 509 (sale of merchandise customarily sold at beach, amusement park, etc.; 1959 amendment to Art. 27, § 521 permits sale in same county of various specified food & toilet articles, ornaments, auto & boat accessories, etc., at retail) and keeping open retail shops not exceeding more than one employee | | | Art. 100, § 30 (children) |
| MASSACHUSETTS | Mass. Gen. Laws Ann. (1958) | C. 136, § 5 | C. 136, § 6 | C. 136 § 47 (compelling unwilling employee to work Sun. in certain industries & establishments unless he is relieved one day in next six) C. 149, § 48 (unlawful to operate mechanical, mercantile or manufacturing establishment Sun. without posting schedule of alternative day of for Sun. employee); See C. 149, § 51 | C. 136, § 2 (presence at or participation in play, sport, game, public diversion) C. 136, § 3 (maintaining public entertainment) | C. 136, § 14 (indecent behavior in place of worship) C. 272, §§ 13, 117 (more severe penalties for certain trespasses to property on Sun.) | C. 138, § 33 (tended birds or mammals; but trapping permitted) C. 136, § 17 (shoot, with exceptions); hunt, net, spear or commercial fishing, with exceptions) | | C. 136, §§ 2, 3, 25, 32 | C. 136, §§ 2, 3, 25, 32 | C. 140, § 177A (pinball licence revocation); C. 136, § 18 (innholders letting gaming apparatus) | (Yes) | C. 136, § 6 (retail sale of drugs & medicines, articles on physician's prescription, merchanical appliances used by physicians or surgeons) | C. 136, § 6 (preparation, printing, publication, sale, delivery of newspapers) | C. 136, § 6 (various provisions permitting different categories of trucking at different hours; transporting perishables, produce for hire, etc.; operation of motor vehicles; letting of horses, carriages, boats, motor vehicles, bicycle; running steam ferries on established route; street R. R.; steamboats & R. R.) | C. 136, § 6 (various provisions permitting different categories of trucking at different hours; transporting perishables, produce for hire, etc.; operation of motor vehicles; letting of horses, carriages, boats, motor vehicles, bicycle; running steam ferries on established route; street R. R.; steamboats & R. R.) | C. 136, § 6 (sale of gas; oil for use; retail sale of accessories for immediate necessary use in connection with motor vehicles, boats & aircraft; emergency repairs & towing of disabled motor vehicles; wholesale or retail sale of fuel) | C. 136, §§ 4, 7 (delivery of frozen desserts & dessert mix; wholesale or retail sale of ice; various classes of enterprise, some at local option; specified dealers may sell at retail frozen dessert, soda water, confectionery; in some enterprises, fruit) | C. 136, § 6 (specified dealers may sell tobacco at retail) | C. 136, § 6 (sales of meals by innholders & common victuallers for consumption) | C. 136, § 4A (bowling alleys, certain tennis clubs at certain hours; sale of amusement parts & beach or pool privileges at certain hours day permitted; local option may be locally licensed after 1 p.m.); C. 136, § 2 (golf; tennis; certain skating after 1 p.m.; lawn bowling, miniature golf & golf driving ranges) C. 136, § 17 (local option skeet, trap & target shooting) | C. 136, §§ 21 to 25, 26 to 32 (two sets of local option provisions for amateur & professional athletics with differing permitted hours; activities to be more than 1,000' from place of worship [with exception]; noncompeting Jewish holidays, of catalogues & art works at certain art exhibits; noncommercial photography; C. 136, § 2 (tennis; entertainment; after 1 p.m., lawn bowling, miniature golf & golf driving ranges) | C. 136, § 4 (public entertainment: in keeping with character of day and not disturbing others; observance may be locally licensed after 1 p.m.) C. 136, § 4A (bowling alleys, certain coasting places, amusement parts & beaches permitted) | C. 136, § 6 (tel. & tel., water, steam, gas, electricity, etc.; certain chemical distributions, etc., with its due observance may be locally licensed after 1 p.m.) | C. 136, § 6 (tel. & tel., water, steam, gas, electricity, etc.; in towns of less than specified population; all activity produce in wartime; unpaid quiet work in private gardens; public baths) | (Yes) | § 1.1740, Ninth (4th class cities) | § 1.1740, Ninth (4th class cities) | C. 149, § 47 (children in specified occups.) C. 149, §§ 47 to 51 (enumerated industries and occupations) (see heading "General Prohibitions: Permitting child or servant to work or labor") |
| MICHIGAN | Mich. Stat. Ann. (Rev. Vols. 1949, 1952, 1957, 1959, 1960) | § 18.851 | § 18.853, 18.856(1); 18.852 (keepers of entertainment houses & taverns cannot entertain other persons than travelers, lodgers) | §§ 18.853, 18.854 (presence or participation at dance, game, sport, play, public show, amusement, entertainment or public assembly other than meetings for worship or moral instruction or concerts of sacred music; § 18.854 applies Sun. evening) | §§ 18.853, 18.854 (presence or participation at dance, game, sport, play, public show, amusement, entertainment or public assembly other than meetings for worship or moral instruction or concerts of sacred music; § 18.854 applies Sun. evening) | § 9.3701, 9.3702 (counties over specified population) | | § 18.121, 18.122 | § 18.422(10) | | § 19.597 (pawnbroker) § 18.531 (pool & billiard halls outside cities) | (Yes) | | | | | | | | | (Baseball in orderly manner so as not to disturb repose) | | | | § 18.855, 18.856(1), 18.122, 9.3702 (concessions on observance of Sat. or Jewish Sabbath not disturbing others) | § 5.1740, Ninth (4th class cities) | § 5.1740, Ninth (4th class cities) | §§ 17.717, 17.718 (children) § 17.351 (motormen) |
| MINNESOTA | Minn. Stat. Ann. (1947) | § 614.29 (& trades, manufacturers, mechanical employments) | § 614.29 (sale of raw meat, groceries, clothing, goods, etc. not within "necessity" exception) | | § 614.29 (noises disturbing peace) | § 340.14, Subd. 1 | | § 168.275 | § 614, 29 (not "necessity"); § 154.16 (licence revocation) | § 361.07 (& certain isols.) | § 221.191 (trucks within 35 miles of city in summer: Sun. & holn.) | § 614.29 (except county fairs) | (In orderly manner so as not to disturb repose & religious liberty) | (Sale of drugs, medicines, surgical appliances) | (Sale of newspapers) | (Fruits, confectionery) | | | (Meals served on or off premises by caterers) | | | (Baseball in orderly manner so as not to disturb repose) | | | | (Shoeshine) | | | |
| MISSISSIPPI | Miss. Code Ann. (1942) (Recomp. 1956) | § 2368 (labor at trade, calling, business) | § 2369 | § 2368 | § 2370 (various exhibitions; bear-baiting, etc.) | | | § 8924 | | § 2371 (hunt with dog or gun; fish) | § 2370 | | (Yes) | (Druggists may sell) | (Sale of newspapers) | (R. R.; steamboat; common or contract track transport; street R. R.) | (Livery stable, garage, gas station) | (Ice house) | | | | | § 2370, 2370.5 (cinema & plays 1-6 p.m., 9-12 p.m.; specified sports 1-6 p.m., but local ordinance may ban these, enable) | (Yes) | (Tel. & tel.; meat markets in towns of less than specified population; all activity in emergency; child or servant may observe Jewish Sabbath) | § 3374-133 | § 2368 (can close garages & gas stations during 3 hours); § 3374-54 | § 294.030 (children) |
| MISSOURI | Vernon's Mo. Stat. Ann. (1953) | § 563.690 | § 563.720 | § 563.690 | § 563.710 (cockfights, cards, games) | | § 311.480. See § 311.396 (certain local option provisions for sale before 1:30 a.m.) | | | | § 563.690 (hunt; shoot) | § 563.710 | (& sale of articles of immediate necessity) | § 563.730 (sale of drugs, medicines) | | § 563.730 (ferrymen) | | (Ice beading "Miscellaneous") | | | | | | | | | § 563.700 (sale of provisions) | § 563.700 (member of religious society observing other Sabbath; defenses to § 563.690) | | § 294.030 (children) |

| State | Code (and Supps.) | "Work" or "Labor" | Keeping Open Shop or Selling Goods | Permitting Child or Servant To Work or Labor | Public Entertainment | Miscellaneous | Trade in Alcoholic Beverages | Automobile Trading | Barbering | Boxing, Wrestling | Hunting, Shooting, and Fishing | Racing | Miscellaneous | Works of Necessity and Charity | Drug Stores; Sale of Drugs, Medical Supplies | Preparation, Distribution or sale of Newspapers, Magazines | Operation of Railroads, Vessels, Tollgates, Ferries; "Families Removing" | Operation of Gasoline Stations; Provision of Automobile Repairs, Service and Accessories; Operation of Livery Stables | Sale of Ice, Ice Cream, Soda, Confectionery, Fresh Fruit | Sale of Tobacco | Operation of Restaurants, Inns, Hotels | Sale of Milk, Bread, Eggs | Sports | Entertainments | Operation of Manufacturing Processes Requiring Constant Operation | Miscellaneous | Exception for Observers of Other Days | Regulation of Sunday Business | Suppression of Sabbath Desecration | Provisions for 6-Day Week for Employees |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MONTANA | Mont. Rev. Code Ann. (1947). | | | | § 94-35-216 (dance hall, exhibiting house, variety hall) | | § 94-35-216 (place of amusement serving alcohol); § 4-414 (state stores) | | § 94-3511 | | | § 94-35-216 (racetrack) | § 94-35-216 (pool room) | | | | | | | | | | | (Free dance in public park) | | | | | |
| NEBRASKA | Neb. Rev. Stat. (1943) (Reissue Vols. 1954, 1956, 1958, 1960, & Cum. Supp. (1959)). | § 28-904 ("common" labor) | | | § 28-940 (public dancing, baseball) | § 28-940 (racing, quarreling) | § 53-179 (some local option) | | § 28-924 | | | § 2-1213 | § 9-107 (bingo); § 69-207 (pawnshop) | (Yes) | | | (Families travelling; watermen landing passengers, tollgate & bridgekeeper; ferryman; R.R. insofar as necessary) | | | | | | (Local option baseball) | | | (Certain regulated public dancing) | § 28-940 (nonsectarian observer of Sat.) | § 14-102(50) (cities); § 16-225 (classes); § 17-128 (of cities) | § 14-102(50) (various classes of cities) | |
| NEVADA | Nev. Rev. Stat. 19— | | | | § 201.260 (noisy sport or amusement disturbing peace of day) | | | | | | | § 201.270 (race grounds) | | | | | | | | | | | | | | | | | | §§ 609.050, 609.110 (waitress) |
| NEW HAMPSHIRE | N.H. Rev. Stat. Ann. 1955. | § 578.4 (labor of own calling?, disturbing others) | § 578.4 | § 275.32 (working minor at usual occupation unless he receive one day off in next six); § 275.33 (restaurant to operate Sun. without posting schedule of rest other day off for Sun. employees) | § 578.3 (play, game, sport); § 578.5 (public dancing) | | § 581.7; § 576.11 (with conspicuous) | | | §§ 578:3, 578:5 | | § 287.2 (bouts) | §§ 578:3, 578:5 | (& sale of necessaries) | (Sale of drugs & medicines) | | | | | | (Entertaining boarders) | (Sale of milk & bread) | | § 578.5 (local option plays, games, sports & exhibitions; can authorize specified sports, and all sports with admission fee, only after 1 p.m.; cinema, theater, vaudeville only after 2 p.m.) | | | (Exemptory reg. of mills and factories); § 276.5 (local option retail business) | | §§ 275.32 to 275.33 (See heading "General Prohibitions: Permitting child or servant to work or labor") |
| NEW JERSEY | N.J. Stat. Ann. 1937-1958. | § 2A:171-1 ("worldly" employment, necessity & charity excepted. Two steps from Bureau ... Harrison, N.J., v. ..., N.J. ... A. 2d 205.) | § 2A:171-1 (sale or offers of sale of several ... sale of goods, e.g. clothing or ... apparel, house paint ... unless ... clothing or working apparel, house paint ... etc. Applies only by statutory adoption by referendum) | | | | § 33:1-49 (local option) | § 2A:171-1.1 | §§ 45:4-26. See §§ 40:49-2.1, 40:52-1 (municipalities may regulate barber & certain ...); §§ 26:2-11, 52:2-15 (like clubs, option) | | § 23:4-24 (hunt, with exceptions); § 23:3-32 (2 decoys, etc.); § 23:3-? (fishing) | N.J. Rev. Stat., 15:5-20, N.J. Rev. Stat., Cum. Supp. (1953-1958); 4:5-16 (racing, local option); § 5:5-47 | §§ 5:12-31 (pawnbroker); N.J. Rev. Stat., Cum. Supp. (1953-1958); 2:8-38 (things, local option); N.J. Rev. Stat., Cum. Supp. (1953-1958); 2:8-? (raffles, local option) | (Yes) | § 2A:171-2 (preparation & sale of drugs) | § 2A:171-6 (local option publication & sale of newspapers) | [2A:171-1: Included for possible relevance under Auto-Rite Supply Co. v. Mayor of Woodbridge, 25 N.J. 188, 135 A. 2d 515. But see Masters-Jersey, Inc., v. Mayor of Paramus, 32 N.J. 296, 160 A. 2d 841.] [Exceptions to § 2A:171-1: Included for possible relevance under Auto-Rite Supply Co. ...] | | | § 2A:171-2 (preparation & sale of foods, prepared food, non alcoholic beverages) | § 2A:171-6 (local option sale & delivery of milk) | | | | § 2A:171-6 (recreation, sport, amusement not disturbing others; at local option and subject to local resolution; walking & driving for recreation; letting conveyances for same) | § 2A:171-4 (conscientious observer of 7th day who devotes same to his religious exercise & does not disturb others; exception does not apply to worldly employment or selling merchandise) | [2A:171-3.8 (A non-business sales)]; § 2A:171-2 (operation & sale of periodicals ...) | | § 31:2-21.3 (children); § 31:2-21 (women in specified occups.) |
| NEW MEXICO | N.M. Stat. Ann. 1953. | § 40-44-2 | | | § 40-44-2 (sport, cockfight, public meetings; from first § ...) | § 40-44-2 (disturbing worshippers or family) | § 46-10-14.1 | | | | § 40-44-2 | § 40-44-2 | § 17-12-5 (sale of jewelry at auction) | (Yes) | § 40-44-3 (drug stores) | § 40-44-3 (newsstands) | § 40-44-2 (truck or stage line) | § 40-44-3 (filling station, garage, tire repair shop) | § 40-44-3 (ice station, confectionery, soft drink stand) | | § 40-44-3 (cooks, waiter, other hotel & restaurant help) | § 40-44-3 (baker) | | § 40-44-2 (cinema) | | | | | | |
| NEW YORK | McKinney's N.Y. Laws. | Pen. Law § 2143; Pen. Law § 2146 (trades, manufactures, agricultural or mechanical employments) | Pen. Law § 2147 (public selling of certain ... narrowly as indicated; incl. for sale of meat & for all-day business); Pen. Law § 2148 (feature of trade) | Lab. Law § 161 (unlawful to operate Sun. without posting schedule of alternative day of rest for non-commercial specified occup.) | Pen. Law § 2145 (public sports, exercise, shows); Pen. Law § 2152 (theatre, concert, etc. & all public shows, exhibitions, entertainments) | Pen. Law § 2145 (public disturbing noise of day); Pen. Law § 2147 (parades in cities) | | | Pen. Law § 2151 | Unusual, § 900 | Pen. Law § 2150 (hunt & trapping not disturbing noise & religious liberty) | Unusual, §§ 758 | Gen. Mun. § 65 (local option bingo) | Pen. Law § 2143; Pen. Law § 2146 (necessary, charity etc.) | Pen. Law § 2147 (sale of drugs, medicine & surgical instruments) | Pen. Law § 2147 (sale of newspapers, magazines) | | Pen. Law § 2147 (sale of gas, oil, tires) | Pen. Law § 2147 (sale of ice, soda, water, fruit, confectionery) | Pen. Law § 2147 (sale of prepared tobacco) | Pen. Law § 2147 (sale of meals—sale on premises, cafeteria) | Pen. Law § 2147 (sale of ice-cream, milk, eggs) | Pen. Law § 2146 (private sports, games & activities primarily for enjoyment & recreation of participants, not disturbing religious liberty; local option operation sports, exercise, shows after 2 p.m.) | Pen. Law § 2149 (certain profession public entertainment after 2 p.m.) | | Pen. Law § 2147 (food sale, review & delivery before 10 a.m.; sale of ... if he does not disturb others keeping Sun.) | Pen. Law § 2144 (private uniformly keeping another day as holy time, & does not disturb others) | Pen. Law § 2147 (local option public entertainment after 2 p.m.) | | Lab. Law § 161, ...; Lab. Law §§ 172, 173, 174 (women and children in specified occups.); Lab. Law § 166 (2-day rest per month specified R.R. employees); Educ. Law § 4007 (1 day per 2 weeks—pharmacists) |
| NORTH CAROLINA | N.C. Gen. Stat. (Recomp. 1958) (Replacement Vols. 1953 & 1960). | | | | | §§ 14-45(2), 18-47 (State stores) | | | | | § 103-2 (hunt); § 113-291 (set fish, with exceptions); §§ 113-291, 113-221 (take or unload explosive; right or Sun.) | | | | | | | | | | | | | | | | N.C. Laws 1959, c. 633 (one county authorized to prohibit commercial operation near place of worship) | | § 110-2 (children); § 95-17 (6-day week for women; 12 days in 14 for men, with exceptions) |

| STATES | | GENERAL PROHIBITIONS | | | | | SPECIAL REGULATIONS OR PROHIBITIONS | | | | | | | EXCEPTIONS TO GENERAL PROHIBITIONS | | | | | | | | | | | | | EXCEPTION FOR OBSERVERS OF OTHER DAYS | MUNICIPAL ENABLING PROVISIONS | | PROVISIONS FOR 6-DAY WEEK FOR EMPLOYEES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| State | Code (and Supps.) | "Work" or "Labor" | Keeping Open Shop or Selling Goods | Permitting Child or Servant To Work or Labor | Public Entertainment | Miscellaneous | Trade in Alcoholic Beverages | Automobile Trading | Barbering | Boxing, Wrestling | Hunting, Shooting, and Fishing | Racing | Miscellaneous | Works of Necessity and Charity | Drug Stores: Sale of Drugs, Medical Supplies | Preparation, Distribution or sale of Newspapers, Magazines | Operation of Railroads, Vessels, Tollgates, Ferries; "Families Removing" | Operation of Gasoline Stations; Provision of Automobile Repairs, Service and Accessories; Operation of Livery Stables | Sale of Ice, Ice Cream, Soda, Confectionery, Fresh Fruit | Sale of Tobacco | Operation of Restaurants, Inns, Hotels | Sale of Milk, Bread, Eggs | Sports | Entertainments | Operation of Manufacturing Processes Requiring Constant Operation | Miscellaneous | | Regulation of Sunday Business | Suppression of Sabbath Desecration | |
| NORTH DAKOTA | N. D. Century Code (1960) | § 12-21-15 ("servile" labor; trades, manufactures, mechanical employment) | § 12-21-15 | | § 12-21-15 (public sports, circuses, carnivals) § 12-21-19 (place for public dancing) | | | | | | § 12-21-15 (shoot) | § 12-21-15 | | (Yes) | (Sale of drugs, medicines, surgical appliances) | (Newspaper plants; sale of newspapers; magazines) | (Steam & street R.R.; cabs; buses) | (Livery & feed barns; garages; gas stations) | Ice cream; soda fountain dispensaries; fruits; candy; confectionery) | (Sale of tobacco, cigars) | (Sale of food to be eaten on premises) | (Bakeries; sale of milk) | (Local option baseball after 1 p.m. played quietly and not within 500' of place of worship) | § 12-21-20 (theater & cinema after 1:15 p.m.) § 12-21-22 (bathhouses, beaches, pleasure boats) | | (Electric light, gas, heat & power; sale of meat & fish before 10 a.m.; beachland; tel. & teleg. business) | | § 12-21-17 (person keeping another day as holy time not within 500' of place of worship) § 12-21-21 (bowling after 1 p.m. unless local option bans it) | § 40-05-02 (food markets may be banned by cities of specified minimum population) | § 34-07-15 (children) § 34-06-06 (women in specified occups.; Comm'n Ag. & Lab. Order No. 6 (1939), State Law Rep., State Laws (1960) p. 57,131 (children)) |
| | | | | | | | | | [Exempted commodities may not be sold in pool or billiard halls, bowling alleys, saloons, gaming places] | | | | | | | | | | | | | | | | | | | | | |
| OHIO | Page's Ohio Rev. Code Ann. (1954) | § 3773.24 ("common" labor) | § 3773.24 | § 3773.24 | § 3773.23 (theatrical or dramatic performances; certain shows and exhibitions; baseball & cinema before noon) | § 3773.23 (keeping low or disorderly house) | § 4301.22 (some local option as to morning hours) See § 3773.23 | | § 4709.24 | | § 1531.02 (hunt bird or quadruped) § 3773.20 (possess hunting or shooting implements in open air) | | | (Yes) | | | (Traveling; incidental services & commodities) | | | | | | | (Recreation, sports, amusements, entertainment, exhibitions; incidental services & commodities) | | (Publicly owned entertainment places; state & other fairs & incidents) | | § 3773.24 (person conducting business on holy day) § 3773.26 (trap shooting) | | § 4109.22 (children in specified occups.) §§ 4107.46, 4107.47 (women) |
| OKLAHOMA | Okla. Stat. Ann. (1951) (Vols. 1952-1958) | T. 21, § 908 ("servile" labor; trades, manufactures, mechanical employment) | T. 21, § 908 (person selling goods) | | T. 21, § 908 (gaming) | | Okla. Const., Art. 27, § 6; T. 37, § 213 (permitted hours, but local option may ban) | | | | T. 21, §§ 917 to 919; T. 21, § 908 (shoot) T. 29, § 228 (net fish commercially Sat. & Sun.) | T. 21, § 908 | | (& sale of necessaries) | (Sale of drugs, medicines, surgical appliances) | | | T. 21, § 918 (sale of gas products, tires, auto accessories; repairs, towing & wrecking) | (Sale of ice) | | (Sale of food & drink for consumption on premises) | (Sale of milk, bread) | | | | (Sale of meat, fish & other food; sale of burial appliances) | | T. 21, § 909 (person keeping another day as holy time, not disturbing other persons keeping Sun. as holy time) | | |
| OREGON | Ore. Rev. Stat. (1959) | | | | | | § 690.210 | | | § 463.030 (& certain hols.) | | § 462.120 | § 726.270 (pawnbroker) | | | | | | | | | | | | | | | | | |
| PENNSYLVANIA | Purdon's Pa. Stat. Ann. (1945-1957) | T. 18, § 4699.4 ("worldly employment or business") | T. 18, § 4699.10 (selling or offering at retail various categories of merchandise, e.g., clothing or wearing apparel, household, business, or office appliances, housewares, hardware, tools, paints, lumber, luggage, jewelry, toys (excluding novelties or souvenirs), etc.) | | T. 18, § 4699.4 (game, sport, diversion) T. 18, §§ 6610 to 6612 (cinema banned before 2 p.m.; banned after 2 p.m. unless permitted by local option (free religious films on church premises excepted); no employee may work in films, cinema unless he has had one day off in preceding six; § 60.1 T. 4, §§ 61 to 95 (baseball & football), and T. 4, §§ 151 to 157 (polo) (similar general ban with local option authorized 1-7 p.m.) | | T. 18, §§ 630, 633 (jurisdictional and forfeiture-allotting provisions) | T. 18, § 4699.9 (& trailers) | T. 63, § 559 (barber license revocation) T. 63, § 519 (same for beauty parlor) | T. 4, §§ 1, 30.202 | T. 34, § 1311.702 (hunt, with exceptions for trapping & dog trials) T. 30, § 366 (fish, banned after 2 p.m.) T. 34, § 1311.721 (retriever trials) T. 34, §§ 116, 158, 163 (net fish Sun. & parts of Sat. in certain areas; Comm'n may except by regulations) | T. 4, § 307(c) | T. 18, § 4651 (pool, billiard hall) T. 63, § 281-28 (pawnbroker) T. 4, § 60.1 (retriever trials) T. 63, § 281.719 (training dog on land without owner's consent) | (& delivery of necessaries before 9 a.m. and after 5 p.m.) | | (Sale of newspapers) | (Ferrymen carrying passengers; watermen landing passengers; persons removing with families) | | | | (Serving travellers, sojourners, strangers, in bake-houses, lodging houses, inns, other houses of entertainment) | (Delivery of milk before 9 a.m. & after 5 p.m.) | T. 18, § 4699.4 ("wholesome recreation"); various enumerated sports and similar healthful & recreational activities) (1959 amend.) T. 4, §§ 161 to 185 (tennis 1-2 p.m.) T. 4, §§ 121 to 127 (licensed public concerts after noon; music must be of high order, and enterprise nonprofit; penalty for presenting other entertainment than music at licensed concert) | T. 30, § 366 (line fishing up to specified number of lines, hooks, etc; bait not fishing with net below specified size; landowner's consent required in certain cases) | | [See heading: "General Prohibitions: Public Entertainment"] | | T. 18, § 4699.4 (public utilities) (1959 amend.) T. 51, § 623 (veteran ass'n band) | T. 33, §§ 20330, 37458 (24) (rules of two classes) | T. 43, §§ 26330, 37.459 (24) (specified occupations) T. 43, § 102(a) (women) T. 43, §§ 361,481 (specified occupations) |
| PUERTO RICO | P.R. Laws Ann. (1955-1956) | T. 33, § 2201 (commercial establishments to close and no work to be done therein Sun. & named hols. Also fixes weekday closing hours.) | | | | | T. 33, § 2202 (in case of disorder in any establishment; municipal officials may close it) | | T. 33, § 2204 | | | | | (Permits in cases of necessity) | (Pharmacies) | (Newspaper enterprise; newspaper stands) | | (Garages; gas stations; livery stables) | (Confectionery & pastry stores & stands selling candy; ice depots) | (Sale of matches, manufactured tobacco at certain stands) | (Shops selling coffee only as a beverage & refreshments; restaurant cafes; hotels; inns) | (Milk depots, dairies, pastry stores) | | (Theaters, racetracks & places of amusement; casinos; billiard rooms) | | (Printers; public utilities; public markets selling local produce; stands selling flashlights, batteries, bulbs, fuses; slaughterhouses; meat stands; docks; undertakers; airport & hotel shops) | | | | T. 29, § 295 (employees of commercial and industrial establishments not subject to T. 33); T. 29, § 271 (children); T. 29, § 295 (double wages); see also T. 29, § 272 |

| State | Code (and Supps.) | "Work" or "Labor" | Keeping Open Shop or Selling Goods | Permitting Child or Servant To Work or Labor | Public Entertainment | Miscellaneous | Trade in Alcoholic Beverages | Automobile Trading | Barbering | Boxing, Wrestling | Hunting, Shooting, and Fishing | Racing | Miscellaneous | Works of Necessity and Charity | Drug Stores; Sale of Drugs, Medical Supplies | Preparation, Distribution or sale of Newspapers, Magazines | Operation of Railroads, Vessels, Tollgates, Ferries; "Families Removing" | Operation of Gasoline Stations; Provision of Automobile Repairs, Service and Accessories; Operation of Livery Stables | Sale of Ice, Ice Cream, Soda, Confectionery, Fresh Fruit | Sale of Tobacco | Operation of Restaurants, Inns, Hotels | Sale of Milk, Bread, Eggs | Sports | Entertainments | Operation of Manufacturing Processes Requiring Constant Operation | Miscellaneous | Regulation of Sunday Business | Suppression of Sabbath Desecration | Provisions for 6-Day Week for Employees |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RHODE ISLAND | R.I. Gen. Laws (1956) | § 11-40-1 (or play) § 11-40-2 (servant of another) § 25-1-6 (no person to permit employee to work at gainful activity in store, mill, factory, commercial occupation, communications or industrial work on Sun. & special feast day and exhibit work wheresoever necessary and permitted on Sun. Enforced by Dept. of Labor) | § 11-40-1 (game, sport, play, recreation) § 11-0-1 (certain performances by children) | | See § 5-22-5 (limiting municipal power to authorize Sun. activity) | | § 3-8-1 (with exceptions, and see § 3-7-14) | § 31-5-19 | § 5-27-17 § 5-27-23 (barber school) § 5-19-25 (hairdresser) § 5-22-9 (electrolysis) [All sections: Sun. & hols.] | §§ 41-5-2, 41-5-21 | | § 41-6-1 | § 19-26-16 (pawnbroker) § 5-16-5 (public laundry cleaning & pick-up Sun. & night in cities of specified minimum population) | (Yes) § 25-3-6 (permits in cases of necessity) | § 5-22-2 (local option retail sale of prescriptions, patent medicines, drugs, hospital supplies) | § 5-22-2 (local option retail sale of newspapers & periodicals); see § 5-23-5 (delivery of newspapers) | | § 5-23-5 (sale of gas, oil, grease, auto parts; auto service & accessories) | § 5-23-2 (local option retail sale of ice, ice cream, confectionery, soda & mineral waters, non-alcoholic tonics & drinks); see § 5-23-5 (delivery of ice) | § 5-23-2 (local option retail sale of tobacco & smokers' supplies) | | § 5-23-2 (local option retail sale of milk, bakery prods., bread); see § 5-23-5 (delivery of milk) | §§ 41-6-1 to 41-6-7 (local option athletic games (with exceptions) with differing permitted hours for amateur and professional games under professional games may be licensed only in Providence; but license may not be granted for open-air games over protest of majority of landowners within 200', or game within 500' of place of worship) § 25-1-6 § 5-3-9 (local option bowling, pool, billiards after 1 p.m. not within 200' of place of worship) § 5-22-5 (local option public golf courses) | § 5-22-6 (Providence may license auto shows, ice skating & polo, roller skating & hockey in halls after 2 p.m.) § 5-22-7 (local option roller skating after 2 p.m.) §§ 5-22-8 to 5-22-11 (local option provisions applicable to various named towns, permitting musical entertainment, lectures, vaudeville, cinema, amusement parks, miniature golf, etc. Different permitted activities for different towns, and different permitted hours for different towns) | | § 5-23-3 (farmers co-op ass'n wholesale produce auction) § 11-40-4 (professor of Sabbatarian or Jewish faith may labor, but not open shops for trade, load or unload vessels, work at mechanical trades in commercial business except places (towns) in Union Station, Providence) | See § 5-23-4 | § 45-4-1 | (See heading "General Prohibitions: Permitting child or servant to work or labor": Dir. Lab. Mandatory Order No. 4-R-2 (1956), CCH Lab. Law Rep., State Laws (1960) ¶ 38,392 (retail trade: day of rest in 7 minimum wage for 7th day) |
| SOUTH CAROLINA | S.C. Code Laws (1952) | § 64-2 ("worldly" labor of "ordinary calling") | | § 64-3 (machine shop work other than emergency) § 64-4 (textile plants may not permit regular employee to do ordinary worldly work of his regular occupation (with exceptions for emergencies and voluntary work to eliminate processing bottlenecks, in which case pay is time and a half)) § 64-8 (manufacturing & mercantile establishments may not employ women & children. Enforced by Comm'r of Labor) | § 64-1 (public sports or pastimes; bear-baiting, football, plays, etc.; or other sports, exercises, pastimes) § 5-601 (dance halls) § 5-102 (cinema, athletics, concerts during prohibited hours) | § 16-566 (keeping gaming table or permitting game played in house where such operated on Sun., exceptions, e.g., mail, passengers, through freight, perishables) | §§ 4-204, 4-205, 4-205.1, 4-102 | | | | § 64-1 (hunt, fish, shoot) § 28-461.3-11 (commercial shrimp trawling in designated county) | § 64-1 | §§ 5-616,5-625 to 5-628,21 (provisions of local application banning juke boxes or outside speakers on music machines; sections differ in application to towns in different counties, in activity prohibited. Some prohibit activity in vicinity of place of worship. Some prohibit Sun. & night operation.) | (Yes) (See also §§ 64-4.1, 64-3 ¶ 2, providing for permits issued by Comm'r of Labor exception from prohibitions of §§ 64-4, 64-5 industries producing goods essential to government contract in national emergency; but no employer opposed on physical or conscientious grounds to Sun. labor may be required to work.) | | | | | | | § 64-1 (restaurants & cafeterias may employ women & children) | | | | | § 64-4.1 (textile plants in designated town; fixed daily and weekly hour maxima apply and Sun. maxima apply and Sun. work may not begin before 10 a.m.) § 5-102; see also § 5-110 (athletics, cinema, concerts in described counties and cities designated specifically and by classes, 2-7 p.m. & 9-12 p.m.) | | | (See heading "General Prohibitions: Permitting child or servant to work or labor") § 40-52 (5-day week: textile mills) |
| SOUTH DAKOTA | S.D. Code (1939) | § 13.1709 ("servile" labor; trades, manufactures, mechanical employments) | § 13.1709 | | § 13.1709 (gaming; public sport) § 53.0208 (dance halls) | | § 5.0226(4) § 5.0319(3) (local option) | | | § 53.0604 | § 13.1709 (shoot) | § 13.1709 | | (Yes) | (Sale of drugs, medicines, surgical appliances) | | | | | | [See "Restaurants, etc."] | (Sale of food to be eaten on premises) | (Sale of milk before 9:00 a.m.) | | | | (Sale of meat & fish before 9 a.m.) | | | § 13.1718 (person keeping another day as holy time, not disturbing any other person keeping Sun. as holy time; defense to labor) |
| TENNESSEE | Tenn. Code Ann. (1955) | § 39-4001 ("common vocations") | | § 39-4001 | § 39-4001 | | | | | | § 39-4003 (hunt) | § 39-4002 (hunt) | | (Yes) | | | | | | | | | | | | | | | § 50-700 (children) |
| TEXAS | Vernon's Tex. Stat. (Vols. 1948, 1952) | Pen. Code, Art. 283 | Pen. Code, Art. 286 | Pen. Code, Art. 283 | Pen. Code, Art. 285 (bowling alley, match shooting, gaming in town); Pen. Code, Art. 284 (place of public amusement: circus, theater, variety, other amusements charging fee for admission) | Pen. Code, Art. 286 (dances at low dives) | Pen. Code, Arts. 666-25, 667-10a)(1), 667-10½; Pen. Code, Art. 666-4(c) (public consumption) | | Pen. Code, Arts. 614-1, 614-1(a) | Pen. Code, Arts. 614-1, 614-11(a) | Pen. Code, Art. 283 (hunt within ½ mile of place of worship, school, residence) | Pen. Code, Art. 285 | Civ. Stat., Art. 6133 (pawnbroker Sun. & hols.) | Pen. Code, Art. 284 | Pen. Code, Art. 287 (drug stores) | Pen. Code, Art. 287 (sale of newspapers) | Pen. Code, Art. 287 (vessels; R. R.; wagon trains; common carriers (including delivery & receipt of goods); mail or passenger stages; persons travelling; ferrymen; toll bridges) | Pen. Code, Arts. 284, 287 (sale of gas, motor fuel, greases) | Pen. Code, Art. 287 (ice cream) | Pen. Code, Art. 287 (sale of ice, ice cream) | Pen. Code, Arts. 284, 287 (hotels; boarding houses; restaurants) | Pen. Code, Art. 287 (sale of milk) [See also heading "Miscellaneous"] | | Pen. Code, Art. 287 (theater & cinema in towns after 1 p.m.; local option may prohibit or regulate) | | Pen. Code, Art. 287 (markets & dealers in provisions before 9 a.m.; sale of burial materials; bathhouses; tel. Pen. Code, Art. 284 (persons travelling; sugar mills; herders) | | Pen. Code, Art. 284 (person conscientiously observing another day; defense to Art. 283) | § 50-700 (children) |
| UTAH | Utah Code Ann. (1953) | § 76-55-1 [held unconstitutional as arbitrary: *Broadbent v. Gibson*, 105 Utah 53, 140 P. 2d 939] | | | | | | | | | § 11-8-1(1) | § 23-1-15 (hunting season not to open on Sun.) | | | | | | | | | | | | | | | | | § 34-5-2 (children) Indust. Comm'n Mandatory Orders Nos. 1 to 4, supplemented by Order No. 5 (1960), CCH Lab. Law Rep., State Laws (1960) pp. 38,920 to 38,935 (women & children in specified occups.) |

[Excepted commodities and services may be sold or furnished only by persons who engage in the same activities on secular days] — (Rhode Island)

[Exceptions to § 76-55-1 omitted] — (Utah)

Appendix II to Opinion of FRANKFURTER, J.

| State | Code (and Supps.) | "Work" or "Labor" | Keeping Open Shop or Selling Goods | Permitting Child or Servant To Work or Labor | Public Entertainment | Miscellaneous | Trade in Alcoholic Beverages | Automobile Trading | Barbering | Boxing, Wrestling | Hunting, Shooting, and Fishing | Racing | Miscellaneous | Works of Necessity and Charity | Drug Stores; Sale of Drugs, Medical Supplies | Preparation, Distribution or sale of Newspapers, Magazines | Operation of Railroads, Vessels; Tollgates, Ferries, "Families Removing" | Operation of Gasoline Stations; Provision of Automobile Repairs, Service and Accessories; Operation of Livery Stables | Sale of Ice, Ice Cream, Soda, Confectionery, Fresh Fruit | Sale of Tobacco | Operation of Restaurants, Inns, Hotels | Sale of Milk, Bread, Eggs | Sports | Entertainments | Operation of Manufacturing Processes Requiring Constant Operation | Miscellaneous | Exception for Observers of Other Days | Regulation of Sunday Business | Suppression of Sabbath Desecration | Provisions for 6-Day Week for Employees |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VERMONT | Vt. Stat. Ann. (Rev. 1959) | T. 13, § 3301 ("secular business or employment") | | | | T. 13, § 3301 (dance; play, game, sport or entertainment disturbing peace or for compensation) | T. 7, § 62 (with exception) | | | | | T. 31, § 604 T. 31, § 307 (motor races) | See T. 13, § 3012 (more severe penalty for certain trespass to property on Sun.) | (Yes) | | | T. 13, § 3308 (P.U.C. may permit such trains as are necessary, having regard to observance of the day) | | | | | | T. 13, § 3301 (winter sports, golf, tennis) T. 31, § 307 (local option motor races after 2 p.m.) T. 13, § 3302 (local option enumerated competition sports, cinema, lectures, concerts after 2 p.m.) | | | | | | | T. 21, § 434 (children) |
| VIRGINIA | Va. Code (1950) (Replacement Vols. 1953 & 1960) | § 18.1-358 | § 18.1-358 (expressly negates "necessity" exception for sale of listed categories of merchandise, e.g., jewelry, silverware, musical instruments, toys, clothing & wearing apparel, home, business, or outdoor furniture, furnishings or appliances, sporting goods (except sale or rent of bathing, boating, fishing paraphernalia & sale or rent on premises of equipment essential to sports, athletic events, recreational facilities), pets, farm produce (except produce grown by seller sold at roadside or retail where grown), fresh, frozen or salt meat, etc. (except smoked or cured ham); list is not exclusive) | § 18.1-358 | | § 18.1-360 (running, loading, unloading R.R. trains, with exceptions, e.g., mail, passenger, mixing interstate trains & trains carrying perishables) § 18.1-363 (boating, unloading steamships, with similar exceptions) | § 4-19 (State stores) § 4-97 (local option) | § 18.1-358 (negates "necessity" exception for sale of motor vehicles, trailers (except mobile homes)) | | | § 29-143(a) (hunt) § 28-155 (take or load oyster, clams, crabs for commercial purposes; Sun. & night) § 28-234 (set fish in Potomac) § 29-150.1 (Va. Acts 1950, c. 439) (fish on private property without owner's permission in described class of county) | | § 18.1-241 (carry weapon) | (Yes) | | (Publication, distribution & sale of newspapers & magazines) | (Yes) § 18.1-360 (Comm'n may issue R.R. emergency permits) | (Sale of gas, oil, repair parts, accessories for immediate necessary use of motors, boats, planes, etc.) | | | | | (Sports & athletic events) | (Cinema, scenic, historic, recreational, amusement facilities) | [See "Miscellaneous"] | (Operation of furnaces, kilns, plants, wholesale-food warehouses; ship chandlers; other business of kind necessary to conduct Sun.) | § 18.1-359 (person conscientiously observing Sat., not compelling any servant out of his faith to labor on Sun.) | | | § 40-57 (children) |
| WASHINGTON | Wash. Rev. Code (1959) | § 9.76.010 (labor about any trade or manufacture) | § 9.76.010 (& expressly negates "necessity" exception for sale of other kinds of cooked meat, groceries, clothing, footwear) | § 9.76.010 | § 9.76.010 (promoting any noisy sport or amusement disturbing the peace of the day) | | § 9.76.010 (keeping open saloon) | | § 9.76.010 (expressly negatives "necessity" exemption) | § 67.08.070 (& specified hols.) | | | | (Conducted in orderly manner not interfering with repose & religious liberty of the community) | (Sale of medical & surgical appliances) | (Sale of newspapers, magazines) | | (Livery stables; garages) | (Sale of fruit, confectionery) | (Sale of prepared tobacco) | (Caterers may serve meals on or off the premises) | (Sale of milk) | | | | [All exempted commodities to be sold in quiet, orderly manner] | § 9.76.020 (person keeping another day as holy time, not disturbing others by labor, & refraining from labor on Sun. as Sabbath; defraud no labor) | | | Indust. Welfare Comm. Orders Nos. 49 (1960), 33 (1951), CCH Lab. Law Rep., State Laws (1960) pp. 59,356, 59,365 (children in specified occups.) |
| WEST VIRGINIA | W. Va. Code Ann. (1955) & Cum. Supp. (1960) | C. 61, art. 8, § 17 [6072] | | C. 61, art. 8, § 17 [6072] | | | C. 60, art. 3, § 12 [5607(40)] (State stores) | | | C. 61, art. 8, § 17 [6072] (shoot; carry firearms) C. 20, art. 3, § 4 [2219] (hunt; but tending traps previously set as permitted) | C. 19, art. 23, § 5 [2290(5)] | | C. 20, art. 3, § 4 [2219] (carry uncased gun) | (Yes) | | | C. 61, art. 8, § 18 [6073] (carrying mail or passengers; R.R. or motor transport carrying 300' passengers; vessels may also carry freight) | C. 61, art. 8, § 18 [6073] (garage; gas station) | | [See heading: "Miscellaneous"] | | | | | | C. 61, art. 8, § 16 [6073] (employees must be on rotating schedule on Sabbath) | C. 61, art. 8, § 18 [6073] (grocers or sellers primarily of food, not within 300' of place of worship during hours of worship on Sabbath) | C. 61, art. 8, § 16 [6073] (person conscientiously observing Sat., not disturbing others in Sun. observance, and not compelling any servant out of his faith to labor on Sun.) | C. 21, art. 6, § 7 [2261] (children) |
| WISCONSIN | West's Wis. Stat. Ann. (1957-1958) | | | | | | § 176.06 (permitted hours) | § 218.01(3)(a) 21 (license revocation) | | § 169.11 | | | § 218.45(11)(a) (savings & loan assns.) § 220.29(1) (banks) § 348.07(2)(d) (restriction on length of car on mobile home unit, in p.m. Sun. & hols.) | | | | | | | | | | | | | § 218.02(3)(a) 21 (person conscientiously observing Sat., Jewish Sabbath) | | | § 103.66(1) (children) § 103.65 (factory or mercantile establishments, with exceptions; inapplicable to employees whose only Sun. labor is tending animals or tending fires) |
| WYOMING | Wyo. Stat. (1957) | | | | | | § 12-19 | | | § 33-112 | | | | | | | | | | | | | | | | | | § 15-160, Twelfth | § 15-160, Eleventh | § 27-226 (children) |

MR. JUSTICE DOUGLAS, dissenting.*

The question is not whether one day out of seven can be imposed by a State as a day of rest. The question is not whether Sunday can by force of custom and habit be retained as a day of rest. The question is whether a State can impose criminal sanctions on those who, unlike the Christian majority that makes up our society, worship on a different day or do not share the religious scruples of the majority.

If the "free exercise" of religion were subject to reasonable regulations, as it is under some constitutions, or if all laws "respecting the establishment of religion" were not proscribed, I could understand how rational men, representing a predominantly Christian civilization, might think these Sunday laws did not unreasonably interfere with anyone's free exercise of religion and took no step toward a burdensome establishment of any religion.

But that is not the premise from which we start, as there is agreement that the fact that a State, and not the Federal Government, has promulgated these Sunday laws does not change the scope of the power asserted. For the classic view is that the First Amendment should be applied to the States with the same firmness as it is enforced against the Federal Government. See *Lovell* v. *Griffin,* 303 U. S. 444, 450; *Minersville District* v. *Gobitis,* 310 U. S. 586, 593; *Murdock* v. *Pennsylvania,* 319 U. S. 105, 108; *Board of Education* v. *Barnette,* 319 U. S. 624, 639; *Staub* v. *City of Baxley,* 355 U. S. 313, 321; *Talley* v.

---

*[NOTE: This opinion applies also to No. 36, *Two Guys From Harrison-Allentown, Inc.,* v. *McGinley, District Attorney, Lehigh County, Pennsylvania, et al., post,* p. 582; No. 67, *Braunfeld et al.* v. *Brown, Commissioner of Police of Philadelphia, et al., post,* p. 599; and No. 11, *Gallagher, Chief of Police of Springfield, Massachusetts, et al.* v. *Crown Kosher Super Market, Inc., et al., post,* p. 617.]

*California,* 362 U. S. 60. The most explicit statement perhaps was in *Board of Education* v. *Barnette, supra,* 639.

"In weighing arguments of the parties it is important to distinguish between the due process clause of the Fourteenth Amendment as an instrument for transmitting the principles of the First Amendment and those cases in which it is applied for its own sake. The test of legislation which collides with the Fourteenth Amendment, because it also collides with the principles of the First, is much more definite than the test when only the Fourteenth is involved. Much of the vagueness of the due process clause disappears when the specific prohibitions of the First become its standard. The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the State may lawfully protect. It is important to note that while it is the Fourteenth Amendment which bears directly upon the State it is the more specific limiting principles of the First Amendment that finally govern this case."

With that as my starting point I do not see how a State can make protesting citizens refrain from doing innocent acts on Sunday because the doing of those acts offends sentiments of their Christian neighbors.

The institutions of our society are founded on the belief that there is an authority higher than the authority of the State; that there is a moral law which the State is powerless to alter; that the individual possesses rights, conferred by the Creator, which government must respect.

The Declaration of Independence stated the now familiar theme:

> "We hold these Truths to be self-evident, that all Men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the Pursuit of Happiness."

And the body of the Constitution as well as the Bill of Rights enshrined those principles.

The Puritan influence helped shape our constitutional law and our common law as Dean Pound has said: The Puritan "put individual conscience and individual judgment in the first place." The Spirit of the Common Law (1921), p. 42. For these reasons we stated in *Zorach* v. *Clauson,* 343 U. S. 306, 313, "We are a religious people whose institutions presuppose a Supreme Being."

But those who who fashioned the First Amendment decided that if and when God is to be served, His service will not be motivated by coercive measures of government. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof"—such is the command of the First Amendment made applicable to the State by reason of the Due Process Clause of the Fourteenth. This means, as I understand it, that if a religious leaven is to be worked into the affairs of our people, it is to be done by individuals and groups, not by the Government. This necessarily means, *first,* that the dogma, creed, scruples, or practices of no religious group or sect are to be preferred over those of any others; *second,* that no one shall be interfered with by government for practicing the religion of his choice; *third,* that the State may not require anyone to practice a religion or even any religion; and *fourth,* that the State cannot compel one so to conduct himself as not to offend the religious scruples of another. The idea, as I understand it, was to limit the power of government to act in religious matters (*Board of*

*Education* v. *Barnette, supra; McCollum* v. *Board of Education,* 333 U. S. 203), not to limit the freedom of religious men to act religiously nor to restrict the freedom of atheists or agnostics.

The First Amendment commands government to have no interest in theology or ritual; it admonishes government to be interested in allowing religious freedom to flourish—whether the result is to produce Catholics, Jews, or Protestants, or to turn the people toward the path of Buddha, or to end in a predominantly Moslem nation, or to produce in the long run atheists or agnostics. On matters of this kind government must be neutral. This freedom plainly includes freedom *from* religion with the right to believe, speak, write, publish and advocate antireligious programs. *Board of Education* v. *Barnette, supra,* 641. Certainly the "free exercise" clause does not require that everyone embrace the theology of some church or of some faith, or observe the religious practices of any majority or minority sect. The First Amendment by its "establishment" clause prevents, of course, the selection by government of an "official" church. Yet the ban plainly extends farther than that. We said in *Everson* v. *Board of Education,* 330 U. S. 1, 16, that it would be an "establishment" of a religion if the Government financed one church or several churches. For what better way to "establish" an institution than to find the fund that will support it? The "establishment" clause protects citizens also against any law which selects any religious custom, practice, or ritual, puts the force of government behind it, and fines, imprisons, or otherwise penalizes a person for not observing it. The Government plainly could not join forces with one religious group and decree a universal and symbolic circumcision. Nor could it require all children to be baptized or give tax exemptions only to those whose children were baptized.

Could it require a fast from sunrise to sunset throughout the Moslem month of Ramadan? I should think not.

Yet why then can it make criminal the doing of other acts, as innocent as eating, during the day that Christians revere?

Sunday is a word heavily overlaid with connotations and traditions deriving from the Christian roots of our civilization that color all judgments concerning it. This is what the philosophers call "word magic."

> "For most judges, for most lawyers, for most human beings, we are as unconscious of our value patterns as we are of the oxygen that we breathe." Cohen, Legal Conscience (1960), p. 169.

The issue of these cases would therefore be in better focus if we imagined that a state legislature, controlled by orthodox Jews and Seventh-Day Adventists, passed a law making it a crime to keep a shop open on Saturdays. Would a Baptist, Catholic, Methodist, or Presbyterian be compelled to obey that law or go to jail or pay a fine? Or suppose Moslems grew in political strength here and got a law through a state legislature making it a crime to keep a shop open on Fridays. Would the rest of us have to submit under the fear of criminal sanctions?

Dr. John Cogley recently summed up [1] the dominance of the three-religion influence in our affairs:

> "For the foreseeable future, it seems, the United States is going to be a three-religion nation. At the present time all three are characteristically 'Amer-

---

[1] The Problems of Pluralism, Danforth Lectures, Miami University, Oxford, Ohio (1960). Other writers suggest that America is still subject to a customary and nonlegal "Protestant establishment" which comes to the surface only on certain political issues. Thus, a Rabbi Arthur Hartzberg was able to analyze the "religious issue" of the recent presidential campaign in these terms:

"As we have seen, the First Amendment was the battleground, at the end of the 18th century, of a major transition in American society in which the old Protestant establishment was forced to yield to the newer ethos of Protestant non-conformity. Today in American society, we are witnessing a change perhaps as important—the full

ican,' some think flavorlessly so. For religion in America is almost uniformly 'respectable,' bourgeois, and prosperous. In the Protestant world the 'church' mentality has triumphed over the more venturesome spirit of the 'sect.' In the Catholic world, the mystical is muted in favor of booming organization and efficiently administered good works. And in the Jewish world the prophet is too frequently without honor, while the synagogue emphasis is focused on suburban togetherness. There are exceptions to these rules, of course; each of the religious communities continues to cast up its prophets, its rebels and radicals. But a Jeremiah, one fears, would be positively embarrassing to the present position of the Jews; a Francis of Assisi upsetting the complacency of American Catholics would be rudely dismissed as a fanatic; and a Kierkegaard, speaking with an American accent, would be considerably less welcome than Norman Vincent Peale in most Protestant pulpits."

This religious influence has extended far, far back of the First and Fourteenth Amendments. Every Sunday School student knows the Fourth Commandment:

"Remember the sabbath day, to keep it holy.
"Six days shalt thou labour, and do all thy work:
"But the seventh day is the sabbath of the LORD thy God: in it thou shalt not do any work, thou, nor thy son, nor thy daughter, thy manservant, nor thy

---

entry of the post-bellum immigrant groups into the national life. Though the battle once again seems to be raging around the First Amendment, it would appear from the foregoing analysis that the true issue is not the separation of church and state, but the symbolic significance for American life and culture of having a non-Protestant—whether he be a Catholic, a Jew, or an avowed atheist—as President of the United States." Hartzberg, "The Protestant 'Establishment,' Catholic Dogma, and the Presidency," Commentary (October 1960), p. 285.

maidservant, nor thy cattle, nor thy stranger that is within thy gates:

"For in six days the LORD made heaven and earth, the sea, and all that in them is, and rested the seventh day: wherefore the LORD blessed the sabbath day, and hallowed it." Exodus 20:8–11.

This religious mandate for observance of the Seventh Day became, under Emperor Constantine, a mandate for observance of the First Day "in conformity with the practice of the Christian Church." See *Richardson* v. *Goddard*, 23 How. 28, 41. This religious mandate has had a checkered history, but in general its command, enforced now by the ecclesiastical authorities, now by the civil authorities, and now by both, has held good down through the centuries.[2] The general pattern of these laws in the United States was set in the eighteenth century and derives, most directly, from a seventeenth century English statute. 29 Charles II, c. 7. Judicial comment on the

---

[2] Blackstone's Commentaries, Bk. IV, c. 4, entitled "Of Offenses Against God and Religion," says in part:

"IX. Profanation of the Lord's day, vulgarly (but improperly) called *Sabbath-breaking*, is a ninth offence against God and religion, punished by the municipal law of England. For, besides the notorious indecency and scandal of permitting any secular business to be publicly transacted on that day, in a country professing christianity, and the corruption of morals which usually follows it's profanation, the keeping one day in seven holy, as a time of relaxation and refreshment as well as for public worship, is of admirable service to a state, considered merely as a civil institution. It humanizes by the help of conversation and society the manners of the lower classes; which would otherwise degenerate into a sordid ferocity and savage selfishness of spirit: it enables the industrious workman to pursue his occupation in the ensuing week with health and cheerfulness: it imprints on the minds of the people that sense of their duty to God, so necessary to make them good citizens; but which yet would be worn out and defaced by an unremitted continuance of labour, without any stated times of recalling them to the worship of their Maker."

Sunday laws has always been a mixed bag. Some judges have asserted that the statutes have a "purely" civil aim, *i. e.,* limitation of work time and provision for a common and universal leisure. But other judges have recognized the religious significance of Sunday and that the laws existed to enforce the maintenance of that significance. In general, both threads of argument have continued to interweave in the case law on the subject. Prior to the time when the First Amendment was held applicable to the States by reason of the Due Process Clause of the Fourteenth, the Court at least by *obiter dictum* approved State Sunday laws on three occasions: *Soon Hing* v. *Crowley,* 113 U. S. 703, in 1885; *Hennington* v. *Georgia,* 163 U. S. 299, in 1896; *Petit* v. *Minnesota,* 177 U. S. 164, in 1900. And in *Friedman* v. *New York,* 341 U. S. 907, the Court, by a divided vote, dismissed [3] "for want of a substantial federal question" an appeal from a New York decision upholding the validity of a Sunday law against an attack based on the First Amendment.

The *Soon Hing, Hennington,* and *Petit* cases all rested on the police power of the State—the right to safeguard the health of the people by requiring the cessation of normal activities one day out of seven. The Court in the *Soon Hing* case rejected the idea that Sunday laws rested on the power of government "to legislate for the promotion of religious observances." 113 U. S., at 710. The New York Court of Appeals in the *Friedman* case followed the reasoning of the earlier cases,[4] 302 N. Y. 75, 80, 96 N. E. 2d 184, 186.

---

[3] See also *Ullner* v. *Ohio,* 358 U. S. 131; *Kidd* v. *Ohio,* 358 U. S. 132; *McGee* v. *North Carolina,* 346 U. S. 802; cf. *Grochowiak* v. *Pennsylvania,* 358 U. S. 47; *Gundaker Cent. Motors, Inc.,* v. *Gassert,* 354 U. S. 933; *Towery* v. *North Carolina,* 347 U. S. 925.

[4] As respects the First Amendment the court said:

"It does not set up a church, make attendance upon religious worship compulsory, impose restrictions upon expression of religious belief, work a restriction upon the exercise of religion according to the

The Massachusetts Sunday law involved in one of these appeals was once characterized by the Massachusetts court as merely a civil regulation providing for a "fixed period of rest." *Commonwealth* v. *Has*, 122 Mass. 40, 42. That decision was, according to the District Court in the *Gallagher* case, "an *ad hoc* improvisation" made "because of the realization that the Sunday law would be more vulnerable to constitutional attack under the state Constitution if the religious motivation of the statute were more explicitly avowed." 176 F. Supp. 466, 473. Certainly prior to the *Has* case, the Massachusetts courts had indicated that the aim of the Sunday law was religious. See *Pearce* v. *Atwood,* 13 Mass. 324, 345–346; *Bennett* v. *Brooks,* 91 Mass. 118, 121. After the *Has* case the Massachusetts court construed the Sunday law as a religious measure. In *Davis* v. *Somerville,* 128 Mass. 594, 596, 35 Am. Rep. 399, 400, it was said:

> "Our Puritan ancestors intended that the day should be not merely a day of rest from labor, but also a day devoted to public and private worship and to religious meditation and repose, undisturbed by secular cares or amusements. They saw fit to enforce the observance of the day by penal legislation, and the statute regulations which they devised for that purpose have continued in force, without any substantial modification, to the present time."

And see *Commonwealth* v. *Dextra,* 143 Mass. 28, 8 N. E. 756. In *Commonwealth* v. *White,* 190 Mass. 578, 581, 77 N. E. 636, 637, the court refused to liberalize its construction of an exception in its Sunday law for works of "necessity." That word, it said, "was originally inserted to secure the observance of the Lord's day in accordance with

dictates of one's conscience, provide compulsory support, by taxation or otherwise, of religious institutions, nor in any way enforce or prohibit religion." 302 N. Y., at 79, 96 N. E. 2d, at 186.

the views of our ancestors, and it ever since has stood and still stands for the same purpose." In *Commonwealth* v. *McCarthy*, 244 Mass. 484, 486, 138 N. E. 835, 836, the court reiterated that the aim of the law was "to secure respect and reverence for the Lord's day."

The Pennsylvania Sunday laws before us in Nos. 36 and 67 have received the same construction. "Rest and quiet, on the Sabbath day, with the right and privilige of public and private worship, undisturbed by any mere wordly employment, are exactly what the statute was passed to protect." *Sparhawk* v. *Union Passenger R. Co.*, 54 Pa. 401, 423. And see *Commonwealth* v. *Nesbit*, 34 Pa. 398, 405, 406–408. A recent pronouncement by the Pennsylvania Supreme Court is found in *Commonwealth* v. *American Baseball Club*, 290 Pa. 136, 143, 138 A. 497, 499: "Christianity is part of the common law of Pennsylvania . . . and its people are christian people. Sunday is the holy day among christians."

The Maryland court, in sustaining the challenged law in No. 8, relied on *Judefind* v. *State*, 78 Md. 510, 28 A. 405, and *Levering* v. *Park Commissioner*,[5] 134 Md. 48, 106 A. 176. In the former the court said:

> "It is undoubtedly true that rest from secular employment on Sunday does have a tendency to foster and encourage the Christian religion—of all sects and denominations that observe that day—as rest from work and ordinary occupation enables many to engage in public worship who probably would not otherwise do so. But it would scarcely be asked of a Court, in what professes to be a Christian land, to declare a law unconstitutional because it requires rest from bodily labor on Sunday, (except works of necessity and charity,) and *thereby* promotes the

---

[5] Cf. *Bowman* v. *Secular Society, Ltd.* [1917] A. C. 406, 464 (opinion of Lord Sumner).

cause of Christianity. If the Christian religion is, incidentally or otherwise, benefited or fostered by having this day of rest, as it undoubtedly is, there is all the more reason for the enforcement of laws that help to preserve it." 78 Md., at 515–516, 128 A., at 407.

In the *Levering* case the court relied on the excerpt from the *Judefind* decision just quoted. 134 Md., at 54–55, 106 A., at 178.

We have then in each of the four cases Sunday laws that find their source in Exodus, that were brought here by the Virginians and by the Puritans, and that are today maintained, construed, and justified because they respect the views of our dominant religious groups and provide a needed day of rest.

The history was accurately summarized a century ago by Chief Justice Terry of the Supreme Court of California in *Ex parte Newman*, 9 Cal. 502, 509:

"The truth is, however much it may be disguised, that this one day of rest is a purely religious idea. Derived from the Sabbatical institutions of the ancient Hebrew, it has been adopted into all the creeds of succeeding religious sects throughout the civilized world; and whether it be the Friday of the Mohammedan, the Saturday of the Israelite, or the Sunday of the Christian, it is alike fixed in the affections of its followers, beyond the power of eradication, and in most of the States of our Confederacy, the aid of the law to enforce its observance has been given under the pretence of a civil, municipal, or police regulation."

That case involved the validity of a Sunday law under a provision of the California Constitution guaranteeing the "free exercise" of religion. Calif. Const., 1849, Art. I, § 4. Justice Burnett stated why he concluded that the

Sunday law, there sought to be enforced against a man selling clothing on Sunday, infringed California's constitution:

"Had the act made Monday, instead of Sunday, a day of compulsory rest, the constitutional question would have been the same. The fact that the Christian *voluntarily* keeps holy the first day of the week, does not authorize the Legislature to make that observance *compulsory*. The Legislature can not compel the citizen to do that which the Constitution leaves him free to do or omit, at his election. The act violates as much the religious freedom of the Christian as of the Jew. Because the conscientious views of the Christian compel him to keep Sunday as a Sabbath, he has the right to object, when the Legislature invades his freedom of religious worship, and assumes the power to compel him to do that which he has the right to omit if he pleases. The principle is the same, whether the act of the Legislature *compels* us to do that which we wish to do, or not to do. . . .

"Under the Constitution of this State, the Legislature can not pass any act, the legitimate effect of which is *forcibly* to establish any merely religious truth, or enforce any merely religious observances. The Legislature has no power over such a subject. When, therefore, the citizen is sought to be compelled by the Legislature to do any affirmative religious act, or to refrain from doing anything, because it violates simply a religious principle or observance, the act is unconstitutional." *Id.,* at 513–515.

The Court picks and chooses language from various decisions to bolster its conclusion that these Sunday laws in the modern setting are "civil regulations." No matter how much is written, no matter what is said, the parentage of these laws is the Fourth Commandment; and they

serve and satisfy the religious predispositions of our Christian communities.[6] After all, the labels a State places on its laws are not binding on us when we are confronted with a constitutional decision. We reach our own conclusion as to the character, effect, and practical operation of the regulation in determining its constitutionality. *Carpenter* v. *Shaw,* 280 U. S. 363, 367–368; *Dyer* v. *Sims,* 341 U. S. 22, 29; *Memphis Steam Laundry* v. *Stone,* 342 U. S. 389, 392; *Society for Savings* v. *Bowers,* 349 U. S. 143, 151; *Gomillion* v. *Lightfoot,* 364 U. S. 339, 341–342.

It seems to me plain that by these laws the States compel one, under sanction of law, to refrain from work or recreation on Sunday because of the majority's religious views about that day. The State by law makes Sunday a symbol of respect or adherence. Refraining from work or recreation in deference to the majority's religious feelings about Sunday is within every person's choice. By what authority can government compel it?

Cases are put where acts that are immoral by our standards but not by the standards of other religious

---

[6] Today we retreat from that jealous regard for religious freedom which struck down a statute because it was "a handy implement for disguised religious persecution." *Board of Education* v. *Barnette, supra,* 644 (concurring opinion). It does not do to say, as does the majority, "Sunday is a day apart from all others. The cause is irrelevant; the fact exists." The cause of Sunday's being a day apart is determinative; that cause should not be swept aside by a declaration of parochial experience.

The judgment the Court is called upon to make is a delicate one. But *in the light of our society's religious history* it cannot be avoided by arguing that a hypothetical lawgiver could find nonreligious reasons for fixing Sunday as a day of rest. The effect of that history is, indeed, still with us. Sabbath is no less Sabbath because it is now less severe in its strictures, or because it has come to be expedient for some nonreligious purposes. The Constitution must guard against "sophisticated as well as simple-minded modes" of violation. *Lane* v. *Wilson,* 307 U. S. 268, 275.

groups are made criminal. That category of cases, until today, has been a very restricted one confined to polygamy (*Reynolds* v. *United States,* 98 U. S. 145) and other extreme situations. The latest example is *Prince* v. *Massachusetts,* 321 U. S. 158, which upheld a statute making it criminal for a child under twelve to sell papers, periodicals, or merchandise on a street or in any public place. It was sustained in spite of the finding that the child thought it was her religious duty to perform the act. But that was a narrow holding which turned on the effect which street solicitation might have on the child-solicitor:

> "The state's authority over children's activities is broader than over like actions of adults. This is peculiarly true of public activities and in matters of employment. A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies. It may secure this against impeding restraints and dangers within a broad range of selection. Among evils most appropriate for such action are the crippling effects of child employment, more especially in public places, and the possible harms arising from other activities subject to all the diverse influences of the street. It is too late now to doubt that legislation appropriately designed to reach such evils is within the state's police power, whether against the parent's claim to control of the child or one that religious scruples dictate contrary action." *Id.,* 168–169.

None of the acts involved here implicates minors. None of the actions made constitutionally criminal today involves the doing of any act that any society has deemed to be immoral.

The conduct held constitutionally criminal today embraces the selling of pure, not impure, food; wholesome,

not noxious, articles. Adults, not minors, are involved. The innocent acts, now constitutionally classified as criminal, emphasize the drastic break we make with tradition.

These laws are sustained because, it is said, the First Amendment is concerned with religious convictions or opinion, not with conduct. But it is a strange Bill of Rights that makes it possible for the dominant religious group to bring the minority to heel because the minority, in the doing of acts which intrinsically are wholesome and not antisocial, does not defer to the majority's religious beliefs. Some have religious scruples against eating pork. Those scruples, no matter how bizarre they might seem to some, are within the ambit of the First Amendment. See *United States* v. *Ballard,* 322 U. S. 78, 87. Is it possible that a majority of a state legislature having those religious scruples could make it criminal for the nonbeliever to sell pork? Some have religious scruples against slaughtering cattle. Could a state legislature, dominated by that group, make it criminal to run an abattoir?

The Court balances the need of the people for rest, recreation, late sleeping, family visiting and the like against the command of the First Amendment that no one need bow to the religious beliefs of another. There is in this realm no room for balancing. I see no place for it in the constitutional scheme. A legislature of Christians can no more make minorities conform to their weekly regime than a legislature of Moslems, or a legislature of Hindus. The religious regime of every group must be respected—unless it crosses the line of criminal conduct. But no one can be forced to come to a halt before it, or refrain from doing things that would offend it. That is my reading of the Establishment Clause and the Free Exercise Clause. Any other reading imports, I fear, an element common in other societies but foreign to us. Thus Nigeria in Article 23 of her Constitution, after

guaranteeing religious freedom, adds, "Nothing in this section shall invalidate any law that is reasonably justified in a democratic society in the interest of defence, public safety, public order, public morality, or public health." And see Article 25 of the Indian Constitution. That may be a desirable provision. But when the Court adds it to our First Amendment, as it does today, we make a sharp break with the American ideal of religious liberty as enshrined in the First Amendment.

The State can, of course, require one day of rest a week: one day when every shop or factory is closed. Quite a few States make that requirement.[7] Then the "day of rest" becomes purely and simply a health measure. But the Sunday laws operate differently. They force minorities to obey the majority's religious feelings of what is due and proper for a Christian community; they provide a coercive spur to the "weaker brethren," to those who are indifferent to the claims of a Sabbath through apathy or scruple. Can there be any doubt that Christians, now aligned vigorously in favor of these laws, would be as strongly opposed if they were prosecuted under a Moslem law that forbade them from engaging in secular activities on days that violated Moslem scruples?

There is an "establishment" of religion in the constitutional sense if any practice of any religious group has the sanction of law behind it. There is an interference with the "free exercise" of religion if what in conscience one

---

[7] Or the State may merely fix a maximum hours' limitation in other terms, either for particular classes of employees, particular classes of employment, or straight across the board. See laws and decisions gathered in 1 & 2 CCH Labor Law Reporter, State Laws, par. 44,500 *et seq.* On argument, there was much made over the desirability of fixing a single day for rest, either on grounds of administrative convenience or on grounds of the need for leisure. In light of the history and meaning of the shared leisure of Sunday, this aim still has religious overtones. Cf. *Joseph Burstyn, Inc.,*. v. *Wilson,* 343 U. S. 495, 505.

can do or omit doing is required because of the religious scruples of the community. Hence I would declare each of those laws unconstitutional as applied to the complaining parties, whether or not they are members of a sect which observes as its Sabbath a day other than Sunday.

When these laws are applied to Orthodox Jews, as they are in No. 11 and in No. 67, or to Sabbatarians their vice is accentuated. If the Sunday laws are constitutional, kosher markets are on a five-day week. Thus those laws put an economic penalty on those who observe Saturday rather than Sunday as the Sabbath. For the economic pressures on these minorities, created by the fact that our communities are predominantly Sunday-minded, there is no recourse. When, however, the State uses its coercive powers—here the criminal law—to compel minorities to observe a second Sabbath, not their own, the State undertakes to aid and "prefer one religion over another"—contrary to the command of the Constitution. See *Everson* v. *Board of Education, supra*, 15.

In large measure the history of the religious clause of the First Amendment was a struggle to be free of economic sanctions for adherence to one's religion. *Everson* v. *Board of Education, supra*, 11–14. A small tax was imposed in Virginia for religious education. Jefferson and Madison led the fight against the tax, Madison writing his famous Memorial and Remonstrance against that law. *Id.*, 12. As a result, the tax measure was defeated and instead Virginia's famous "Bill for Religious Liberty," written by Jefferson, was enacted. *Id.*, 12. That Act provided: [8]

> "That no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or burthened in his body or goods, nor shall other-

[8] 12 Hening, Stat. Va. (1823), p. 86.

wise suffer on account of his religious opinions or belief . . . ."

The reverse side of an "establishment" is a burden on the "free exercise" of religion. Receipt of funds from the State benefits the established church directly; laying an extra tax on nonmembers benefits the established church indirectly. Certainly the present Sunday laws place Orthodox Jews and Sabbatarians under extra burdens because of their religious opinions or beliefs. Requiring them to abstain from their trade or business on Sunday reduces their work-week to five days, unless they violate their religious scruples. This places them at a competitive disadvantage and penalizes them for adhering to their religious beliefs.

"The sanction imposed by the state for observing a day other than Sunday as holy time is certainly more serious economically than the imposition of a license tax for preaching," [9] which we struck down in *Murdock* v. *Pennsylvania*, 319 U. S. 105, and in *Follett* v. *McCormick*, 321 U. S. 573. The special protection which Sunday laws give the dominant religious groups and the penalty they place on minorities whose holy day is Saturday constitute, in my view, state interference with the "free exercise" of religion.[10]

---

[9] Pfeffer, Church, State, and Freedom (1953), p. 235.

[10] ". . . assuming that the idle Sunday is an 'institution' of Christianity, does a statute which for that reason requires men to be idle on Sunday give a preference to one particular religion? How can it be maintained that it does not, unless a similar institution of every other religion be honored with like recognition? As to the individual aspect of the case, if the law is to assist Christianity by making idleness compulsory on its sacred day, thereby presumably commending it to those who reject it, and strengthening its hold upon its devotees, is there not a 'preference' given to a religion, unless the Hebrew and all other faiths have a like recognition extended to their sacred days? And as to the social aspect, assuming that it is an advantage to have other people kept extraordinarily quiet while we pray, and to have

I dissent from applying criminal sanctions against any of these complainants since to do so implicates the States in religious matters contrary to the constitutional mandate.[11] Reverend Allan C. Parker, Jr., Pastor of the

an especial 'peace' established by law on the day we select for public worship, and that we have the right to prevent our neighbor from earning his living at a certain time because the practice of his avocation interferes with our religious exercises, must it not be called a 'preference' to do all this for the Christian's benefit, and not to do it for the benefit of the followers of Moses, or Mahomet, or Confucius or Buddha?" Ringgold, Legal Aspects of the First Day of the Week (1891), pp. 68–69.

[11] It is argued that the wide acceptance of Sunday laws at the time of the adoption of the First Amendment makes it fair to assume that they were never thought to come within the "establishment" Clause, and that the presence in the country at that time of large numbers of Orthodox Jews makes it clear that those laws were not thought to run afoul of the "free exercise" Clause. Those reasons would be compelling if the First Amendment had, at the time of its adoption, been applicable to the States. But since it was then applicable only to the Federal Government, it had no possible bearing on the Sunday laws of the States. The Fourteenth Amendment, adopted years later, made the First Amendment applicable to the States for the first time. That Amendment has had unsettling effects on many customs and practices—a process consistent with Jefferson's precept "that laws and institutions must go hand in hand with the progress of the human mind." 15 The Writings of Thomas Jefferson (Memorial ed. 1904), p. 41.

Moreover, there is solid evidence to suggest that the Jewish population of our Nation was then minuscule. "Despite the roseate estimates of some Jewish writers on the subject, it is safe to say there were never more than one thousand Jews living among the three million and more inhabitants of the colonies. The Newport community in its heyday totaled at most one hundred and fifty to one hundred and seventy-five Jews. Perhaps New York had as many, or more. Philadelphia, Charleston and Savannah were certainly smaller communities. Even when combining their Jewish populations with the lonely groups in the back county, we still are far from an impressive total." Goodman, American Overture: Jewish Rights in Colonial Times (1947), p. 3.

South Park Presbyterian Church, Seattle, Washington, has stated my views:

"We forget that, though Sunday-worshiping Christians are in the majority in this country among religious people, we do not have the right to force our practice upon the minority. Only a Church which deems itself without error and intolerant of error can justify its intolerance of the minority.

"A Jewish friend of mine runs a small business establishment. Because my friend is a Jew his business is closed each Saturday. He respects my right to worship on Sunday and I respect his right to worship on Saturday. But there is a difference. As a Jew he closes his store voluntarily so that he will be able to worship his God in his fashion. Fine! But, as a Jew living under Christian inspired Sunday closing laws, he is required to close his store on Sunday so that I will be able to worship my God in my fashion.

"Around the corner from my church there is a small Seventh Day Baptist church. I disagree with the Seventh Day Baptists on many points of doctrine. Among the tenets of their faith with which I disagree is the 'seventh day worship.' But they are good neighbors and fellow Christians, and while we disagree we respect one another. The good people of my congregation set aside their jobs on the first of the week and gather in God's house for worship. Of course, it is easy for them to set aside their jobs since Sunday closing laws—inspired by the Church— keep them from their work. At the Seventh Day Baptist church the people set aside their jobs on Saturday to worship God. This takes real sacrifice because Saturday is a good day for business. But that is not all—they are required by law to set aside

their jobs on Sunday while more orthodox Christians worship.

". . . I do not believe that because I have set aside Sunday as a holy day I have the right to force all men to set aside that day also. Why should my faith be favored by the State over any other man's faith?" [12]

With all deference, none of the opinions filed today in support of the Sunday laws has answered that question.

---

[12] 56 Liberty, January-February 1961, No. 1, pp. 21–22.